RECEIPT # _74943_
AMOUNT $ _250 a 100_
SUMMONS ISSUED_ Y 2_
LOCAL RULE 4.1_____
WAIVER FORM _____
MCF ISSUED_____
BY DPTY. CLK._____
DATE _____ _9-11-06_

# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

JOE W. KUEFLER, Individually and on )  No.
Behalf of All Others Similarly Situated )
                                        )
                      Plaintiff,        )                MAGISTRATE JUDGE
                                        )
                                        )    **CLASS ACTION COMPLAINT**
            vs.                         )
                                        )
WEBLOYALTY.COM, INC. and                )
FANDANGO, INC. d/b/a FANDANGO.COM,      )
                                        )    **JURY TRIAL DEMAND**
                      Defendants.       )
                                        )
_____ )

Plaintiff Joe E. Kuefler ("Plaintiff"), individually and on behalf of all others similarly situated, files this Class Action Complaint against defendants Webloyalty, Inc. ("Webloyalty") and Fandango, Inc. d/b/a Fandango.com ("Fandango") (collectively "Defendants"), and alleges as follows:

## INTRODUCTION

1.      Plaintiff brings this class action to remedy the harm caused by Webloyalty's "Coupon Click Fraud" scheme. This scheme involves the fraudulent and deceptive sale of its "Reservation Rewards" discount products to unwitting consumers who make legitimate online purchases from various web retailers, including Fandango, and the unauthorized transfer of private credit and debit card account information by the web retailer to Webloyalty.

2.      When consumers enter into online transactions with one of Webloyalty's 75 or more e-commerce clients, including defendant Fandango, a "pop-up" window appears on the consumer's computer screen that promises a $10 cash back reward from the web retailer on the consumer's next purchase. Once the consumer clicks the "pop-up" window and enters their e-mail address to redeem their free $10 discount, their personal information, including their credit or debit card number, is automatically transferred to Webloyalty. Webloyalty then automatically bills the consumer's credit card a flat monthly fee of up to $10.00 for a membership in its "discount club" on a purported 30-day trial basis. Webloyalty then completes its "bait and switch" by using a "negative option" sales tactic whereby it allegedly e-mails consumers to notify them that they can only cancel their "membership" by contacting Webloyalty within 30 days, or they will be charged a recurring monthly membership fee on their credit or debit card account.

3.      Consumers' credit or debit accounts are then billed month after month for this "membership program," of which consumers had no knowledge and never accepted. To add insult to injury, the "membership program" does not provide consumers with any benefit whatsoever.

4.      Webloyalty retains the consumer payments and then pays its web retailer clients, such as the co-defendant, Fandango, a "per customer" fee for each consumer who allegedly "signs up," resulting in substantial revenues for both Webloyalty and its clients.  Hundreds, if not thousands, of consumers have complained to Webloyalty and local, state and federal consumer protection agencies about the deceptive nature of its sales of its "Reservation Rewards" discount club product and its unauthorized access to their credit card information.  Despite these complaints, Webloyalty continues to automatically enroll new consumers in its Reservation Rewards discount club and to charge these consumers' credit and debit card accounts for its Reservation Rewards product.

5.      Plaintiff, individually and on behalf of a class of similarly situated individuals, brings claims for violations of the Electronic Communications Privacy Act – Interception of Electornic Communications, 18 U.S.C. §2510, *et seq.* (the "ECPA"), unfair and deceptive acts and practices, unjust enrichment, invasion of privacy, money had and received, and civil theft.

## JURISDICTION AND VENUE

6.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because it arises under the laws of the United States, specifically 18 U.S.C. §2510, *et seq.*  The Court also has subject matter jurisdiction pursuant to 28 USC §1332(d)(2) because this matter is a class action with an amount in controversy that exceeds $5,000,000, there are thousands of class members, and members of the class of plaintiffs are citizens of a State different from Defendants.

7.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and (c) because a substantial part of the events or omissions giving rise to the claims occurred in this District and because Defendants are subject to personal jurisdiction in this District.

## THE PARTIES

8.      Plaintiff is an individual who resides in Stow, Massachusetts and is a citizen of Massachusetts.

9.     Webloyalty is a Connecticut corporation with a principal place of business at 101 Merritt 7, Seventh Floor, Norwalk, Connecticut.   Webloyalty is a citizen of Connecticut. Webloyalty has significant minimum contacts with the Judicial District of Massachusetts and all fifty states in the United States.   Webloyalty purports to be in the business of providing marketing programs to e-commerce web sites, online communities and internet service providers.   In reality, however, Webloyalty is in the business of collecting fees from consumers and not providing promised discount coupons.  As a result of Webloyalty's "business" practice of charging consumers \$9.00 to \$10.00 for nothing, Webloyalty was able to generate revenues of \$108.6 million for Fiscal Year 2005, and achieved a compound annual growth rate of over 90% for the past three years.

10.     Fandango is a California corporation with a principal place of business at 12200 West Olympic Blvd, Suite 150, Los Angeles, California. Fandango is a citizen of California.  Fandango has significant minimum contracts with the Judicial District of Massachusetts and all fifty states in the United States.  Fandango is an internet movie ticketing service that sells movie tickets to theaters and cinemas across the nation.

## FACTUAL BACKGROUND

### Webloyalty's Coupon Click Fraud Scheme

11.     At all times material hereto, Webloyalty entered into contracts with online e-commerce retail companies including co-defendant, Fandango, in an effort to sell its suite of products to unknowing customers. One of Webloyalty's subscription-based products that generates repeat monthly fees is called "Reservation Rewards."  Webloyalty claims that Reservation Rewards is an entertainment and travel protection program promising "top attraction" discounts, dining discounts, movie ticket discounts, shopping and service discounts, hotel over-booking protection, baggage delay and loss protection, travel delay protection and 24-hour road and tow protection.

12.    Webloyalty enters into contracts with web retailers for access to consumers' information, including their private credit and debit card account information, during online transactions. As part of its agreements with its 75 plus web retailers (which include, or included during the relevant time period, such popular web sites as Fandango, Classmates.com, EBGames.com, Priceline.com, Drugstore.com and UBID.com) Webloyalty, or an entity or agent acting on its behalf, is allowed to post a "pop-up" window offering a $10 cash back reward as part of a consumer's on-line transaction. According to its standard practices, the "pop-up" window provides a "Continue" button for the consumer to click to proceed through checkout. The following statement appears above the "Continue" button: "Your purchase is complete. Click here to claim your $10.00 Cash Back Reward on your next purchase.!"    The following statement appears below the "Continue" button: "By clicking above, you can claim your reward from the reward provider, Reservation Rewards."

13.    In marketing this program to its web retailer clients, Webloyalty advised its clients, including Fandango, to "simply place a banner like this on your confirmation page alerting the customer to the Free Thank You Gift."

14.    Based on Webloyalty's actual sales practices, consumers were either not provided with a "pop-up" window to click their acceptance or, upon clicking the "Continue" button in a "pop-up" window and entering their e-mail address to redeem their "coupon," were deemed to have been immediately and surreptitiously enrolled in Webloyalty's Reservation Rewards membership club. In this way, consumers attempting to complete online transactions are unwittingly baited into purchasing Webloyalty's "product" and their private credit and debit account information is automatically transferred to Webloyalty by the retailer, without the consumer's knowledge or consent.

15.     At no time prior to being deemed enrolled in Webloyalty's subscription membership club are consumers told essential and material terms such as what Reservation Rewards is, the price of the "membership," the benefits offered by a Reservation Rewards membership or how to use such a "membership," and, most importantly, that their private credit and debit card account information will be automatically transferred to Webloyalty.

16.     Through the use of its "Coupon Click Fraud" scheme, Webloyalty has enrolled, and continues to enroll, thousands of consumers nationwide into its Reservation Rewards program in the same and similar manner and its web retailer clients continue to reap the financial benefits from actively participating in the scheme.

17.     Despite Webloyalty's representations, its "pop-up" window does not constitute a valid offer that consumers can accept and be deemed to have agreed to purchase a membership in Reservation Rewards.  to the contrary, the "pop-up" window is designed to intentionally mislead consumers into believing that it is part of the normal check-out process and that they will receive a free coupon to be used for their next purchase.  In fact, there is no free coupon since a consumer is automatically enrolled in a club membership with a monthly recurring charge.

18.     Additionally, neither Webloyalty nor the web retailer provide legitimate and accurate disclosures to consumers describing the "product" being offered by Webloyalty, the recurring cost of the "product," and the fact that the consumer's private credit and debit card information will be automatically transferred by the web retailer to Webloyalty.

19.     During these transactions, Webloyalty electronically accesses consumers' personal information, including their credit and debit card account numbers, which are transferred from the web retailer (in this case, Fandango.com) to Webloyalty without a consumer's knowledge or consent.   At no point in the transaction are consumers informed by Webloyalty.com or

- 5 -

Fandango.com that their credit card information is being provided to a third party so that their credit cards can be automatically debited by that third-party.

20.    After the credit card and e-mail information is obtained, Webloyalty claims to send consumers an e-mail notifying them that if their "membership" is not canceled within 30 days they will be charged for the membership on a monthly basis. More often than not, such e-mails are typically recognized as "spam" that is disregarded, automatically filtered out of the consumer's e-mail box, or ignored. While Webloyalty considers a consumer's failure to respond to its "negative option" e-mail to be acceptance of the membership, such a practice is deceptive, unfair and illegal.

21.    Webloyalty has designed its negative option e-mails in a manner calculated to cause them to be deleted as spam, and this additional deception is part and parcel of its perpetration of its Coupon Click Fraud scheme.

22.    Webloyalty and many of its retail clients, including Fandango, have received hundreds, if not thousands, of consumer complaints challenging the legitimacy of the automatic enrollment and recurring monthly charges and have received thousands of requests for refunds. Webloyalty is also the subject of a Connecticut Better Business Bureau (the "BBB") Reliability Report condemning its deceptive marketing and sales practices and for unauthorized consumer credit card charges. In its report, the BBB cites the numerous consumer complaints that it has received, and Webloyalty's failure to correct its sales and marketing practices.

### Plaintiff's Involvement with Fandango and Webloyalty

23.    On December 25, 2005, Plaintiff went "on-line" to Fandango's website to purchase movie tickets. Using his Visa credit card, Plaintiff made two purchases of movie tickets for $29.25 and $7.25. To proceed through the purchasing process, Plaintiff provided Fandango with personal information including his name, his credit card number and its expiration date. These internet

- 6 -

transactions were posted to Plaintiff's Visa credit card account on December 26, 2005, as demonstrated here:

| Posting Date | Transaction Date | Ref # | Card Type | Category | Transactions | Charges | Credits (CR) |
|---|---|---|---|---|---|---|---|
| 12/27/2005 | 12/23/2005 | 5870 | VS | C | HMSHOST-SMF-AIR #00 - SACRAMENTO CA | $19.08 | |
| 12/27/2005 | 12/23/2005 | 1328 | VS | C | CHEVRON 00096784 - SACRAMENTO CA | $20.25 | |
| 12/27/2005 | 12/23/2005 | 4439 | VS | C | IN-MOTION/ALTITUNES - 877-383-8540 FL | $43.09 | |
| 12/27/2005 | 12/24/2005 | 0009 | VS | C | MASSPORT AUTH LOGAN PK - 617-5611633 MA | $88.00 | |
| 12/27/2005 | 12/25/2005 | 1549 | VS | C | CVS PHARMACY #1181 Q03 - DANVERS MA | $32.19 | |
| 12/27/2005 | 12/26/2005 | 0564 | VS | C | LOEWS CINEPLEX - FANDANGO.COM MA MAIL/PHONE | $7.25 | |
| | | | | | 408465397 | | |
| 12/27/2005 | 12/26/2005 | 1034 | VS | C | LOEWS CINEPLEX - FANDANGO.COM MA MAIL/PHONE | $29.25 | |
| | | | | | 408448087 | | |
| 12/28/2005 | 12/26/2005 | 6163 | VS | C | CVS PHARMACY #1181 Q03 - DANVERS MA | $9.68 | |
| 12/28/2005 | 12/26/2005 | 3980 | VS | C | MANDARIN DANVERS - DANVERS MA | $50.24 | |
| 12/28/2005 | 12/27/2005 | 6057 | VS | C | VER VERIZONWRLS ECARS - 888-466-4646 CA MAIL/PHONE | $52.50 | |
| | | | | | 47195839 | | |

24.    During the online transaction, Plaintiff was presented with the following "pop-up" window stating "Your purchase is complete. Click here to claim your $10.00 Gift Voucher for your next purchase." The "pop-up" window contained a "Continue" button. Plaintiff was never informed by either Webloyalty or Fandango that this "pop-up" was an offer to purchase something or that clicking on it would cause his private credit card information to be transmitted to Webloyalty. To complete his movie ticket purchases and to check out, Plaintiff clicked "Continue."



25.    Two months later, in February 2006, while reviewing his monthly Visa card statement, Plaintiff discovered a $10.00 charge posted January 24, 2006 for "WLI Reservation Rewards" along with a toll free number and a description of "mail/phone," as demonstrated here:

| Posting Date | Transaction Date | Ref# | Card Type | Category | Transactions | Charges | Credits (CR) |
|---|---|---|---|---|---|---|---|
| 01/25/2006 | 01/24/2006 | 3460 | VS | C | STARBUCKS USA 00074500 - BEVERLY MA | $7.40 | |
| 01/25/2006 | 01/24/2006 | 3520 | VS | C | STARBUCKS USA 00008458 - MARLBOROGH MA | $11.84 | |
| 01/26/2006 | 01/24/2006 | 2653 | VS | C | MCDONALD'S F1865 - BEDFORD MA<br>08346281866V16X7000000098 | $11.40 | |
| 01/26/2006 | 01/24/2006 | 2912 | VS | C | WLI RESERVATIONREWARDS - 800-732-7031 CT  MAIL/PHONE<br>88284117 | $10.00 | |
| 01/26/2006 | 01/24/2006 | 9261 | VS | C | SUNOCO SVC STATION - BEVERLY MA<br>02530301015862 | $56.19 | |
| 01/26/2006 | 01/25/2006 | 8505 | VS | C | LL BEAN MAILORDER VISA - 800-3414341 ME  MAIL/PHONE<br>006012534941 | $4.00 | |
| 01/27/2006 | 01/25/2006 | 6779 | VS | C | RITZ CAMERA #377 - MARLBOROUGH MA | $17.66 | |
| 01/27/2006 | 01/25/2006 | 2305 | VS | C | SHAW'S MARKET 552 - STOW MA<br>08578320552SC1Y7000352786 | $20.00 | |

26.    Prior to this charge appearing on his credit card statement, Plaintiff had never heard of "WLI Reservation Rewards," had not agreed to purchase any product called "Reservation Rewards" and had not allowed his personal information including his credit card account number to be provided by Fandango to Webloyalty for the purchase of "Reservation Rewards."

27.    As demonstrated above, Fandango never notified or disclosed to Plaintiff that his personal credit card account information was being transferred to Webloyalty, or that he was being enrolled in Webloyalty's Reservation Rewards program for a monthly fee. In addition, Fandango never disclosed to Plaintiff that it was receiving a financial benefit from Webloyalty for transferring Plaintiff's private information to Webloyalty.

## Confidential Witnesses

28.    Plaintiffs' allegations herein are based upon, in part, interviews with former Webloyalty employees. Throughout the course of the investigation into Defendants' unfair and deceptive business practices, former employees provided information regarding both the illegal Reservation Reward membership fees and the policies of Webloyalty concerning responding to

complaints. Indeed, Webloyalty armed its customer service representatives with prepared scripts to deal with inevitable complaints.

29.     Among those interviewed in the course of the investigation of the wrongful business practices complained of herein were numerous former Customer Service Representatives, a Customer Service Representative "Lead," a Supervisor of Webloyalty's Customer Service Department, and a Quality Assurance Analyst at Webloyalty, each of whom were employed by Webloyalty during the Class Period.

30.     A former Webloyalty Customer Service Representative "Group Lead," employed by Webloyalty from July 2000 until December 2003 at its Norwalk, CT headquarters and then its Shelton, CT headquarters, described his/her position as Group Lead as being a "primary point of contact to resolve escalated issues" and also to maintain the "e-mail queue." During his/her employment with Webloyalty, "every issue was escalated" insofar as "[t]here were few and far between customers that were not upset." This individual further explained that retail websites that offered Webloyalty memberships, such as Fandango, "got a percentage of each member." As a result, refunds and cancellations "has to be tracked [by Webloyalty] for purposes" of compensating marketing partners, such as Fandango. In addition, this former employee explained that complaints received about Webloyalty from the BBB were so rampant that the company had to designate people to handle the BBB complaints. Moreover, according to this former employee, customer service representatives often got in trouble for not using company-designated scripts for handling customer complaints. This former employee was unwilling to use the scripts because he/she believed that Webloyalty "was trying to pull the wool over the customers' eyes."

31.     Another former employee worked for Webloyalty as a Customer Service Representative from February 2004 through May 2005. According to this individual, Webloyalty

generated customers who did not know they were signing up to be customers or be billed by Webloyalty. If people entered their e-mail address into a "pop-up" relating to a rebate or discount offer after purchasing something from an online retailer, such as Plaintiff, that was all that was needed to sign them up as Webloyalty customers. Consumers would never know that they were actually transferring their private information to Webloyalty. This former employee further explained that the benefits of the Webloyalty programs that people were paying for "were not really benefits."

32. Among other things, the Webloyalty programs offered people coupons worth less than what the people were paying in membership costs each month. In addition, this former employee explained that "[s]ome people were [Webloyalty] members for years and didn't know about it."

33. This former employee noted that because the job of a customer service representative was principally to take abuse from customers who had unwittingly signed up for Webloyalty and had been billed monthly without their knowledge (each customer service representative answered approximately 50-70 calls daily, only two of which could be categorized as positive or neutral), there was tremendously high turnover among the customer service representatives. This customer service representative confirmed that Webloyalty required customer service representatives to follow a script verbatim when responding to consumer complaints. Interestingly, this customer service representative had inadvertently fallen victim to Webloyalty himself/herself a few years before working there after buying music from ColumbiaHouse.com. He/she had eventually obtained a refund (after losing more than $200 in overdraft/insufficient fund charges), but did not know the company that scammed him/her was Webloyalty. This former employee also described how, in 2005, Webloyalty shifted to a new, less customer-friendly script. Previously, the first step in the

- 10 -

script for dealing with an unhappy customer was to offer at least a partial refund. The new script in early 2005 instructed Customer Service Representatives to initially offer only to cancel the customer's service and stop billing, rather than granting any refund. At this stage the script indicated that the customer will still enjoy access to the site for the remainder of the billing period, even though billing is halted. Only if the customer complains at this stage and insists on a refund can the Customer Service Representative offer a refund of one month's worth of payments. Then the customer has to demand a refund of all the payments before the Customer Service Representative can grant a full refund. The script for a full refund says that it is not Webloyalty's normal procedure to provide a full refund, but in this customer's case, Webloyalty will make an exception and grant a full refund. The former employee confirmed, however, that this script was a lie; the granting of full refunds when demanded was "very much a normal procedure." This 2005 script was effectively a "retention script" even though Webloyalty claimed it was not. The idea was to give the Customer Service Representative two or three rebuttal opportunities before processing a full refund.

34. Another former employee also worked as a Customer Service Representative in Webloyalty's Shelton, CT headquarters in 2003. This former employee's duties were to answer incoming calls from customers routed to his/her through an electronic queue. These calls concerned three varieties of products and services offered by Webloyalty: Reservation Rewards, Travel Plus, and a third offering. According to this former employee, nearly every call he/she received was from people wanting to cancel their membership and people who were unaware that they were members or how they became enrolled in these programs. Customer Service Representatives had scripts that they used to interact with customers, he/she explained. If customers complained or demanded interaction beyond what the scripts permitted, Customer Service "escalated" the call to the Lead Customer Service Representative to better explain to the customer how they became a member. This

former employee explained that most callers to the customer service center "were not aware they were members." If customers visited Classmates.com or Fandango.com, for example, and clicked on something, they automatically became members. In addition, this former employee asked people at Webloyalty how people signed up for Webloyalty programs, and was told that people signed up without realizing it.

35. Another former employee is also a former Webloyalty Customer Service Representative who worked in Shelton, CT. As this former employee described it, "99% of the people calling were calling to cancel their membership" because "[a] lot of the people didn't know they were going to be charged." This former employee stated that the volume of calls into the customer service department seeking cancellations was "so high" and that he/she probably received "well over 100 calls a day" from customers seeking to cancel their Webloyalty membership. He/she used prepared scripts to respond to consumer complaints. In addition, this former employee explained that Webloyalty "could not keep track of how many people canceled memberships because there were just too many." He/she opined that "if you're doing thousands of cancellations a day, people should be getting suspicious." He/she concluded by stating that he/she "knew a lawsuit would happen one day" over people unknowingly being charged for Webloyalty memberships.

36. Yet another former Webloyalty Customer Service Representative in Shelton, CT provided details concerning the company's business practices. This former employee specifically resigned from Webloyalty employment because he/she "didn't like the way the Company worked – charging people without them knowing." As a Customer Service Representative, this former employee received calls from Webloyalty customers, and was given two different scripts to employ for customer calls – one script for cancellations and one script for refunds or credits. He/she described the scripts as requiring Webloyalty Customer Service Representatives to "use some words

over and over again." In fact, according to this former employee (and confirming what others have described), "if you didn't read the script right, you got in trouble." That is, "[i]f you didn't get the script right at least 98% of the time, you were in trouble." As other former employees have described, this individual believes that 99% of the calls he/she received were from customers seeking a refund for charges to their credit card.

37.    In addition, a former Webloyalty Customer Service Supervisor, who worked for Webloylaty from August 2000 through February 2005, described the hierarchy in the call center at Webloyalty as follows:



Directors

Assistant Director

Supervisor

Lead Customer Service Representative

Customer Service Representative

38.    This former employee stated that the call center was typically so busy that Lead Customer Service Representatives had to take calls from customers and did not have much time to do anything else except take escalated calls from the representatives they supervised. He/she confirmed that 99% of calls received were from customers canceling their memberships and complaining that they had not intentionally signed up for any services from Webloyalty. Some consumers complained that Webloyalty "was taking food out of their kids' mouths," or had "stolen

- 13 -

their money," and others called up just crying. Customer Service Representatives were trained to respond to the consumer that "they had approved [the monthly charge] by putting their e-mail address twice" into a "pop-up" window. Importantly, this former employee described how Webloyalty's upper management was well aware of the shenanigans at the company insofar as they held weekly meetings at headquarters where, among other things, they listened to recordings of calls from consumers, virtually every one of which was from an angry customer wanting to cancel their service and get a refund.

39.     Finally, a former Quality Assurance Analyst for Webloyalty from 2001 to 2004 who explained that his/her job function was to record and listen to customer service representative conversations with customers to see how consistent those contacts were with company standards. This former employee further explained that the Webloyalty call center was a "scripted environment" and that Quality Analysts such as him/her were in charge of monitoring "script consistency." The Quality Analyst graded the representative based on, among other things, how well they followed the script. When listening to calls, this witness typically heard customers ask how they had gotten signed up for a Webloyalty service and then the customers immediately demanded a refund. This former employee knew that consumers were signed up for a membership by Webloyalty without knowing it. That is, if a consumer went to the website of a Webloyalty partner such as Classmates.com, a rebate offer would come up, and that, if the consumer accepted the rebate offer, they were automatically signed up for Webloyalty membership, and if the consumer did not cancel their membership within 30 days, the would get monthly charges on their credit card statements. Interestingly, this former employee described how customer service representatives at Webloyalty were required to keep their calls within three to four minutes in length, and that if the call went on for longer than that, a flag would comes up on the Supervisor's monitor. The reason

- 14 -

given for this practice, according to this former employee, was that the script only took that long and if the call went longer other calls may not be answered and the representative would be "off script." In addition, this former employee confirmed that Webloyalty management attending weekly meetings in Shelton, CT where Quality Analysts, including this former employee, played recordings of calls with customers canceling their service and demanding refunds.

## CLASS ACTION ALLEGATIONS

40.     Plaintiff brings this action on behalf of a class of all other persons or entities similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiff seeks to certify the following classes:

(a)     all persons or entities whose personal and/or credit card information was accessed by Webloyalty during online transactions with Fandango as part of Webloyalty's sales of its Reservation Rewards product; and

(b)     all persons or entities who were charged fees for a "Reservation Rewards" membership when purchasing a product or service online from Fandango whose fees were not refunded in full, with interest, by Webloyalty.

41.     The class period is limited to the applicable statute of limitations for the claims at issue.

42.     There are questions of law and fact that are common to all members of the purported class, which questions predominate over any questions affecting only individual class members.

43.     The principal common issues include the following:

(a)     whether Defendants wrongfully accessed Plaintiff's and the Class members' confidential credit card information;

- 15 -

(b)     whether Defendants are liable under the ECPA for accessing, intercepting, and/or transmitting personal and private information of Plaintiff and Class members electronically communicated over the Internet and/or contained on their computers, or using a device to do so;

(c)     whether Fandango is liable under the ECPA for intentionally disclosing to Webloyalty and/or using Plaintiff's and the Class' electronic communications;

(d)     whether Defendants have violated and are violating the ECPA;

(e)     whether Fandango aided and abetted or conspired with Webloyalty to violate the ECPA;

(f)     whether Plaintiffs and the Class are entitled to damages provided for under 18 U.S.C. §2520;

(g)     whether the manner in which Webloyalty routinely and systematically promoted the Reservation Rewards product during consumer online transactions with web retailers constituted a valid contractual offer as a matter of law to Plaintiff and the Class;

(h)     whether Defendants can establish Plaintiff's and the Class members' acceptance of any so-called offer to purchase its Reservation Rewards membership;

(i)     whether Webloyalty induced its web retailer clients to breach its contracts with Plaintiff and the Class members by obtaining their credit card information without their prior authority or consent;

(j)     whether Webloyalty committed unfair and deceptive acts and practices in charging Plaintiff and the Class for the "Reservation Rewards" product, and whether Fandango committed unfair and deceptive acts and practices in accepting a percentage of fees charged by Webloyalty for the "Reservation Rewards" product;

(k)     whether Defendants have been unjustly enriched at the expense of Plaintiff and the Class;

(l)     whether Defendants are liable to Plaintiff and the Class for money had and received; and

(m)     whether Plaintiff and the Class are entitled to injunctive relief.

44.     In this case there is no question as to the identification of class members because Defendants have a database of consumers who they contend are their customers to whom they have assessed charges or conspired to assess charges on their credit cards. There is also no issue as to the amount of the Class members' damages because the charges assessed by Defendants are contained in their records.

45.     The claims of Plaintiff are typical of the claims of all the members of the purported class because all claims are based on the same legal and remedial theories.

46.     Plaintiff will fairly and adequately protect the interests of all purported class members in the prosecution of this action and in the administration of all matters relating to the claims stated herein. Plaintiff is similarly situated with, and has suffered similar injuries as, the members of the purported class that he seeks to represent. Plaintiff believes that he has been wronged, wishes to obtain redress of the wrong and wants Defendants stopped from reaping ill gotten gains. To that end, Plaintiff has retained counsel experienced in class action cases and trial work in general. Neither Plaintiff, nor counsel, have any interest that may cause them to not vigorously pursue this action.

47.     Plaintiff brings this action under Rule 23(b)(3) because common questions of law and fact (identified in paragraph 43 above) predominate over questions of law and fact affecting individual members of the Class. Indeed, the predominant issues in this action are whether

Defendants are violating and have violated the law by charging consumers nationwide for the Reservation Rewards program. In addition, the expense of litigating each Class member's claim individually would be so cost prohibitive as to deny Class members a viable remedy. Certification under Rule 23(b)(3) is appropriate because:

        (a)     the individual class members may not be aware that they have been wronged and are thus unable to prosecute individual actions;

        (b)     the amount of money Defendants have wrongfully charged each Class member, sums presumably under $300, does not justify individual lawsuits;

        (c)     concentration of the litigation concerning this matter in this Court is desirable;

        (d)     the claims of the representative Plaintiff are typical of the claims of the members of the purported class;

        (e)     a failure of justice will result from the absence of a class action; and

        (f)     the difficulties likely to be encountered in the management of this class action are not great.

48. Plaintiff also brings this action under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to all members of the Class, thereby making final injunctive relief concerning the Class as a whole appropriate. In the absence of appropriate injunctive relief, Webloyalty will continue to unlawfully charge consumers for the illegal Reservation Rewards program and Defendants will both continue to collect fees stemming from the same activity. Defendants' uniform conduct towards Plaintiff and the other members of the Class makes certification under Rule 23(b)(2) appropriate.

49. The putative Class is so numerous as to make it impracticable to join all members of the class as plaintiffs. Webloyalty has uniformly accessed Class members' credit card accounts to

assess its fees and Fandango has aided and abetted or conspired with Webloyalty to do so. Because the charge is small (either $9 or $10 per month) many class members may not even be aware of the extent of Defendants' wrongdoing and the amount in controversy would be too small to justify the expense of individual litigation in state court. In contrast, on a class-wide basis, Defendants have reaped huge monetary gains by uniformly and systematically debiting class members' credit card accounts.

## CAUSES OF ACTION

### COUNT I
### (Violation of Title I of the Electronic Communications Privacy Act)

50.    Plaintiff repeats and realleges the allegations contained in each of the preceding paragraphs as if fully set forth herein.

51.    Communications by Plaintiff and the Class between their computers and any other entity, including a web retailer over the Internet are "electronic communications" affecting interstate commerce as defined in 18 U.S.C. §2510.

52.    Defendants Webloyalty and Fandango, either directly or by aiding, abetting and/or conspiring to do so, have intentionally intercepted and/or procured to be intercepted Plaintiff's and Class members' electronic communications with the web retailers from which they have made purchases without Plaintiff's of the Class members' knowledge, authorization, or consent in violation of 18 U.S.C. §2511. Defendants, either directly or by aiding, abetting and/or conspiring to do so, have also intentionally used and/or procured to be used a device to intercept the above-referenced electronic communications. Defendants, either directly or by aiding, abetting and/or conspiring to do so, have also intentionally disclosed to another person, and/or used, the contents of the above-referenced electronic communications.

- 19 -

53.     Defendants' conduct in intercepting, procuring to be intercepted, and/or using or disclosing Plaintiff's and Class members' electronic communications without their knowledge or consent was willful and intentional and was committed for the purpose of engaging in tortious deceptive behavior as set forth herein.

54.     Pursuant to 18 U.S.C. §2520, Plaintiff and each Class member is entitled to preliminary, equitable, and declaratory relief as may be appropriate, statutory damages of the greater of $10,000 or $100 a day for each day of violation, actual and punitive damages, reasonable attorneys' fees and costs, plus any profits made by each Defendant as a result of such violations of law.

55.     Plaintiff has retained the services of the undersigned attorneys who are entitled to a reasonable fee upon prevailing pursuant to 18 U.S.C. §2520(b)(3).

56.     Plaintiff seeks to obtain a pecuniary benefit for the Class in the form of all damages recoverable from Defendants pursuant to 18 U.S.C. §2520(b)(2) and (c). Plaintiff also seeks to obtain a non-pecuniary benefit for the Class in the form of injunctive relief against Defendants. Plaintiff's counsel are entitled to recover their reasonable attorneys' fees and expenses as a result of the conference of a pecuniary and non-pecuniary benefit on behalf of the Class, and will seek an award of such fees and expenses at the appropriate time.

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, prays for relief and judgment against Defendants as follows:

A.      For an order certifying the Class under the appropriate provisions of Rule 23, as well as any appropriate subclasses, and appointing Plaintiff and his legal counsel to represent the Class;

B.      Awarding damages as provided by 18 U.S.C. §2520(b)(2) and (c), including punitive damages;

C.      Awarding injunctive relief as provided by 18 U.S.C. §2520(b)(1);

D.      Awarding declaratory relief as provided by 18 U.S.C. §2520(b)(1);

E.      For pre- and post-judgment interest to the Class, as allowed by law;

F.      For reasonable attorneys' fees and costs to counsel for the Class pursuant to 18 U.S.C. §2520(b)(3), and if and when pecuniary and non-pecuniary benefits are obtained on behalf of the Class; and

G.      Granting such other and further relief as is just and proper.

## COUNT II
### (Unjust Enrichment)

57.      Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 49 as if fully set forth herein.

58.      Defendant Webloyalty has accessed and received payments from Plaintiff's and the Class members' credit and debit card accounts without authorization and thus knowingly received a benefit from Plaintiff and the Class.

59.      Defendant Fandango has received fees or "kickbacks" from Webloyalty for providing Plaintiff's and the Class' personal and private information to Webloyalty, which Webloyalty uses to charge its illegal Reservation Rewards fees and, thus, has knowingly received a benefit from Plaintiff and the Class. These fees or "kickbacks," upon information and belief, are a percentage of the fees charged by Webloyalty to Plaintiff and Class members.

60.      Defendant Webloyalty has no valid or legal basis to access and charge Plaintiff's and each Class member's credit and debit cards for fees associated with its Reservation Rewards membership club.

61.      Defendant Fandango has no valid or legal basis to accept payments from Webloyalty, which are actually payments from Plaintiff and the Class for accessing and charging Plaintiff's and

the Class members' credit and debit cards for fees associated with Webloyalty's Reservation Rewards membership club.

62.    Webloyalty has received, and continues to receive, substantial fees by charging Plaintiff and Class member credit and debit card accounts and/or using Plaintiff's and Class member personal and credit and debit information to earn money for itself.

63.    Fandango has received, and continues to receive, substantial fees from Webloyalty as a result of Webloyalty's practice of charging Plaintiff and Class member credit and debit card accounts and/or using Plaintiff's and Class member personal and credit and debit information to earn money for itself.

64.    Such fees, compensation and/or profits constitute unjust enrichment for Webloyalty and Fandango and must be disgorged.

65.    Plaintiff and members of the Class are entitled to recover from Defendants all amounts wrongfully collected and improperly retained by Defendants, plus interest thereon.

66.    As a direct and proximate result of Defendants' unjust enrichment, Plaintiff and members of the Class have suffered injury and are entitled to reimbursement, restitution and disgorgement from Defendants of the benefits conferred by Plaintiff and the Class.

67.    Plaintiff and the Class have no adequate remedy at law.

68.    Plaintiff seeks to obtain a pecuniary benefit for the Class in the form of all reimbursement, restitution and disgorgement from Defendants. Plaintiff's counsel are entitled to recover their reasonable attorneys' fees and expenses as a result of the conference of a pecuniary benefit on behalf of the Class, and will seek an award of such fees and expenses at the appropriate time.

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, prays for relief and judgment against Defendants as follows:

A.      For an order certifying the Class under the appropriate provisions of Rule 23, as well as any appropriate subclasses, and appointing Plaintiff and his legal counsel to represent the Class;

B.      Awarding reimbursement, restitution and disgorgement from Defendants of the benefits conferred by Plaintiff and the Class;

C.      For pre- and post-judgment interest to the Class, as allowed by law;

D.      For reasonable attorneys' fees and costs to counsel for the Class if and when pecuniary benefits are obtained on behalf of the Class; and

E.      Granting such other and further relief as is just and proper.

## COUNT III
### (Invasion of Privacy)

69.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 49 as if fully set forth herein.

70.     Plaintiff and the Class have a reasonable expectation of privacy concerning their internet communications.

71.     Defendants have for their own commercial gain committed a serious and offensive intrusion upon the privacy of Plaintiff and the Class by wrongfully accessing, disclosing, communicating and sharing their private credit and debit card account information and other personal information.

72.     Plaintiff and the Class did not voluntarily authorize or consent to the accessing, disclosing, communicating or sharing of their private credit and debit card account information and other personal information, all of which would be highly offensive to a reasonable person.

73.     Plaintiff and the Class have been injured and damaged by the Defendants' conduct.

74.     Pursuant to common law, Plaintiff and the Class are entitled to the relief requested below as appropriate.

75.     Plaintiff seeks to obtain a pecuniary benefit for the Class in the form of all actual and consequential damages recoverable from Defendants.  Plaintiff also seeks to obtain a non-pecuniary benefit for the Class in the form of injunctive relief against Defendants.  Plaintiff's counsel are entitled to recover their reasonable attorneys' fees and expenses as a result of the conference of a pecuniary and non-pecuniary benefit on behalf of the Class, and will seek an award of such fees and expenses at the appropriate time.

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, prays for relief and judgment against Defendants as follows:

A.     For an order certifying the Class under the appropriate provisions of Rule 23, as well as any appropriate subclasses, and appointing Plaintiff and his legal counsel to represent the Class;

B.     For judgment entered against Defendants in the amount of Plaintiff's and the Class' damages incurred with interest, reasonable attorneys' fees, and costs;

C.     For an order permanently enjoining Defendants from charging Class members' credit card accounts and using the Class' personal and credit and debit information for any purpose whatsoever;

D.     For an order requiring Defendants to produce all Class member personal and credit and debit card information and certify that it has purged and destroyed any and all such information from its files; and

E.     For an order requiring Defendants disgorge any and all monies it received through the sale, use or access of any class member personal information and/or lists to third parties for the purposes of marketing or selling additional products or services to the class.

## COUNT IV
### (Breach of Implied Covenant of Good Faith & Fair Dealing)

76.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 49 as if fully set forth herein.

77.     As with all contracts, the agreements entered into between Plaintiff and the Class on the one hand and Webloyalty and Fandango on the other hand contained an implied covenant of good faith and fair dealing.

78.     Defendants breached the implied covenant of good faith and fair dealing by consciously, deliberately, and improperly charging Plaintiff and the Class fees for "Reservation Rewards" membership which they did not request and which provide only illusory benefits.

79.     More specifically, Defendants breached this implied covenant of good faith and fair dealing by charging Plaintiff and the Class for the "Reservation Rewards" membership, thereby creating an obligation to actually provide benefits to the Class members with respect to these charges.

80.     Instead, Defendants breached the covenant of good faith and fair dealing by providing little or no such benefits. In other words, Defendants breached their covenant of good faith and fair dealing by providing only illusory benefits.

81.     Defendants' breach of the covenants of good faith and fair dealing proximately caused damages to Plaintiff and the Class.

82.     In particular, as a result of Defendants' conduct, Plaintiff was charged a total of $10.00 by Webloyalty, a percentage of which was given to Fandango. Upon information and belief, the other members of the Class were similarly charged.

83.     Plaintiff seeks to obtain a pecuniary benefit for the Class in the form of all actual and consequential damages recoverable from Defendant. Plaintiff's counsel are entitled to recover their

reasonable attorneys' fees and expenses as a result of the conference of a pecuniary benefit on behalf of the Class, and will seek an award of such fees and expenses at the appropriate time.

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, prays for relief and judgment against Defendants as follows:

A.     For an order certifying the Class under the appropriate provisions of Rule 23, as well as any appropriate subclasses, and appointing Plaintiff and his legal counsel to represent the Class;

B.     Awarding actual and consequential damages for breach of the implied covenant of good faith and fair dealing;

C.     For pre- and post-judgment interest to the Class, as allowed by law;

D.     For reasonable attorneys' fees and costs to counsel for the Class if and when pecuniary benefits are obtained on behalf of the Class; and

E.     Granting such other and further relief as is just and proper.

## COUNT V
### (Money Had and Received)

84.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 49 as if fully set forth herein.

85.     As a result of the conduct alleged herein, Defendants improperly received monies from Plaintiff and the Class they were not legally entitled to receive.

86.     Plaintiff and members of the Class have a claim for improperly paid fees for the Reservation Rewards membership.

87.     Equity and good conscience require that Defendants ought to pay over such additional monies, described above, to Plaintiff and the Class.

88.     As a direct and proximate result of Defendants' inappropriate practices, Plaintiff and members of the Class have suffered injury and are entitled to reimbursement, restitution and

disgorgement in the amount necessary to restore them to the position they would have been in if Defendants had not improperly collected and retained the aforementioned fees.

89.     Plaintiff seeks to obtain a pecuniary benefit for the Class in the form of reimbursement, restitution and disgorgement from Defendants. Plaintiff's counsel are entitled to recover their reasonable attorneys' fees and expenses as a result of the conference of a pecuniary benefit on behalf of the Class, and will seek an award of such fees and expenses at the appropriate time.

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, prays for relief and judgment against Defendants as follows:

A.      For an order certifying the Class under the appropriate provisions of Rule 23, as well as any appropriate subclasses, and appointing Plaintiff and his legal counsel to represent the Class;

B.      Awarding reimbursement, restitution and disgorgement from Defendants of the benefits conferred by Plaintiff and the Class;

C.      For pre- and post-judgment interest to the Class, as allowed by law;

D.      For reasonable attorneys' fees and costs to counsel for the Class if and when pecuniary benefits are obtained on behalf of the Class; and

E.      Granting such other and further relief as is just and proper.

## COUNT VI
### (Civil Theft – Treble Damages)

90.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 49 as if fully set forth herein.

91.     This claim is brought pursuant to Connecticut General Statutes § 52-564, which provides that: "Any person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages."

92.     Pursuant to Connecticut General Statutes § 53a-119(2): "A person obtains property by false pretenses when, by any false pretense, he obtains from another any property with intent to defraud him or any other person."

93.     Defendants explicitly or implicitly made false representations and statements of existing facts by being silent and omitting to disclose to Plaintiff and the Class the following material facts, which Defendants made with the intent to deceive Plaintiff and the Class: (a) that, by clicking on a "pop-up" advertisement designed by Webloyalty while completing a transaction with Fandango, Plaintiff's and the Class' private credit card information would be disclosed by Fandango to Webloyalty; (b) that Webloyalty would automatically charge Plaintiff and the Class a monthly fee for Webloyalty's Reservation Rewards membership program; (c) that Webloyalty's Reservation Rewards membership program provides no benefit to Plaintiff and the Class; and (d) that Fandango obtains a percentage of the monthly fees charged by Webloyalty to Plaintiff and the Class.

94.     In other words, Webloyalty stole money from Plaintiff and the Class by false pretenses when it deceived Plaintiff and each member of the Class into believing that, but clicking on the "pop-up" ad, they would be receiving a $10.00 gift voucher. Instead, when Plaintiff and the members of the Class clicked on the "pop-up" ad, they were, unwittingly, enrolled into a program that *charged* them up to $10.00 per month. This slight-of-hand scheme by Webloyalty and Fandango is fraudulent, is the basis for the civil theft claim, and is the equivalent of each Class member having his/her pocket-picked of up to $10.00 per month.

95.     Plaintiff and the Class relied on the intentional false statements/omissions of material fact by Defendants in completing their transaction with Webloyalty and clicking on the Webloyalty "pop-up" advertisement.

96.    The false statements/omissions of material fact by defendants were not made innocently or inadvertently, but were instead made with the intent to obtain money from Plaintiff and the Class by false pretenses.

97.    Defendants' silence and omissions as to the material facts outlined above were material insofar as such silence and omissions caused the Class to, without their knowledge, enable defendants to defraud them out of up to $10.00 per month.

98.    Defendants knew that their actions would result in the theft of money from Plaintiff and the Class. Indeed, as described by many former employees of Webloyalty, 99% of all phone calls to its customer service representatives were in the nature of complaints and requests for refunds from defrauded consumers, and Webloyalty management held regular meetings where such complaints were discussed. Fandango's knowledge is likewise evident from the fact that Fandango received kickbacks from Webloyalty in the form of a percentage of the money taken from the Class by Webloyalty in monthly membership fees.

99.    Both of the defendants intended to and did defraud Plaintiff and the Class, as evidenced by defendants' conduct alleged in this complaint.

100.    Plaintiff and the Class were induced to click the "pop-up" ad by defendants' fraudulent acts, and were injured thereby.

101.    Defendants obtained money from Plaintiff and the Class as a direct and proximate cause of defendants' fraud by false pretenses, and Plaintiff and the Class have not been compensated for the payment of such money.

102.    Plaintiff seeks to obtain a pecuniary benefit for the Class in the form of damages, including treble damages, from Defendants. Plaintiff's counsel are entitled to recover their

- 29 -

reasonable attorneys' fees and expenses as a result of the conference of a pecuniary benefit on behalf of the Class, and will seek an award of such fees and expenses at the appropriate time.

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, prays for relief and judgment against Defendants as follows:

A.      For an order certifying the Class under the appropriate provisions of Rule 23, as well as any appropriate subclasses, and appointing Plaintiff and his legal counsel to represent the Class;

B.      Awarding treble damages to Plaintiff and the Class pursuant to Connecticut General Statutes § 52-564;

C.      For pre- and post-judgment interest to the Class, as allowed by law;

D.      For reasonable attorneys' fees and costs to counsel for the Class if and when pecuniary benefits are obtained on behalf of the Class; and

E.      Granting such other and further relief as is just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff, individually and on behalf of all others similarly situated, hereby demands a trial by jury on all counts so triable.

DATED: September 11, 2006

PHILLIPS & GARCIA, LLP
CARLIN J. PHILLIPS
ANDREW J. GARCIA

Andrew J. Garcia, MA BBO# 559084
agarcia@phillipsgarcia.com
Carlin J. Phillips, MA BBO# 561916
cphillips@phillipsgarcia.com
13 Ventura Drive
North Dartmouth, MA 02747
Telephone: 508/998-0800
508/998-0919 (fax)

LERACH COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
DAVID J. GEORGE
STUART A. DAVIDSON
MARISA N. DEMATO
MICHAEL GREENWALD
197 South Federal Highway, Suite 200
Boca Raton, FL 33432
Telephone: 561/750-3000
661/750-3364 (fax)

LEE & AMTZIS, P.L.
ERIC A. LEE
5550 Glades Road, Suite 401
Boca Raton, FL 33431
Telephone: 561/ 981-9988
561/981-9980 (fax)

Attorneys for Plaintiff and the Class

G:\sdavidson\Webloyalty\COM - FINAL [SAD].doc