# Exhibit A

LEXSEE 2005 CONN. SUPER. LEXIS 417

**Christopher B. Swift v. Rikki S. Ball et al.**

CV010344047S

SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF DANBURY, AT DANBURY

*2005 Conn. Super. LEXIS 417*

February 22, 2005, Decided
February 22, 2005, Filed

**NOTICE:** [*1] THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**JUDGES:** Bellis, J.

**OPINION BY:** Bellis

**OPINION:**

MEMORANDUM OF DECISION

I

INTRODUCTION

This case involves an unfortunate business dispute between two brothers-in-law who had, for many years, successfully operated a business together. The plaintiff Christopher Swift, brought a five-count complaint against his brother-in-law, Rikki S. Ball, and Rikki Electric Inc., d/b/a R.E.I. (hereinafter referred to as "REI"), alleging fraud, constructive trust, unjust enrichment, and breach of oral agreement, and seeking judicial dissolution of the corporation and appointment of a receiver. The plaintiff alleges, *inter alia*, that he joined R.E.I. as a principal in October 1992, in consideration of the defendant Rikki Ball's agreement to make the plaintiff an officer and 50 percent owner of the defendant corporation, remaining there until he left to start his own business. The defendants filed a third-party complaint against Connectivity Design, LLC, claiming tortious interference, theft of services, and a violation of the *Connecticut Unfair Trade Practices Act* [*2], alleging that the third-party defendant Connectivity Design, LLC was formed by Mr. Swift while Mr. Swift was still employed by REI, and that the third-party defendant interfered in REI's business. The defendants also filed counterclaims against the plaintiff alleging tortious interference, breach of agency, duty of care and loyalty, theft of services, and civil theft.

A courtside trial was conducted over the course of several weeks.

II

FACTS

The plaintiff, Christopher Swift, has been engaged in the telecommunications and data cabling business for many years. Immediately prior to the business venture at issue, Mr. Swift was self-employed for several months; that self-employment involved one client in New York. Before that brief period of self-employment, Mr. Swift ran his own business, "Pro-Com Solutions," for approximately two and one-half years. That business ended following a Chapter 7 bankruptcy in 1992. In light of that business failure, Mr. Swift was wary of the risks involved in starting a new company and instead approached his brother-in-law of many years, the defendant, Rikki Ball, with the suggestion that they go into business together.

Mr. Ball, an electrician, [*3] had been employed in that field at Norwalk Hospital prior to starting his own corporation, Rikki Electric, Inc., in 1986. Mr. Ball was the sole shareholder and president of Rikki Electric, Inc., whose business initially was by and large electrical work for new construction, although it did do some minimal data work as well. At the time Mr. Ball was approached by Mr. Swift in 1992, Rikki Electric was doing well.

Messrs. Ball and Swift had, in the past, particularly during the Pro-Com years, done collaborative work together, where the two would help each other with installations, pulling cable, and the like. Although Mr. Ball initially resisted, he soon agreed to take on Mr. Swift as a partner, in large part because of his perception that Mr. Swift was in financial difficulty.

Although he was not actually in dire straits, Mr. Swift welcomed the opportunity ultimately offered to him by his brother-in-law, and the two began a business relationship in late 1992 which was, for many years, rewarding on many levels to both gentlemen, including financially and professionally. The men agreed to become partners and held themselves out as such. Mr. Swift was made vice-president of the business. [*4] The appropriate paperwork was filed, and the business became known as REI, so that it would not sound like a one-man enterprise.

The business relationship between the two men was one based on mutual trust rather than on a written agreements and to their credit the arrangement worked well for nearly a decade, despite their never having actually reduced the arrangement to writing. They orally agreed to split all profits equally, and they shared equal salaries and benefits including medical benefits, vacation time, and company-owned vehicles. Mr. Swift did not contribute any capital to Rikki Electric when he joined the business although he did bring his expertise in the data communications field.

Prior to this new business arrangement, Mr. Ball, who has a learning disability, would generally charge for "time and materials" on a given job. Mr. Swift, once he joined the business, assumed the responsibility of preparing written documents required by the business, including bid proposals. His other duties included marketing, developing contacts in the data communications field, client contact, and work in the field. Mr. Swift had authority to issue proposals and sign contracts on behalf [*5] of the business. Despite several entreaties by Mr. Swift, Mr. Ball refused to allow Mr. Swift to sign company checks, based upon Mr. Ball's perceptions regarding Mr. Swift's financial stability, and the fact that Mr. Swift had not formally, in writing, assumed financial responsibility for the business.

Mr. Ball continued with his financial duties such as payroll, taxes, managing the bank accounts and check writing duties, and continued his work in the field. Normally, Mr. Ball would turn over any leads to Mr. Swift. Rikki Electric had had no standing service contracts with clients, and REI got its work through the parties' contacts, word of mouth, and the bidding process.

Both men would make purchases including equipment purchases for the company, but they would generally consult each other before making any significant purchase.

On numerous occasions beginning in 1996 through 1997, the two men negotiated the terms of a shareholder agreement. Mr. Ball was willing to issue shares to Mr. Swift once there was a legal written agreement to that effect. Mr. Ball thought the original draft shareholder agreement to be fair and was interested in having Mr. Swift sign the agreement so that [*6] Mr. Swift would be financially responsible for the liabilities of the business. The agreement was never signed, as Mr. Swift was not satisfied with all its terms. Following proposed revisions to the draft document by Mr. Swift, no further steps were taken by him in that regard, due to his being busy and his level of trust of Mr. Ball who all along had indicated a willingness to enter into a shareholder agreement.

Due to the hard work and efforts of both men, who were also the primary labor force, the business flourished for many years. Mr. Swift maintained client contact, assigned work and ensured there was manpower for each job, and by all accounts wrote very good job proposals. He prepared a client list which he kept on his computer and which was distributed within the company. His son, Mike, was hired as an installer for the business although problems developed with Mike's job performance including tardiness, abuse of the company cell phone, and being argumentative at job sites.

In approximately 1995, Mr. Swift and Mr. Ball purchased term life policies with the proceeds to be paid to their respective wives. In early 1999, Mr. Swift prepared a letter to his bank for the purposes [*7] of obtaining a loan which Mr. Ball signed. The letter indicated, *inter alia*, that Mr. Swift owned half of the business' assets and liabilities.

REI evolved from its Rikki Electric days of primarily electrical work to a business heavily immersed in the data communications field. From approximately 1998 to early 2001, the majority of the revenue brought into the business was a result of Mr. Swift's marketing efforts. Beginning in late 1999, however, Mr. Swift became increasingly uneasy with his arrangement with Mr. Ball, due in part to his perception that he was more productive and putting forth greater effort than Mr. Ball.

Mr. Swift continued with the business of REI, including drafting some substantial proposals. He began to plan for a possible departure, and he also expended efforts toward the formation of his new business. Prior to his departure from REI, Mr. Swift had discussions with Mr. William Sestrom, a customer of REI since late 1999, regarding investment opportunities. Mr. Sestrom controlled many of the properties that REI worked on. Early in their relationship, when Mr. Swift had joined REI, Mr. Sestrom had expressed an interest in investing in REI. Mr. Swift's response [*8] to Mr. Sestrom's overture was noncommittal at that time. Sometime later, beginning in early 2001, discussions began in earnest with regard to Mr. Sestrom investing in a new venture with Mr. Swift, rather than in REI. Mr. Sestrom, who also ran a Web design business out of his home, had reserved the domain name "Connectivity Design, LLC" for Mr. Swift in

the summer of 2000, based upon a list of key words provided by Mr. Swift. No evidence was presented with regard to Mr. Swift's being charged by Mr. Sestrom for this service. Mr. Swift filed the necessary paperwork with the Secretary of State on February 27, 2001 in order to reserve the new domain name.

Mr. Ball returned to the office on March 1, 2001, having been in Florida initially for vacation purposes and then for a work-related project. Upon his return, Mr. Swift informed Mr. Ball that during Mr. Ball's absence, Mr. Swift had reviewed the company books and determined that he owned no shares in the business. Mr. Swift had not inspected the books until Mr. Ball's absence, as he had been relatively content with their arrangement until, as indicated above, he became increasingly uneasy and troubled by what he felt was Mr. Ball's lack [*9] of trust in him as well as his perception of Mr. Ball's recent lack of performance. Mr. Ball confirmed that Mr. Swift owned no shares in the company, as the original agreement had never been finalized, and the gentlemen agreed that Mr. Swift would work on the agreement. There had been no further discussions between the two with regard to the ownership of shares in the intervening years since their discussions in 1996 and 1997.

As of March 1, 2001, no work was posted on the job board, and Mr. Swift took time off. Mr. Ball made inquiries, and was able to arrange for a job at Norwalk Hospital for himself and an REI employee. The following week, Mr. Swift traveled to Philadelphia to work on an REI job for a company known as 1838 Investment Advisors. At approximately this time, Mr. Swift's son Mike terminated his employment at REI.

On March 10, 2001, Mr. Swift presented Mr. Ball with a shareholder document he had prepared. Mr. Ball was not willing to sign the document on the spot without further review. At that point, they reached an impasse, and the two men decided to go their separate ways. The plan then was to split the net assets of the business equally, with Mr. Swift to perform [*10] a physical inventory in that regard. Additionally, Mr. Ball would obtain information regarding the liabilities of the business. The men began their discussions regarding divvying up the customers of the business. Mr. Swift agreed not to solicit Reebok and Norwalk Hospital and Mr. Ball agreed not to solicit MBIA, Inc. and 1838 Investment Advisors. Mr. Ball's understanding was that Mr. Swift would not solicit the remaining customers until a final agreement was in place, while Mr. Swift believed that he was free to solicit the remaining customers. With Mr. Ball's consent, Mr. Swift took his laptop, cell phone, digital camera, and Yukon vehicle with him when he departed. At that point in time, the two even planned on working together on some jobs, with Mr. Swift working out of his own company, although that never came to fruition. The men understood that additional efforts were needed in order to finalize the breakup which, although amicable, was also emotional.

At this point, virtually all of the revenue to REI was from data communications rather than electrical work. REI had approximately two hundred clients on its customer list, five of which were active and significant.

Mr. Swift [*11] tendered a written letter of resignation. He returned to the office shortly thereafter for the purpose of inventorying the stock. The physical inventory revealed tangible assets of $ 96,000. The relationship remained cordial at that point, and further steps were still needed in order to finalize the breakup agreement, including determining the liabilities of REI, and how to deal with the remaining REI clients.

In the meantime, in mid March, after numerous conversations through early March 2001 Messrs. Swift and Sestrom, who had become close socially as well, entered into a written agreement, with Mr. Sestrom having advanced $ 10,000 toward Mr. Swift's new business, out of a total investment of $ 25,000. Mr. Sestrom became a 5 percent owner of the business, Michael Swift became a 20 percent owner, and Mr. Swift owned the remaining 75 percent. Mr. Sestrom created a web page and did advertising for the new business, which began its work immediately as evidenced by the March 14 meeting and March 15 proposal to the Liquor Depot, realizing its first revenues in April 2001.

With the exception of his discussions with Mr. Sestrom, Mr. Swift did not tell any REI customers of any intentions [*12] to form Connectivity, LLC until after he left REI, nor did he disparage Mr. Ball or REI at any time. On March 30, 2001, Mr. Swift, on behalf of Connectivity Inc., LLC, did write letters to REI's clients in an attempt to solicit their business, using the information contained in the REI customer list. As a result of Mr. Swift's efforts, for the year 2001, Connectivity did work for ten REI customers. For that same period of March through December 2001, REI did business with approximately the same number of repeat customers.

In March, shortly after they were sent, Mr. Ball discovered that Mr. Swift had sent the letters of solicitation to REI customers. Mr. Ball became angry that Mr. Swift had actively solicited REI clients prior to their finalizing their dissolution, and a confrontation resulted. It was only when Mr. Ball discovered Mr. Swift's efforts to solicit business from REI customers that their relationship disintegrated and their attempts to work out a dissolution ceased. Mr. Ball felt that Mr. Swift was taking REI customers in violation of his responsibility to REI not to do so until a final agreement was reached, and while Mr. Ball had initially been willing to divide REI assets [*13] with Mr. Swift, he was no longer willing to do so once

he found out about the solicitation letters. Mr. Ball demanded that Mr. Swift return all REI property. Mr. Swift did return the company vehicle. The remaining items were not returned.

Up through his departure from REI, Mr. Swift responded to inquiries and wrote proposals for prospective customers. As was his routine, the proposals were both stored in his computer and in folders on his desk and were at all times accessible to Mr. Ball. Mr. Ball did not avail himself of the proposals, nor did he take the initiative to communicate with any of the contact people at REI customers early on, expecting customers to call REI rather than the reverse. Thus, while Mr. Ball could have followed up on outstanding REI proposals including the A&E proposal, he did not do so. REI business slowed for the remainder of 2001 and REI employees were let go.

III

DISCUSSION OF LAW

A

AS TO THE COMPLAINT

1. FRAUD-COUNT ONE

"It is well settled that the essential elements of fraud are: (1) a false representation was made as a statement of fact; (2) it was untrue and known to be untrue by the party making it; (3) it was made to induce the other party to [*14] act upon it; and (4) the other party did so act upon that false representation to his injury." (Internal quotation marks omitted.) *Leonard v. Commissioner of Revenue Services, 264 Conn. 286, 296, 823 A.2d 1184 (2003)*. "All of these ingredients must be found to exist; and the absence of any one of them is fatal to a recovery . . . Additionally, the party asserting such a cause of action must prove the existence of the first three of [the] elements by a higher standard than the usual preponderance of the evidence, which higher standard [is] described as clear and satisfactory or clear, precise and unequivocal." (Internal quotation marks omitted.) *Harold Cohn & Co. v. Harco International, 72 Conn.App. 43, 51, 804 A.2d 218*, cert. denied, *262 Conn. 903, 810 A.2d 269 (2002)*.

"Generally, misrepresentations must relate to an existing or past fact. A promise to do something in the future is not actionable unless the promise is coupled with a present intention not to fulfill the promise." (Internal quotation marks omitted.) *New Horizon Financial Services, LLC v. First Financial Equities, Inc., 175 F. Supp. 2d 348, 352-53 (D.Conn. 2001)*. [*15] "An assurance, wholly promissory in its nature, cannot be the basis of an action for fraud . . . It could not be held fraudulent unless the [individual], when he made it, knew or had reason to believe that the corporation would not assume the obligation or gave the assurance recklessly or without belief that it would do so." (Citation omitted; internal quotation marks omitted.) *Lowe v. Kohn, 128 Conn. 45, 51, 20 A.2d 407 (1941)*.

"While some connection, direct or indirect, between a party charged with making false representations and a party relying thereon must be shown, it is not essential, in support of a cause of action resulting from false representations, that the false representations be shown to have been made directly to the party claiming to have relied upon them." (Internal quotation marks omitted.) *Giulietti v. Giulietti, 65 Conn.App. 813, 842-43, 784 A.2d 905*, cert. denied, *258 Conn. 946, 788 A.2d 95 (2001)*. Nevertheless, the party making the false representation to another must possess the intent or knowledge that the representations will be exhibited or repeated to a third-party for the purpose of deceiving the third-party, [*16] and furthermore, the false representation must actually deceive that third-party. *Id., 843*.

The plaintiff claims that the defendants defrauded him based upon his claim that they never issued 50 percent of the shares in REI to him as promised. This claim must fail. No representation was made by or on behalf of the defendants that the shares had in fact been issued. Despite the letter to Peoples Bank written by Mr. Swift and signed by Mr. Ball, the evidence is clear that Mr. Swift always knew that the shares had not been issued, as a final agreement was never reached nor was one signed. While Mr. Ball had indicated a willingness to issue the shares in the future if a formal agreement was finalized, no such agreement was reached, and the plaintiff did not prove that Mr. Ball did not have the present intention to issue the shares when he indicated his willingness to do so. The court therefore finds in favor of the defendants as to the First Count of the complaint.

2. CONSTRUCTIVE TRUST--COUNT TWO

"A constructive trust arises contrary to intention and in invitum, against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, [*17] or by any form of unconscionable conduct, artifice, concealment, or questionable means or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy . . . Moreover, the party sought to be held liable for a constructive trust must have engaged in conduct that wrongfully harmed the plaintiff." (Citations omitted; internal quotation marks omitted.) *Wendell Corp. Trustee v. Thurston, 239 Conn. 109, 113-14, 680 A.2d 1314 (1996)*.

"In such cases, a trust does not arise so much by reason of the parol agreement of the parties but by operation of law . . . A constructive trust is the formula through

which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee . . . The imposition of a constructive trust by equity is a remedial device designed to prevent unjust enrichment . . . Thus, a constructive trust arises where a person who holds title to property is subject to an equitable duty to convey [*18] it to another on the ground that he would be unjustly enriched if he were permitted to retain it . . . One holding title to property upon which a constructive trust is imposed is not compelled to reconvey the property because he is a constructive trustee; it is because he can be compelled to convey title to the property that he is a constructive trustee." (Citations omitted; internal quotation marks omitted.) *Cohen v. Cohen, 182 Conn. 193, 202-03, 438 A.2d 55 (1980).*

"An examination of a number of Connecticut cases leads to the conclusion that there is no one method of listing a finite number of elements that if alleged and proven would amount to a constructive trust. It would serve no present purpose to attempt to catalogue the various situations which fall within the designation constructive fraud, even if that were possible. *Worobey v. Sibieth, [136 Conn. 352, 356, 71 A.2d 80 (1949)].*" (Internal quotation marks omitted.) *Castaldo v. Castaldo*, Superior Court, judicial district of Fairfield Housing Session at Bridgeport, Docket No. SPBR 941228656 (July 19, 1995, Tierney, J.) (15 Conn. L. Rptr. 135).

"It is clear that to invoke a constructive [*19] trust there must be a duty owed, or a fiduciary or other special relationship between the parties." *Downey v. Downey, 1 Conn.App. 489, 495, 472 A.2d 1296 (1984).* "Whether . . . a confidential relationship exists is a factual question for the trial court." *Albuquerque v. Albuquerque, 42 Conn.App. 284, 287, 679 A.2d 962 (1996).*

"Proof of a fiduciary relationship . . . imposes a twofold burden upon the fiduciary. Once a [fiduciary] relationship is found to exist, the burden of proving fair dealing properly shifts to the fiduciary . . . Furthermore, the standard of proof for establishing fair dealing is not the ordinary standard of fair preponderance of the evidence, but requires proof either by clear and convincing evidence, clear and satisfactory evidence or clear, convincing and unequivocal evidence." (Citations omitted; internal quotation marks omitted.) *Dunham v. Dunham, 204 Conn. 303, 322-23, 528 A.2d 1123 (1987).*

Where . . . a [confidential] relationship exists, proof of fraudulent intent is not a condition precedent for the imposition of a constructive trust . . . Indeed, in such cases the burden of proof rests on the party [*20] denying the trust to negate it by clear and convincing evidence." (Citation omitted.) *Koizim v. Koizim, 181 Conn. 492, 495, 435 A.2d 1030 (1980).* In *Koizim*, a wife testified that "stock was supposed to be in joint names and that she relied on her husband's representation in [that] respect. The [trial] court found that a confidential relationship existed between the parties and that the [husband], by purchasing the stock solely in his own name, abused that relationship. Relying on this abuse and principles of constructive trust, the court fixed the [wife's] interest in the stock at 50 percent." *Id.* The Supreme Court determined "the trial court was justified, on the basis of the evidence, in treating the shares of stock . . ., as being jointly owned by the parties." *Id.*

"The Connecticut Supreme Court has identified several indicia of the fiduciary relationship, many of which are inferable from the evidence presented at the trial . . . It is apparent that an explicit invitation to a party to repose trust is a strong factor in identifying the existence of a fiduciary relationship . . . Relationships that generate a natural inclination to trust, such [*21] as brother-brother or parent-child--with or without an explicit invitation to do so--also supply a strong indicium of a fiduciary relationship. In addition . . ., an otherwise non-fiduciary relationship can become a fiduciary relationship where the party reposing confidence is in a position of weakness or vulnerability." (Citations omitted.) *Martinelli v. Bridgeport Roman Catholic Diocesan, 10 F. Supp. 2d 138, 154 (D.Conn. 1998).*

"While the relationship between . . . in-laws is not per se antithetical to a confidential relationship, the [plaintiff] must assert some facts which support the allegation that such a relationship exists." *Wing v. White, 14 Conn.App. 642, 644, 542 A.2d 748 (1988).*

"The fact that one business person trusts another and relies on [the person] to perform [its obligations] does not rise to the level of a confidential relationship for purposes of establishing a fiduciary duty." (Internal quotation marks omitted.) *Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 255 Conn. 20, 41, 761 A.2d 1268.*

"To conclude that a constructive trust exists, the trial court must find, in addition to the existence of a confidential relationship, [*22] that unjust enrichment of the party holding title would occur if the trust were not imposed." *Gulack v. Gulack, 30 Conn.App. 305, 313, 620 A.2d 181 (1993).*

In this matter, the court finds that Messrs. Swift and Ball enjoyed, as brothers-in-law, friends, and partners a fiduciary relationship based upon mutual trust, giving rise to a confidential relationship. The court further finds that the defendant, Mr. Ball, has met his burden of proof by clear and convincing evidence that he dealt fairly with Mr. Swift. n1 As such, the plaintiff cannot prevail on the second count of the complaint.

n1 It is also worth mentioning at this point that although not a necessary element of this particular cause of action, the court also finds that Mr. Swift dealt fairly with Mr. Ball.

### 3. UNJUST ENRICHMENT--COUNT THREE

"An unjust enrichment claim has been variously denominated an implied-in-law claim, a quasi contract claim, and a claim in restitution. *Meaney v. Connecticut Hospital Assn., Inc., 250 Conn. 500, 511, 735 A.2d 813*] [*23] (1999)." *Leisure Resort Technology v. Trading Cove Associates*, Superior Court, complex litigation docket at Waterbury, Docket No. X06 CV 00 0164799 (August 4, 2004, Alander, J.).

> A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another. . . With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, it becomes necessary in any case where the benefit of the doctrine is claimed, to examine the circumstances and the conduct of the parties and apply this standard . . .
>
> Unjust enrichment is a very broad and flexible equitable doctrine that has as its basis the principle that it is contrary to equity and good conscience for a defendant to retain a benefit that has come to him at the expense of the plaintiff . . . The doctrine's three basic requirements are that (1) the defendant was benefited, (2) the defendant unjustly failed to pay the plaintiff for the benefits, and (3) the failure of payment was [*24] to the plaintiff's detriment . . . All the facts of each case must be examined to determine whether the circumstances render it just or unjust, equitable or inequitable, conscionable or unconscionable, to apply the doctrine.

(Citations omitted; internal quotation marks omitted.) *Gagne v. Vaccaro*, 255 Conn. 390, 408-09, 766 A.2d 416 (2001).

"Lack of a remedy under the contract is a precondition for recovery based upon unjust enrichment." *Gagne v. Vaccaro, supra*, 255 Conn. 401.

The court finds that the defendants benefited by the fact that the net assets of the business were not divided between the parties, pursuant to their initial understanding as well as their initial understanding at the time of their breakup. The court finds that the failure to do so was to the plaintiff's detriment. The court therefore exercises its equitable powers and finds for the plaintiff on the unjust enrichment count.

### 4. BREACH OF ORAL CONTRACT--COUNT FOUR

"The elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." (Internal quotation marks omitted.) *Rosato v. Mascardo*, 82 Conn.App. 396, 411, 844 A.2d 893 (2004). [*25]

"The rules governing contract formation are well settled. To form a valid and binding contract in Connecticut, there must be a mutual understanding of the terms that are definite and certain between the parties . . . To constitute an offer and acceptance sufficient to create an enforceable contract, each must be found to have been based on an identical understanding by the parties . . . If the minds of the parties have not truly met, no enforceable contract exists . . . An agreement must be definite and certain as to its terms and requirements . . . So long as any essential matters are left open for further consideration, the contract is not complete . . . A contract requires a clear and definite promise. See *Suffield Development Associates Ltd. Partnership v. Society for Savings*, . . . 243 Conn. [832,] 843, [708 A.2d 1361 (1998)]. An agreement must be definite and certain as to its terms and requirements, *Fortier v. Newington Group, Inc.*, 30 Conn.App. 505, 510, 620 A.2d 1321, cert. denied, 225 Conn. 922, 625 A.2d 823 (1993). As long as any essential matters are left open for further consideration, the contract is not complete. *17A Am.Jur.2d, Contracts Sec. 32* [*26] (1991). "If there has been a misunderstanding between the parties, or a misapprehension by one or both so that their minds have never met, no contract has been entered into by them." *Hoffman v. Fidelity & Casualty Co.*, 125 Conn. 440, 443-44, 6 A.2d 357 (1939). *Cheverie v. Ashcraft & Gerel*, 65 Conn.App. 425, 783 A.2d 474 (2001). "If the minds of the parties have not truly met, no enforceable contract exists . . . An agreement must be definite and certain as to its terms and requirements . . . So long as any essential matters are left

open for further consideration, the contract is not complete." (Internal quotation marks omitted.) *L&R Realty v. Connecticut National Bank*, 53 Conn.App. 524, 535, 732 A.2d 181, cert. denied, 250 Conn. 901, 734 A.2d 984 (1999); *Geary v. Wentworth Laboratories, Inc.*, 60 Conn.App. 622, 760 A.2d 969 (2000). A court may, however, enforce an agreement 'if the missing terms can be ascertained, either from the express terms or by fair implication.' *Presidential Capital Corp. v. Reale*, 231 Conn. 500, 507-08, 652 A.2d 489 (1994). Thus, an agreement, previously unenforceable [*27] because of its indefiniteness, may become binding if the promise on one side of the agreement is made definite by its complete or partial performance. See *Augeri v. C.F. Wooding Co.*, 173 Conn. 426, 430, 378 A.2d 538 (1977)." (Citation omitted; internal quotation marks omitted.) *Geary v. Wentworth Laboratories*, 60 Conn.App. 622, 627-28, 760 A.2d 969 (2000).

In this matter, the plaintiff claims that the defendant breached an oral agreement following the plaintiff's departure from REI regarding the division of the company's assets. That claim must fail, as there was no meeting of the minds with respect to dividing up the company's customers, which was a critical issue. While Messrs. Swift and Ball did agree on divvying up a few of the larger clients, there was a misunderstanding between the two as to the many remaining customers of the business. Mr. Ball was willing to give Mr. Swift half of the company's net assets once the liabilities had been determined, the remaining customers were addressed, and there was a final agreement in place. Mr. Ball understood that Mr. Swift would not solicit the remaining clients until a final agreement was in place. Mr. [*28] Swift, on the other hand, understood that he was free to solicit the remaining REI clients and in fact did so prior to the men dividing the assets and finalizing the dissolution agreement. The court finds that the misunderstanding between the parties as to the remaining customers of the company involved an essential matter, preventing a meeting of the minds and preventing the formation of a binding contract. Therefore, the plaintiff cannot prevail on the fourth count of his complaint.

### 5. JUDICIAL DISSOLUTION--COUNT FIVE

*General Statutes § 33-896(a)(1)* provides a mechanism for a shareholder to seek judicial dissolution. A "shareholder," defined in *General Statutes § 33-602(27)*, as amended by No. 03-158 of the 2003 Public Acts, is "the person in whose name shares are registered in the records of a corporation or the beneficial owner of shares to the extent of the rights granted by a nominee certificate on file with a corporation."

According to the evidence produced during the trial, the records of the corporation neither contained a nominee certificate nor depicted shares registered in Swift's name. Nevertheless, Swift argues that he [*29] is entitled to pursue a claim under *§ 33-896* based on the allegation that he is a de facto owner of shares. A mere de facto shareholder, however, fails to meet the definition of a shareholder provided by the statute. See *Diette v. Dental Group of Norwalk*, Superior Court, judicial district of Stamford-Norwalk at Stamford, Docket No. CV 97 0158747 (February 27, 1998, Lewis, J.). As a result, Swift's fifth count is without merit.

### B

### AS TO THE REVISED THIRD-PARTY COMPLAINT

### 1. TORTIOUS INTERFERENCE--THIRD-PARTY COMPLAINT--COUNT ONE

"In order to recover for a claim of tortious interference with business expectancies, the claimant must plead and prove that: (1) a business relationship existed between the plaintiff and another party; (2) the defendant intentionally interfered with the business relationship while knowing of the relationship; and (3) as a result of the interference, the [claimant] suffered actual loss." *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 32-33, 761 A.2d 1268 (2000).

Though "[the Connecticut Supreme Court] has long recognized a cause of action for tortious interference with rights relations . . . [it has, nonetheless, held that] [*30] not every act that disturbs a contract or business expectancy is actionable . . . For a [claimant] successfully to prosecute such an action it must prove that the [alleged wrongdoer] conduct was in fact tortious. This element may be satisfied by proof that the defendant was guilty of fraud, misrepresentation, intimidation or molestation . . . or that the [alleged wrongdoer] acted maliciously . . . An action for intentional interference with business relations requires the [claimant] to plead and prove at least some improper motive or improper means . . ." (Citations omitted; internal quotation marks omitted.) *Daley v. Aetna Life & Casualty Co.*, 249 Conn. 766, 805-06, 734 A.2d 112 (1999).

"To substantiate a claim of tortious interference with a business expectancy, there must be evidence that the interference resulted from the defendant's commission of a tort . . . [Not e]very act of interference is . . . tortious." (Internal quotation marks omitted.) *Downes-Patterson Corp. v. First National Supermarkets, Inc.*, 64 Conn.App. 417, 429, 780 A.2d 967 (2001). "[A] claim is made out [only] when interference resulting in injury to another is [*31] wrongful by some measure beyond the fact of the interference itself." (Internal quotation marks omitted.) *Blake v. Levy*, 191 Conn. 257, 261, 464 A.2d 52 (1983).

Incidental disruptions of a company's relations with other business entities contacted by a departing member of the company for investment or employment purposes fails to establish that the departing member intentionally sought to interfere with those relationships, much less so with malicious intent or through fraudulent or criminal conduct. See *Solomat Partners, L.P. v. Ibar (In re Solomat Partners, L.P.), 261 B.R. 72, 79 (Bankr. D. Conn. 2001).*

Although liability may attach for "unjustifiably inducing [a company's] customers to cease doing business with [the company] . . .;" *Bowman v. Grolsche Bierbrouwerij B.V., 474 F. Supp. 725, 733 (D.Conn. 1979);* the company must establish that it "would, but for the malicious interference of the [inducer], have entered into [a] contract . . . There must be some certainty that the [company] would have gotten [a] contract but for the fraud. This cannot be left to surmise or speculation." (Citation omitted; internal quotation [*32] marks omitted.) *Goldman v. Feinberg, 130 Conn. 671, 675, 37 A.2d 355 (1944).*

Here, Mr. Ball and REI allege that Connectivity Design, LLC tortiously interfered with their business by soliciting and performing work for REI clients. This claim must fail. There was no credible evidence presented that the third-party defendant, or Mr. Swift, in any way maliciously, fraudulently, or improperly interfered with REI business, or that the third-party defendant, or Mr. Swift, in any other way intimidated or intentionally interfered with REI business, nor was there sufficient evidence that the third-party plaintiffs would have gotten contracts with REI customers but for any tortious interference by Connectivity Design, and the court will not engage in speculation in that regard. Therefore, the third-party plaintiffs cannot recover under count one.

2.   THEFT OF SERVICES--THIRD-PARTY COMPLAINT--COUNT TWO

*General Statutes § 53a-119(7)(C)* provides in relevant part: "A person is guilty of theft of services when . . . obtaining or having control over labor in the employ of another person, or of business, commercial or industrial equipment or facilities of [*33] another person, knowing that he is not entitled to the use thereof and with intent to derive a commercial or other substantial benefit for himself or a third person, he uses or diverts to the use of himself or a third person such labor, equipment or facilities."

"Under *General Statutes § 53a-119(7)(C),* the court asks: (1) whether labor in the employ of another was used or diverted to benefit oneself or a third-party, or (2) whether equipment or facilities of another were used to benefit oneself or a third-party. A review of cases for theft of services pursuant to *General Statutes § 53a-119(7)* reveals no case law finding theft of services outside of those circumstances. [See *State v. Wohler, 231 Conn. 411, 650 A.2d 168 (1994)* and *State v. DiDominic, 38 Conn. Supp. 593, 456 A.2d 1216 (1983)* (diversion of labor and facilities of another for benefit to oneself or a third person).] No court has expanded the definition of theft of services beyond the statutory parameters to include a situation . . . where a party to a contract has failed to honor his contractual obligation to pay for services." *Delta* [*34] *Capital Group, LLC v. Smith,* Superior Court, judicial district of Hartford-New Britain at Hartford, Docket No. CV97 0571407 (March 31, 1998, Hale, J.).

Here, Mr. Ball and REI allege theft of services based upon Connectivity's solicitation of and performance of work for REI clients. The third-party plaintiffs allege that Connectivity, through Mr. Swift while Mr. Swift was still an employee of REI, solicited and obtained work from REI clients. Here, however, Mr. Swift did not solicit REI clients or conduct Connectivity business until after his departure from REI. Furthermore, Mr. Swift on behalf of the third-party defendant Connectivity did not solicit REI customers until he was under the innocent misunderstanding that he was free to do so, having divided up the larger REI clients with Mr. Ball. There was insufficient evidence that Connectivity Design, LLC used the labor, equipment, or facilities of REI. The third-party plaintiffs cannot prevail on the second count of the third-party complaint.

3.   CONNECTICUT UNFAIR TRADE PRACTICES ACT--THIRD-PARTY COMPLAINT--COUNT THREE

"CUTPA provides a private cause of action to any person who suffers any ascertainable loss of money or property, [*35] real or personal, as a result of the use or employment of a [prohibited] method, act or practice . . . *General Statutes § 42-110g(a).* A 'person' is defined as, a natural person, corporation, trust, partnership, incorporated or unincorporated association, and any other legal entity . . . *General Statutes § 42-110a(3).* CUTPA, by its own terms, applies to a broad spectrum of commercial activity. The operative provision of the act, [*General Statutes] § 42-110b(a),* states merely that no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. Trade or commerce, in turn, is broadly defined as the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state. *General Statutes § 42-110a(4).* The entire act is remedial in character; *General Statutes § 42-110b(d);* . . . and must be liberally construed [*36] in favor of those whom the legislature in-

tended to benefit." (Citation omitted; internal quotation marks omitted.) *Fink v. Golenbock, 238 Conn. 183, 212-13, 680 A.2d 1243 (1996).*

"It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the 'cigarette rule' by the Federal Trade Commission for determining when a practice is unfair: (1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise--whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other businessmen] . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three . . . We previously have stated in no uncertain terms that CUTPA imposes no requirement of a consumer [*37] relationship . . . CUTPA is not limited to conduct involving consumer injury and . . . a competitor or other business person can maintain a CUTPA cause of action without showing consumer injury." (Citations omitted; internal quotation marks omitted.) *Fink v. Golenbock, supra, 238 Conn. 215.*

The third-party plaintiffs have failed to establish any facts which would support a CUTPA violation. Here, the third-party plaintiffs allege, *inter alia*, that Connectivity Design interfered with REI business by soliciting REI clients. There has been no credible evidence that the third-party defendant engaged in any unfair methods of competition or unfair or deceptive acts or practices. As discussed above, the court has found that Mr. Swift acting on behalf of Connectivity Design did not solicit REI clients until he reasonably believed it could do so. At no time did anyone acting on behalf of Connectivity Design disparage REI or Mr. Ball. There was no covenant not to compete or any other restrictions on Mr. Swift and Connectivity Design's solicitation of REI clients. As such, the third count of the third-party complaint must fail.

C

AS TO THE SECOND REVISED COUNTERCLAIM [*38]

1. TORTIOUS INTERFERENCE--COUNT 1

In their second revised counterclaim, Mr. Ball and REI allege tortious interference against Mr. Swift, claiming that Mr. Swift solicited clients of REI and tortiously interfered with REI business, to their financial loss. For the reasons set forth in its discussion of the claim for tortious interference made in the third-party complaint above, the claim for tortious interference in the counterclaim must fail as well.

2. BREACH OF AGENCY DUTY OF CARE AND LOYALTY--COUNT 2

Here, Mr. Ball and REI allege that Mr. Swift breached a duty of loyalty and reasonable care, by Mr. Swift's failure to disclose his adverse interests to REI once those interests arose.

"The fiduciary duty comprises two prongs: a duty of care, and a duty of loyalty . . . While the duty of care requires that the . . . fiduciaries exercise their best care and judgment . . . the duty of loyalty derives from the prohibition against self-dealing that inheres in the fiduciary relationship." (Internal quotation marks omitted.) *Gurski v. Rosenbium & Filan, LLC,* Superior Court, Docket No. 179063 (February 23, 2001, D'Andrea, J.) (28 Conn. L. Rptr. 717).

"It is axiomatic that a party [*39] cannot breach a fiduciary duty to another party unless a fiduciary relationship exists between them. A fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other . . . *Hi-Ho Tower, Inc. v. Com-Tronics, Inc., 255 Conn. 20, 38, 761 A.2d 1268 (2000).* "In the cases in which this court has, as a matter of law, refused to recognize a fiduciary relationship, the parties were either dealing at arm's length, thereby lacking a relationship of dominance and dependence, or the parties were not engaged in a relationship of special trust and confidence." (Internal quotation marks omitted.) *Biller Associates v. Peterken, 269 Conn. 716, 723-24, 849 A.2d 847 (2004).* "The [fiduciary] relationship implies that the principal has reposed some trust or confidence in the agent and that the agent or employee is obligated to exercise the utmost good faith, loyalty and honesty toward his principal or employer. *3 Am.Jur.2d, Agency, 199.* In the absence of clear consent [*40] or waiver by the principal, an agent, during the term of the agency, is subject to a duty not to compete with the principal concerning the subject matter of the agency. 3 C.J.S., Agency, 143; *Restatement (Second), 2 Agency 393.* Upon termination of the agency, however, and in the absence of a restrictive agreement, the agent can properly compete with his principal in matters for which he had been employed. '*Thus, before the end of his employment; he can properly purchase a rival business and upon termination of employment immediately compete.* He is not, however, entitled to solicit customers for such rival business before the end of his employment . . . in direct competition with the employer's business.' [Emphasis Added] *Restatement (Second), 2 Agency 393, comment e.* Knowledge acquired by an employee during

his employment cannot be used for his own advantage to the injury of the employer during employment." *Town and Country House and Homes Service, Inc. v. Evans, 150 Conn. 314, 317, 189 A.2d 390 (1963).*

Here, the fiduciary relationship between the counterclaim plaintiffs and Mr. Swift terminated upon Mr. Swift's announcement of his resignation and departure [*41] from REI. Prior to that time, and as indicated above, Mr. Swift responded to inquiries and wrote proposals for prospective REI customers, and continued with the work of REI. Although he had considered and explored the possibility of forming another business by the reservation of the domain name, that alone did not give rise to an adverse interest to REI. While Mr. Swift did solicit REI business upon his departure from REI, he was no longer an agent of REI and owed no duty of care and loyalty to REI, as he believed that a final agreement was in place and that he was free to solicit REI customers, with only the distribution of the net assets left for determination. Additionally, the court finds that Mr. Swift was free to use the REI customer lists following his departure from REI as he prepared the list and kept the hard copy of it on his computer which he took upon his departure with the permission of Mr. Ball, and as the list was distributed openly, easily accessible, and did not constitute a trade secret. Finally, Mr. Swift, during his tenure with REI, did not usurp any corporate opportunity of REI.

For the foregoing reasons, the second count of the counterclaim is denied.

3. THEFT [*42] OF SERVICES--COUNT THREE

In the third count of the counterclaim, Mr. Ball and REI allege theft of services against Mr. Swift, claiming that Mr. Swift, while an employee of REI, solicited RET clients and obtained work for Connectivity Design, in violation of *C.G.S. § 53a-119(7).* This claim must fail for the same reasons as set forth in its discussion of the claim for theft of services made in the third-party complaint. Mr. Swift did not solicit REI clients or perform work for REI clients until after his departure from REI. Mr. Swift did not compete with REI until he had announced his intention to sever his relationship with REI, and reached an understanding, albeit not a mutual understanding, that he was free to solicit the remaining REI clients. Therefore, the counterclaim plaintiffs cannot prevail on the third count of their counterclaim.

4. CIVIL THEFT--COUNT FOUR

In the fourth count of the counterclaim, the counterclaim plaintiffs claim that Mr. Swift committed civil theft by wrongfully taking certain REI property, to wit, a laptop, fax machines, cell phones, and a digital camera.

*Connecticut General Statutes § 52-564* provides: [*43] "Any person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages."

"*Section 52-564* is silent on the burden of proof issue." *Howard v. MacDonald, 270 Conn. 111, 130, 851 A.2d 1142 (2004).* "Clear and convincing proof is [not necessarily] an appropriate standard of proof whenever claims of tortious conduct have serious consequences or harsh or far-reaching effects on individuals or require the proof of willful, wrongful and unlawful acts. *Id.* "[It has] not [been] decided expressly . . . whether, in order to prevail on his claim for relief under a theory of statutory theft, the [claimant] must prove the elements by clear and convincing evidence or a preponderance of the evidence . . ." *Id.* "Absent evidence of legislative intent to the contrary, we continue to presume that when a statutory private right of action includes multiple damages, the plaintiff's burden of proof is the same as that in other tort cases." (Internal quotation marks omitted.) *Id.*

In this instance, Mr. Swift, when he departed the company, took the above mentioned items along with the Yukon vehicle, with the [*44] knowledge, consent, and permission of REI. The company vehicle was ultimately returned although the remaining items were not. Mr. Swift reasonably believed that he could retain possession of the items pursuant to the dividing of the assets by Messrs. Swift and Ball. The court finds that Mr. Swift did not wrongfully take or withhold the remaining items from REI and that Mr. Swift is not liable for civil theft under *C.G.S. § 52-564.*

IV

CONCLUSION

The court finds in favor of the defendants as to the first, second, fourth and fifth counts of the complaint. The court finds in favor of the plaintiff on count three of the complaint.

The court finds in favor of the third-party defendant on all three counts of the third-party complaint.

The court finds in favor of the counterclaim defendant on all four counts of the counterclaim.

Pursuant to *Connecticut Practice Book § 19-19,* the parties are referred to an accountant for an examination of the company accounts and books in order to determine the net assets of the company as March 10, 2001. The fees and expenses of the accountant are to be shared equally by the parties. The parties are to agree on the accountant; [*45] if they are unable to do so, they are to return to the court for the selection of an accountant.

Bellis, J.