## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE WEBLOYALTY.COM, INC. MARKETING AND SALES PRACTICES LITIGATION | MDL No. 07-01820 - JLT<br><br>Lead Case: 06-11620-JLT |

## LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS
## IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants respectfully submit the following Statement of Undisputed Facts pursuant to Local Rule 56.1. These facts are undisputed and demonstrate that Defendants are entitled to judgment as a matter of law.

### PLAINTIFF KUEFLER

### Fandango Purchase and Enrollment in Reservation Rewards

1.      On December 25, 2005, Plaintiff Kuefler visited the Fandango web site to purchase movie tickets. See Declaration of Shane O'Neill ("O'Neill Decl.") ¶ 3.

2.      After he used the Fandango service to identify the film and showing for which he wished to purchase tickets, Mr. Kuefler visited the "SELECT TICKETS" page of the Fandango website, which asked him to confirm the film that he wanted to purchase tickets to, and to enter the number of tickets he wished to buy. O'Neill Decl. ¶ 5; Declaration of Tamra Lichtman ("Lichtman Decl.") ¶ 6.

3.      In the lower third of the Select Tickets page was a gray box labeled "**Optional Offer.**" The box contained a blank square box labeled "Yes," which Mr. Kuefler was required to check off in order to learn more about the offer and claim a $10 cash back reward. No

- 1 -

customer of Fandango, including Mr. Kuefler, was required to click this box in order to proceed with purchasing his selected movie tickets, and the box was "unchecked" by default. Lichtman Decl. ¶ 6; O'Neill Decl. ¶ 5.

4.     Mr. Kuefler checked the box for more information and then clicked "Continue" at the bottom of the Select Tickets page.  Neither action by Mr. Kuefler resulted in his being enrolled in Reservation Rewards or in the transfer of his credit card or other personal information from Fandango to Reservation Rewards.   Lichtman Decl. ¶ 7; O'Neill Decl. ¶ 9.

5.     After checking the box and clicking "Continue," Mr. Kuefler was next directed to a Fandango sign-in page.  After signing in, Mr. Kuefler was directed to the Payment page of the Fandango website.  Lichtman Decl.¶ 8; O'Neill Decl. ¶ 6.

6.     Because Mr. Kuefler previously had clicked "Yes" and "Continue" in the Optional Offer box on the Select Tickets page, he was directed from the Payment page to the Reservation Rewards enrollment page ("Enrollment page").[1]  When he arrived at the Enrollment page, Mr. Kuefler still had not been enrolled in the Reservation Rewards program and his credit card information still had not been transferred from Fandango to Reservation Rewards.  Lichtman Decl. ¶¶ 9-13; O'Neill Decl. ¶¶ 6, 9.

7.     The Enrollment page described the terms of membership in Reservation Rewards, including the cost of the program and the fact that, if he enrolled, Mr. Kuefler's credit or debit card information would be transmitted from Fandango to Reservation Rewards and that

---

[1]     Had Mr. Kuefler not checked the "YES" box indicating that he wanted to learn more about the program and the offered $10 cash reward, he would have been directed instead to the Fandango Order Review page.  Lichtman Decl. ¶ 9.

charges would be billed to that card.  There was no limit on the amount of time a customer could review the Enrollment page.  <u>See</u>  Lichtman Decl. ¶ 10 and Exhibit 2 thereto; O'Neill Decl. ¶ 6 and Exhibit 2 thereto.

8.    The Enrollment page in at least four separate places informed Mr. Kuefler that he would be charged a monthly $10 membership after an initial free one-month trial membership. <u>See</u> Exhibit 2 to Lichtman Decl.; Exhibit 2 to O'Neill Decl.

9.    An off-set colored box on the Enrollment page contained three highlighted bullet points. The bullets state:

- 30 Days FREE plus only $10 a month thereafter
- E-mail reminder before first monthly charge
- Cancel anytime hassle-free online or by phone

<u>See</u> Exhibit 2 to Lichtman Declaration; Exhibit 2 to O'Neill Declaration.

10.   Under these bullets, in colored text, the Enrollment page explained how to enroll in Reservation Rewards: "Sign up for Reservation Rewards by entering your e-mail address and clicking YES below."  Just beneath this text, the Enrollment page explained that, by entering his email address twice and clicking "YES," Mr. Kuefler was attesting that he "ha[d] read and agree[d] to the Offer and Billing Details and authorize[d] Fandango to securely transfer my name, e-mail address and credit or debit card information to Reservation Rewards for billing and benefit processing."  <u>See</u> Exhibit 2 to Lichtman Decl.;  Exhibit 2 to O'Neill Decl.

11.   The yellow scroll-down box on the Enrollment page disclosed to Mr. Kuefler the offer and billing details of the Reservation Rewards program, as well as the fact that, by

choosing to enroll, he was expressly authorizing the transfer and use of his credit or debit card information.  More specifically, the scroll-down box disclosed: (a) the fact that the customer would be charged $10 per month after the 30-day trial membership; (b) that the credit or debit card information provided by the customer to Fandango would be billed by Reservation Rewards for the $10 monthly charge; (c) that the contact information provided by the customer to Fandango would be used for billing and benefit processing; and (d) that the customer could contact Reservation Rewards (at a toll-free number provided) at any time to cancel his or her membership and "owe nothing further."  See Exhibit 2 to Lichtman Decl.; Exhibit 2 to O'Neill Decl.

12.   The text immediately above the email signature boxes on the Enrollment page explained that, by entering his email address as his electronic signature, he was attesting to his having read the Offer and Billing Details and also authorizing the transfer of his credit or debit card information to Reservation Rewards for billing and benefits processing.  In addition, immediately to the left of the signature boxes, was the "Offer and Billing Details" box, which was offset by a different color and disclosed the fact that he would be billed $10 a month after an initial trial period and that the credit or debit card he used for his purchase would be used for that purpose.  See Exhibit 2 to Lichtman Decl.; Exhibit 2 to O'Neill Decl.

13.  Mr. Kuefler  (1) entered his email address in the box provided; (2) entered his email in the confirmation box provided; and, (3) clicked on the "YES!" button.  Lichtman

- 4 -

Decl. ¶ 11; O'Neill Decl.¶ 7.[2]

14.    Mr. Kuefler accepted the terms of the Reservation Rewards offer, attested that he had read and agreed to the Offer and Billing details, and authorized the transfer by Fandango to Reservation Rewards of his credit or debit card information for billing purposes.  Lichtman Decl. ¶¶ 11-12; O'Neill Decl. ¶ 7.

15.    Directly above the space in which the aforementioned three steps occurred, the following language alerted Mr. Kuefler as to the significance of what he was doing, the substance of what he was attesting to, and the consent he was giving:

> By entering my e-mail address as my electronic signature and clicking YES, I have read and agree to the Offer and Billing Details and authorize Fandango to securely transfer my name, e-mail address and credit or debit card information to Reservation Rewards for billing and benefit processing.

See Lichtman Decl. ¶11 and Exhibit 2 thereto; O'Neill Dec. ¶ 7 and Exhibit 2 thereto.

16.    No credit or debit card or personal information was transmitted to Reservation Rewards until Mr. Kuefler had completed his purchase transaction with Fandango, had the material terms of the program disclosed to him (including that the credit or debit card he used for his purchase would be charged $10 per month after a trial period and that he could cancel his membership at any time), had the opportunity to read the terms of the offer, and had taken several steps to accept the offer, enroll in the program, and/or authorize the billing of his credit or debit card.  The same is true of all customers who at or around the same time, enrolled in

---

[2]    After he clicked YES!, Mr. Kuefler was directed to a Fandango Order Review page where he completed his ticket purchase transaction.   Lichtman Decl. ¶ 12; O'Neill Decl. ¶ 8.

Reservation Rewards through this website.  <u>See</u> Lichtman Decl. ¶¶ 10-13 and Exhibit 2 thereto; O'Neill Decl. ¶¶ 4, 7-9 and Exhibit 2 thereto.

17.    A Fandango customer could not enroll in Reservation Rewards without having entered his email address twice and clicking on the "YES!" button on the Enrollment page.   If the customer clicked "No thanks" instead of "YES!," or if he simply clicked the "Continue with ticket purchase" button at the bottom of the page without filling in his email address in the two sign up boxes and clicking "YES!," he would continue with his Fandango purchase, without having enrolled.  Nor would a customer's email or credit or debit card information be transmitted from Fandango to Reservation Rewards or used or billed unless the customer had taken the affirmative steps to authorize the transmission and use of that information. Lichtman Decl. ¶¶ 11, 13; O'Neill Decl. ¶¶ 8-9.

18.    Once Mr. Kuefler had entered his email address twice into the enrollment form and clicked the "YES!" button, he was enrolled in Reservation Rewards.  At this time, and not before, Fandango transmitted Mr. Kuefler's credit card and identifying information to the Reservation Rewards program.  O'Neill Decl. ¶ 8-9.

**<u>Post-Enrollment Communications Concerning Reservation Rewards</u>**

19.    A few minutes after enrollment, on December 25, 2005, Reservation Rewards sent to Mr. Kuefler an email with the subject line: "As requested, your Membership Kit for Reservation Rewards, please login today."  Among other things, the email described the benefits available to Reservation Rewards members and repeated the Offer and Billing details, stating:

If you are completely satisfied during your trial, do nothing.  All your Reservation

> Rewards discounts and protection will automatically continue for just $10 a month billed by Reservation Rewards to the credit or debit card you authorized [Visa, Last 4 digits: 2089].  For your convenience Reservation Rewards will use the contact and credit or debit card information you authorized for billing and benefit processing. . . . Your monthly fee will show up on your card statement as billed by WLI*RESERVATIONREWARDS 800-732-7031 CT.

The confirming email also reiterated the previous disclosure that membership could be canceled at any time.  Lichtman Decl. ¶¶ 14-15 and Exhibit 3 thereto.

20.    Seven days into Mr. Kuefler's trial period (i.e., on January 1, 2006), Webloyalty sent to Mr. Kuefler an email with a subject line "New member benefit update from Reservation Rewards" reminding him of his membership in the Reservation Rewards program.  Lichtman Decl. ¶ 16 and Exhibit 4 thereto.

21.    Approximately a week later, on January 7, 2006, Webloyalty sent an email with a subject line "Your $10.00 Cash Back on next Fandango purchase" to Mr. Kuefler reminding him of his membership.   Lichtman Decl. ¶ 17 and Exhibit 5 thereto.

22.    Reservation Rewards sent Mr. Kuefler another email on January 10, 2006, reminding him that, unless he cancelled his membership, his credit card would be charged a $10 membership fee.  The subject line of the email was:  "Benefit and billing reminder notice for Reservation Rewards members."   The email identified by name and number the specific card that would be charged and stated the name under which the charge would appear.  The email also explained how Mr. Kuefler could cancel his membership if he wished to do so before being charged and provided a toll-free number to reach Reservation Rewards customer service.  Lichtman Decl. ¶ 18 and Exhibit 6 thereto.

23.    On January 24, 2006, Mr. Kuefler's trial membership expired and his credit card

was charged $10.  On the same day, Reservation Rewards' sent Mr. Kuefler another email confirming that he had enrolled in the program and describing some of its benefits.  Lichtman Decl. ¶ 19 and Exhibit 7 thereto.

**Mr. Kuefler's Cancellation of Membership and Full Refund**

24.   Approximately one month later, on February 22, 2006, Mr. Kuefler contacted Reservation Rewards' toll-free number and asked that his membership in Reservation Rewards be canceled and that he receive a refund of the $10 previously billed in January 2006. His requests were granted in full the next day. Confirmation emails were sent to Mr. Kuefler on the same day confirming the cancellation and refund.  Lichtman Decl. ¶ 20 and Exhibit 8 thereto.

**PLAINTIFF CROUSE**

**Priceline Purchase and Enrollment in Reservation Rewards**

25.   On January 11, 2005, Mr. Crouse conducted a transaction on the Priceline website.  Declaration of  Michael Masone ("Masone Decl.") ¶ 3.

26.   On Priceline, customers can offer to purchase travel products (such as airline flights or hotel rooms) at a particular price.  If a name your own price offer is accepted by one of Priceline's vendors (such as an airline or hotel company), the customer is taken to a transaction acceptance screen ("Transaction Acceptance Screen").  At that point, the customer's Priceline transaction is complete.  Masone Decl. ¶ 4 and Exhibit 1 thereto; Lichtman Decl. ¶ 23 and Exhibit 10 thereto.

27.   The Transaction Acceptance Screen contained two "banner advertisements" – or boxes of text containing an internet link – that would direct the customer to the Reservations

Rewards Enrollment page, but only if the customer affirmatively chose to click on either one of the banners.  Lichtman Decl. ¶¶ 23, 24; Masone Decl. ¶ 5.

28.    In the top third of the page, at the right side, was a banner advertisement that stated:  "Your request is complete.  Click here to claim Special Offer!" and that included a grey button with the words "Continue" inside.  At the bottom of the page, another banner read: "Click here to claim your Special Offer for your request today!"   Lichtman Decl. ¶ 23 and Exhibit 10 thereto.

29.    No Priceline customer – including Mr. Crouse – was required to click on either banner for any purpose with respect to his Priceline transaction.  The banners were passive until activated by the customer, who needed to click on one or the other of the banners to indicate a desire to learn more about the offer.  Clicking on either of the banners did nothing more than allow Mr. Crouse to see a page giving full information about the terms and conditions of joining Reservations Rewards.  Clicking on the banner did not enroll Mr. Crouse automatically in the Reservation Rewards program.  Nor did it result in the transfer or use of any credit or debit card information or personal information.  Masone Decl. ¶¶ 6, 8; Lichtman Decl.  ¶¶ 23, 26, 27, 28.

30.    Mr. Crouse clicked on one of the banners on the Transaction Acceptance screen and, in doing so, expressed his interest in learning more about the offer.  Mr. Crouse was next directed to an Enrollment page setting forth the details of the Reservation Rewards program. When he arrived at the Enrollment page, Mr. Crouse was still not enrolled in the Reservation Rewards program and his credit card or personal information had not been transferred from Priceline to Reservation Rewards.  Lichtman Decl. ¶¶ 24, 27, 28; Masone Decl. ¶ 8.

31.    The Enrollment page notified Mr. Crouse of the terms of membership in the Reservation Rewards program.  Among other things, the Enrollment page disclosed that membership in the program cost $9 per month, and also disclosed that the amount would be charged to the credit or debit card provided by Mr. Crouse to Priceline.  There was no limit to the amount of time a customer could review the Enrollment page.  Lichtman Decl. ¶ 25 and Exhibit 11 thereto.

32.    The Enrollment page disclosed four times that Mr. Crouse would be billed a $9 monthly fee.  Exhibit 11 to Lichtman Decl.

33.    Directly above the area in which Mr. Crouse entered his email address twice and clicked "YES!" to become a member of Reservation Rewards, the Enrollment page disclosed that, by accepting the offer, Mr. Crouse was authorizing the transfer of his "name, address and credit or debit card information to Reservation Rewards for billing and benefit processing." See Exhibit 11 to Lichtman Decl.

34.    The "Offer Details" box (i.e., the yellow box to the left of the spot where Mr. Crouse entered his email address twice as his electronic signature) disclosed to Mr. Crouse the offer and billing details of the Reservation Rewards program, as well as the fact that, by choosing to enroll, he was authorizing the transfer and use of his credit or debit card information.   More specifically, the Offer Details box disclosed: (a) that the credit or debit card Mr. Crouse used at Priceline.com would be charged $9 a month; (b) that the contact information he provided to Priceline.com would be used for billing and benefit processing; and (c) that Mr. Crouse could contact Reservation Rewards (at a toll-free number provided) to cancel his membership and "owe nothing further."  See Exhibit 11 to Lichtman Decl.

- 10 -

35.   The text immediately above the email signature boxes on the Enrollment page explained that, by entering his email address as his electronic signature, he was attesting to his having read the Offer Details and also authorizing the transfer of his credit or debit card information from Priceline to Reservation Rewards for billing and benefit processing. Immediately to the left of the signature boxes, was the "Offer Details" box, which was offset by a different color and disclosed the fact that Mr. Crouse would be billed $9 a month and that the credit or debit card he used for his purchase would be used for that purpose. See Lichtman Decl. ¶ 25 and Exhibit 11 thereto.

36.   Mr. Crouse  (1) entered his email address in the box provided; (2) entered his email a second time on the Enrollment page as required to proceed further; and (3) clicked on the "YES!" button.  Lichtman Decl. ¶ 26; see Masone Decl. ¶ 8.

37.   Mr. Crouse accepted the terms of the Reservation Rewards offer, attested that he had read and agreed to the Offer Details, and authorized the transfer by Priceline to Reservation Rewards of his credit card information for billing purposes.   Lichtman Decl. ¶ 26.

38.   Directly above the space in which the aforementioned three steps occurred, the following language alerted Mr. Crouse as to the significance of what he was doing, the substance of what he was attesting, and the consent he was giving:

> By entering my email address as my electronic signature and clicking YES, I have read and agree to the Offer Details and authorize Priceline.com to securely transfer my name, address and credit or debit card information to Reservation Rewards for billing and benefit processing.

See Lichtman Decl. ¶ 26 and Exhibit 11 thereto.

39.   Mr. Crouse was not enrolled in the Reservation Rewards program until all

material terms of the program had been disclosed to him (including that the credit or debit card he used for his Priceline purchase would be charged $9 per month), he had the opportunity to read the terms of the offer, and he took several steps to accept the offer, enroll in the program, and/or authorize the billing of his credit or debit card. The same is true of all other customers who, at or around the same time, enrolled in Reservation Rewards through this website. Lichtman Decl. ¶ 28.

40.    A Priceline customer, like Mr. Crouse, could leave the Enrollment page without joining Reservation Rewards. Because his Priceline transaction had already been completed, he could simply close the Enrollment page without entering his email address twice and clicking the "YES!" button. Or he could simply click the "back" button on his web browser, and he would be returned to the Priceline.com Transaction Acceptance screen. Finally, he could click the phrase in blue text just below the email signature boxes and enrollment button, "No thanks, please take me back to Priceline.com" and he would also be returned to the home page of www.priceline.com. Lichtman Decl. ¶ 27; Masone Decl. ¶ 4.

41.    Once Plaintiff Crouse had entered his email twice into the enrollment form and clicked the "YES!" button, he was enrolled in Reservation Rewards. At this time, and not before, Priceline.com transmitted Mr. Crouse's credit card and identifying information to the Reservation Rewards program. Lichtman Decl. ¶ 28; Masone Decl. ¶ 8.

42.    It was not possible to join Reservation Rewards from this Priceline.com screen flow on January 11, 2005, without taking each of these three affirmative steps. Until Plaintiff Crouse chose to enroll in Reservation Rewards by taking these steps, no credit card or other personal identifying information of Plaintiff Crouse's was transmitted from Priceline to the

program.  Lichtman Decl. ¶ 28; Masone Decl. ¶ 8.

43.    Immediately upon enrolling in the Reservation Rewards program, Mr. Crouse was taken to a Reservation Rewards welcome screen ("Welcome screen").  The Welcome screen contained detailed information concerning the program and also repeated much of the information that had been disclosed on the Enrollment page.  More specifically, the Welcome screen repeated the details concerning the costs of the program to Mr. Crouse and gave the brand name and the last four digits of the credit card he had authorized to be billed.  The Welcome screen also informed Mr. Crouse that charges to his credit card would be billed as "WLI*RESERVATIONREWARDS.COM 888-688-5995 CT."  The Welcome screen also alerted Mr. Crouse that he would receive an email containing his membership kit.  In addition, the Welcome screen again informed Mr. Crouse that he could cancel his membership at any time, and gave Mr. Crouse a toll-free number he could call to cancel and an email address he could use to contact Reservation Rewards customer service.  Lichtman Decl. ¶ 30 and Exhibit 12 thereto.

**Post-Enrollment Communications Concerning Reservation Rewards**

44.    On January 11, 2005, Reservation Rewards sent Plaintiff Crouse an email welcoming him to the program and describing its benefits and confirming the offer details, including the charges he would incur, and that the credit or debit card he had authorized would be used for billing purposes.  The subject line of this email was "As requested, your Membership Kit for Reservation Rewards, please login today."  Lichtman Decl. ¶ 31 and Exhibit 13 thereto.

45.    This email displayed Plaintiff Crouse's member number and the email address he

had provided on enrollment, and informed him of the Reservation Rewards password that had

been generated for him.  It also explained how Plaintiff Crouse could claim his $10 cash back

award.  Lichtman Decl. ¶ 32 and Exhibit 13 thereto.

46.   On January 12, 2005, Reservation Rewards sent Plaintiff Crouse an email with a

subject line: "Benefit and billing reminder notice for Reservation Rewards members."  The

email described the Reservation Rewards program and reminded him that "your next $9.00

membership fee will be billed by Reservation Rewards to the credit card or deducted from the

debit card you used to join and authorized Reservation Rewards to use for billing and benefit

processing," and identifying that credit card by brand and the last four digits of the card

number.  The email further explained that the billing would occur on January 18, 2005, and

provided a toll free number that Plaintiff Crouse could call if he wanted to cancel his

membership and avoid billing.  Lichtman Decl. ¶ 33 and Exhibit 14 thereto.

47.   On January 12, 2005, Plaintiff Crouse logged onto the Reservation Rewards web

page and visited the shopping discounts page.   To log in at this time, Plaintiff Crouse would

either have clicked a link in one of the emails sent to him by Reservation Rewards, which

would have automatically logged him in to the Reservation Rewards system, or he would have

needed to visit the Reservation Rewards home page and log in using his email address and the

password provided in his Welcome email.  Lichtman Declaration ¶ 34.

48.   On January 18, 2005, Plaintiff Crouse's credit card was charged $9 for his first

membership fee.   Also on January 18, 2005, another email was sent.  Lichtman Decl. ¶ 35 and

Exhibit 15 thereto.

49.   Reservation Rewards sent Mr. Crouse six additional emails describing his

membership benefits and encouraging him to use those benefits.  Lichtman Decl. ¶¶ 36-41 and Exhibits 16-21 thereto.

## Mr. Crouse's Cancellation of Membership and Full Refund

50.   On February 8, 2006, Plaintiff Crouse contacted the Reservation Rewards toll free number and used the automated system to cancel his membership.  After completing this transaction, Plaintiff Crouse hung up, phoned back to Reservation Rewards customer service, and requested a refund of prior billings.  This request was granted and the requested refunds were processed the very next day.  Lichtman Decl. ¶ 42.

51.   An email confirming the cancellation of Plaintiff Crouse's membership was sent to the email address then on file with Reservation Rewards -- asshifmohamed@hotmail.com -- and a second email confirming the refund of his membership fees was sent to a new email address that Plaintiff Crouse provided for his account that day -- kcrouse@freshdelmonte.com.  Lichtman Decl. ¶ 42 and Exhibit 22 thereto.

## PLAINTIFF STAAF

## JustFlowers Purchase and Enrollment in Reservation Rewards

52.   Ms. Staaf conducted a transaction on www.GiftBasketsasap.com on December 19, 2005.[3]  At the end of her transaction, Ms. Staaf was taken to a confirmation page that contained a banner advertisement stated:  "Your purchase is complete.  Click here to claim your $10.00 Reward Certificate for your next purchase!"  Below this banner was a "Continue" button on which Ms. Staaf was required to click if she wanted to receive further information

---

[3] The websites operated by Defendants Garrett and Khoklov will be referred to herein as "JustFlowers."

about this offer. Only if a customer chose to click on the "Continue" button would he or she be directed to the Reservation Rewards Enrollment page. Declaration of Nelson Shane Garrett ("Garrett Decl.") ¶¶ 3, 4 and Exhibit 1 thereto; Lichtman Declaration ¶ 46 and Exhibit 24 thereto.

53.    No customer of JustFlowers, including Ms. Staaf, was required to click on the "Continue" button for any purpose with respect to his or her transaction. Indeed, as the banner made clear, the customer's purchase was already complete. Garrett Decl. ¶¶ 4-5 and Exhibit 1 thereto; Lichtman Decl. ¶¶ 46, 50 and Exhibit 24 thereto.

54.    Ms. Staaf clicked on the "Continue" button and, by doing so, expressed her interest in learning more about the offer. Ms. Staaf was then directed in the same browser window to an Enrollment page setting forth all the details of the offer. Clicking on the banner did not enroll Ms. Staaf automatically in the Reservation Rewards program, nor did it result in the transfer or use of any credit or debit card or personal information. Lichtman Decl. ¶ 47; Garrett Decl. ¶ 7.

55.    The Enrollment page notified Ms. Staaf of the terms of membership in the Reservation Rewards program. Among other things, the Enrollment page disclosed that membership in the program costs $9 per month after a 30-day free trial period, and also disclosed that the amount would be charged to the credit or debit card provided by the customer during her transaction. There was no limit to the amount of time a customer could review the Enrollment page. Lichtman Decl. ¶ 48 and Exhibit 25 thereto.

56.   The Enrollment page disclosed five times that Ms. Staaf would be billed a $9 monthly fee after the initial 30-day trial membership.  See Exhibit 2 to Garrett Decl.; Exhibit 25 to Lichtman Decl.

57.   Directly above the area in which Ms. Staaf entered her email address twice and clicked YES to become a member of Reservation Rewards, the Enrollment page disclosed that, by accepting the offer, Ms. Staaf was authorizing the transfer of her "name, address and credit or debit card information used for my purchase at flower.com to Reservation Rewards for billing and benefit processing."  See Exhibit 2 to Garrett Decl.; Exhibit 25 to Lichtman Decl.

58.   The "Offer and Billing Details" box  (i.e., the blue box directly to the left of the area in which Ms. Staaf entered her email address twice and clicked YES to become a member of Reservation Rewards), disclosed to Ms. Staaf the offer and billing details of the Reservation Rewards program, as well as the fact that, by choosing to enroll, she was authorizing the transfer and use of her credit or debit card information.  More specifically, the box disclosed: (a) that Ms. Staaf would be charged $9 a month after a free 30-day trial membership; (b) that the credit or debit card used by Ms. Staaf for her JustFlowers transaction would be billed by Reservation Rewards for the $9 monthly charge; (c) that the contact information she provided to JustFlowers would be used for billing and benefit processing; and (d) that Ms. Staaf could contact Reservation Rewards (at a toll-free number provided) to cancel her membership and "owe nothing further."  See Exhibit 2 to Garrett Decl.; Exhibit 25 to Lichtman Decl.

59.   The text immediately above the email signature boxes on the Enrollment page explained that, by entering her email address as her electronic signature, she was attesting to

- 17 -

her having read the Offer and Billing Details and also authorizing the transfer of her credit or

debit card information to Reservation Rewards for billing and benefits processing.  In

addition, immediately to the left of the signature boxes, was the "Offer and Billing Details"

box, which was offset by a different color and disclosed the fact that she would be billed $9 a

month after an initial trial period and that the credit or debit card she used for her purchase

would be used for that purpose. See Lichtman Decl. ¶ 48 and Exhibit 25 thereto.

60.   Ms. Staaf (1) entered her email address in the box provided; (2) entered her email

a second time on the Enrollment page as required to proceed further; and, (3) clicked on the

"YES!" button, as final confirmation of her consent.  Lichtman Decl. ¶ 49; Garrett Decl. ¶ 6.

61.   Ms. Staaf accepted the terms of the Reservation Rewards offer, attested that she

had read and agreed to the Offer and Billing details, and authorized the transfer by JustFlowers

to Reservation Rewards of her credit card information for billing purposes.  Lichtman Decl. ¶

49; Garrett Decl. ¶ 6.

62.   Directly above the space in which the aforementioned three steps occurred, the

following language alerted Ms. Staaf as to the significance of what she was doing, the

substance of what she was attesting, and the consent she was giving:

> By entering my email address as my electronic signature and clicking YES, I have
> read and agree to the Offer and Billing Details and authorize the secure transfer of
> my name, address, and credit or debit card information used for my purchase at
> flower.com to Reservation Rewards for billing and benefit processing.

See Lichtman Decl. ¶ 49 and Exhibit 25 thereto; Garrett Decl. ¶ 6 and Exhibit 2 thereto.

63.   Ms. Staaf was not enrolled in the Reservation Rewards program until all material

terms of the program had been disclosed to her (including that the credit or debit card she used

for her purchase would be charged $9 per month after an individual trial period and that she could cancel her membership at any time), she had the opportunity to read the terms of the offer, and she took several steps to accept the offer, enroll in the program, and/or to authorize the billing of her credit card. The same is true of all other customers who, at or around the same time, enrolled in the Reservation Rewards program through this website. Lichtman Decl. ¶ 51 and Exhibit 25 thereto; Garrett Decl. ¶¶ 6, 7 and Exhibit 2 thereto.

64.    A JustFlowers customer, like Ms. Staaf, could leave the Enrollment page without joining Reservation Rewards. Because her retail transaction was already complete, she could simply close the Enrollment page without entering her email address twice and clicking the "YES!" button. Or she could simply click her web browser's "back" button and would be returned to the confirmation page. Finally, the customer could click the underlined phrase "No Thanks" just below the email signature boxes and enrollment button, and again would be taken back to the confirmation page. Lichtman Decl. ¶ 50.

65.    Once Ms. Staaf had entered her email address twice into the enrollment form and clicked the "YES!" button, she was enrolled in the Reservation Rewards program. At this time, and not before, JustFlowers transmitted Ms. Staaf's credit card and identifying information to the Reservation Rewards program. Garrett Decl. ¶ 7; Lichtman Decl. ¶ 51.

66.    It was not possible to join Reservation Rewards from the JustFlowers screen flow on December 19, 2005, without taking each of these affirmative steps and, until Plaintiff Staaf chose to enroll in the Reservation Rewards program by taking these steps, no credit or debit card or other personal identifying information of Ms. Staaf's was transmitted from JustFlowers to the program. Lichtman Decl. ¶ 51; Garrett Decl. ¶ 7.

67.   Immediately upon enrolling in the Reservation Rewards program, Ms. Staaf was automatically taken in to a Reservations Rewards welcome screen ("Welcome screen"). The Welcome screen repeated much of the information regarding Reservation Rewards that was presented to Ms. Staaf on the Enrollment page.  More specifically, the Welcome screen repeated the details concerning the costs of the program to Ms. Staaf and provided the brand name of the credit card she had authorized to be billed.  The Welcome screen also notified Ms. Staaf that the charges to her credit card would be billed as "WLI*RESERVATIONREWARDS.COM 800-732-7031 CT."  The Welcome screen also notified Plaintiff Staaf to the fact that an email containing her Membership Kit would be arriving shortly, and suggested she print the page for her records.  It also again informed Ms. Staaf that she could cancel her membership at any time, and that upon cancellation she would owe nothing further.  The Welcome screen also gave Ms. Staaf a toll-free number she could call to cancel and an email address she could contact.  The page also informed Ms. Staaf of the precise date on which her free trial membership would expire.  Lichtman Decl. ¶ 53 and Exhibit 26 thereto.

**Post-Enrollment Communications Concerning Reservation Rewards**

68.   On December 19, 2005, Reservation Rewards sent Plaintiff Staaf an email with a subject line "As requested, your Membership Kit for Reservation Rewards, please login today."  The email welcomed her to the program and described its benefits and confirmed the offer details including the charges she would incur and the fact that, once her free trial period expired, the credit or debit card she had used for her retail purchase would be billed by Reservation Rewards for her first $9 monthly membership fee.  Lichtman Decl. ¶ 54 and Exhibit 27 thereto.

69.   This Welcome email displayed Plaintiff Staaf's member number and the email address she had provided on enrollment.  It also explained how Plaintiff Staaf could claim her $10 reward certificate.  Lichtman Decl. ¶ 55 and Exhibit 27 thereto.

70.   On December 26, 2005, Reservation Rewards sent Plaintiff Staaf an email encouraging her to use her two for one dining benefits.  The subject line of this email was "New Member benefit update from Reservation Rewards."  Lichtman Declaration ¶ 56 and Exhibit 28 thereto.

71.   On January 1, 2006, Reservation Rewards sent Plaintiff Staaf another email, this time encouraging her to claim her reward certificate and to use her membership benefits.  Lichtman Decl. ¶ 57 and Exhibit 29 thereto.

72.   On January 4, 2006, Reservation Rewards sent Plaintiff Staaf another email describing the Reservation Rewards program and stating that "your next $9.00 membership fee will be billed by Reservation Rewards to the credit card or deducted from the debit card you used to join and authorized Reservation Rewards to use for billing and benefit processing."  This email also identified the credit card by brand and the last four digits of the card number.  The email further explained that the billing would occur on January 18, 2006, and provided a toll free number that Plaintiff Staaf could call if she wanted to cancel her membership and avoid billing.  The subject line of this email was "Benefit and billing reminder notice for Reservation Rewards members."  Lichtman Decl. ¶ 58 and Exhibit 30 thereto.

73.   On January 18, 2006, Plaintiff Staaf's credit card was charged $9 for her first membership fee.  Also on January 18, 2006, another email was sent, this one encouraging her

to use her movie ticket discounts.  The subject line of this email was "Member benefit update from Reservation Rewards."  Lichtman Decl. ¶ 59 and Exhibit 31 thereto.

74.    Reservation Rewards sent Ms. Staaf two additional emails describing membership benefits and encouraging her to use the benefits.  Lichtman Decl. ¶¶ 60-61 and Exhibits 32-33 thereto.

**Ms. Staaf's Cancellation of Membership and Full Refund**

75.    On March 22, 2006, Plaintiff Staaf contacted the Reservation Rewards toll free number and used the automated system to cancel her membership.  Also on this date, Reservation Rewards sent Ms. Staaf an email confirming the cancellation of her membership.  Lichtman Decl. ¶ 62 and Exhibit 34 thereto.

76.    On April 22, 2006, Plaintiff Staaf's credit card company notified Reservation Rewards that she had disputed the charges reflecting her three prior monthly membership fees.  On that same day, Reservation Rewards credited those billings back to the credit card issuer.  Lichtman Decl. ¶ 63.

**PLAINTIFF MELO**

**123inkjets Purchase and Enrollment in Reservation Rewards**

77.    On August 3, 2005, Mr. Melo conducted a transaction on the 123inkjets.com website.  During the "check-out" process of his transaction, Mr. Melo was directed to a webpage that asked him to provide shipping, billing and other information concerning his purchase.  If Mr. Melo wished to complete his transaction, he needed to click on the "submit my order" button at the bottom of the webpage.  Mr. Melo clicked on the "submit my order" button.  Declaration of Veronica Miller ("Miller Decl.") ¶¶ 3-5; Lichtman Decl.  ¶¶ 64-66.

78.   Mr. Melo was then directed to the Reservation Rewards Enrollment page.  This multi-colored Enrollment page was automatically displayed on Mr. Melo's computer screen. At the very top of the Enrollment page was a statement that Mr. Melo's 123inkjets.com purchase was complete and that the Enrollment page was an optional offer from another provider:  "Your purchase is complete . . . here's a Special Reward from a preferred partner of 123inkjets.com!"   At the top of the Enrollment page, there was an option to decline joining the program.  All Mr. Melo, or any other 123inkjets.com customer, had to do was click on the button marked "No Thanks" next to the text "Just take me to the confirmation page" if he did not want to join Reservation Rewards.  Lichtman Decl. ¶¶ 67, 70 and Exhibit 37 thereto.

79.   Mr. Melo did not click on the "No Thanks" button at the top of the Enrollment page.  Instead, he scrolled down through the text describing the Reservation Rewards program on the Enrollment page.  At that point, he again did not choose to decline the offer by clicking on the additional "No Thanks" button at the bottom of the page.  See Lichtman Decl. ¶ ¶ 69-71.

80.   The Enrollment page notified Mr. Melo of the terms of membership in the Reservation Rewards program.  Among other things, the Enrollment page disclosed that membership in the program costs $9 per month after a 30-day free trial period, and also disclosed that the amount would be charged to the credit or debit card provided by the customer during his transaction on 123inkjets.com.  There was no limit to the amount of time a customer could review the Enrollment page.  See Lichtman Decl. ¶ 68 and Exhibit 37 thereto.

81.   The Enrollment page disclosed at least five times that, should Mr. Melo choose to

enroll in the Reservation Rewards program, he would be charged $9 per month after an initial 30-day trial period.  See Exhibit 37 to Lichtman Decl.

82.   Directly above the area in which Mr. Melo entered his email address twice and clicked YES to become a member of Reservation Rewards, the Enrollment page also disclosed that, by accepting the offer, Mr. Melo was authorizing the transfer of his "name, address, and credit or debit card information to Reservation Rewards for billing and benefit processing." See Exhibit 37 to Lichtman Decl.

83.   The "Offer and Billing Details" on the Enrollment page disclosed: (a) that Mr. Melo would be charged $9 per month after the 30-day trial membership; (b) that the credit or debit card provided by Mr. Melo to 123inkjets.com would be billed by Reservation Rewards for the $9 monthly charge; (c)  that the contact information he provided to 123inkjets.com would be used for billing and benefit processing; (d) that Mr. Melo could contact Reservation Rewards (at a toll-free number provided) at any time to cancel his membership and "owe nothing further."  See Exhibit 37 to Lichtman Decl.

84.   The text immediately above the email signature boxes on the Enrollment page explained that, by entering his email address as his electronic signature, he was attesting to his having read the Offer and Billing Details and also authorizing the transfer of his credit or debit card information to Reservation Rewards for billing and benefits processing.  In addition, immediately to the left of the signature boxes, was the "Offer and Billing Details" box, which was offset by a different color and disclosed the fact that he would be billed $9 a month after an initial trial period and that the credit or debit card he used for his 123inkjets.com purchase would be used for that purpose.  Lichtman Decl. ¶ 68 and Exhibit 37 thereto.

85.   Mr. Melo (1) entered his email address in the box provided; (2) entered his email address a second time on the Enrollment page as required to proceed further; and (3) clicked on the "YES!" button, as final confirmation of his consent.  Lichtman Decl. ¶ 69; Miller Decl. ¶ 7.

86.   Mr. Melo accepted the terms of the Reservation Rewards offer, attested that he has read and agreed to the Offer and Billing Details, and authorized the transfer by 123inkjets.com to Reservation Rewards of his credit or debit card information for billing purposes.  See Lichtman Decl. ¶ 69 and Exhibit 37 thereto; Miller Decl. ¶ 7.

87.   Directly above the space in which the aforementioned three steps occurred, the following language alerted Mr. Melo as to the significance of what he was doing, the substance of what he was attesting, and the consent he was giving:

> By entering my email address as my electronic signature and clicking YES, I have read and agree to the Offer and Billing Details and authorize 123inkjets.com to securely transfer my name, address and credit or debit card information to Reservation Rewards for billing and benefit processing.

Lichtman Decl. ¶ 69 and Exhibit 37 thereto; Miller Decl. ¶ 7 and Exhibit 1 thereto.

88.   Mr. Melo was not enrolled in the Reservation Rewards program until all material terms of the program had been disclosed to him (including that the credit or debit card he used for his 123inkjets.com purchase would be charged $9 per month after the initial trial period and that he could cancel his membership at any time), he had had the opportunity to read the terms of the offer, and he took several steps to accept the offer, enroll in the program, and to authorize the billing of his credit or debit card.  The same is true of all other customers of 123inkjets.com who, at or around the same time period, enrolled in the Reservation Rewards

program through the 123inkjets.com website.  Lichtman Decl. ¶ 68, 69.

89.   A 123inkets.com customer, like Mr. Melo, could leave the Enrollment page without joining Reservation Rewards.  He could have clicked the "No Thanks" button at the top of the page, next to the words "Just take me to the confirmation page."  There was an additional "No Thanks" button directly under the email signature boxes and the YES! button, marked:  "I want to get my confirmation page without the Reservation Rewards program or $10.00 Cash Back Award," which he also could have clicked.  Lichtman Decl. ¶ 70 and Exhibit 37 thereto.

90.   Once Mr. Melo entered his email address twice into the enrollment form and clicked the "YES!" button, he was enrolled in the Reservation Rewards program.  At this time, and not before, 123inkjets.com transmitted Mr. Melo's debit card and identifying information to Reservation Rewards.  Miller Decl. ¶¶ 7, 10.

91.   It was not possible to join Reservation Rewards from the 123inkjets.com screen flow on August 3, 2005, without taking each of these affirmative steps.  Until Mr. Melo chose to enroll in the Reservation Rewards program by taking these steps, no credit or debit card or other personal identifying information of Mr. Melo's was transmitted from 123inkjets.com to the program.  Miller Decl. ¶ 9; Lichtman Decl. ¶ 72.

92.   After Mr. Melo entered his email address twice in the Enrollment page and clicked the "YES!" button, the window in which he was viewing the Enrollment page was taken to the 123inkjets.com purchase confirmation page, which contained details regarding his 123inkjets.com transaction for his records.  Lichtman Decl. ¶71 and Exhibit 38 thereto; Miller Decl. ¶ 8.

93.    At the same time, because Mr. Melo had entered his email address twice on the Enrollment page and clicked the "YES!" button, he was enrolled in Reservation Rewards.  At this time, and not before, 123inkjets.com transmitted Mr. Melo's debit card and identifying information to the Reservation Rewards program.  Lichtman Decl. ¶ 72; Miller Decl. ¶ 9.

94.    Upon Mr. Melo's enrollment in Reservation Rewards, a new browser window (the "Welcome screen") opened automatically on his computer.  The Welcome screen, among other things, repeated the offer and billing details contained on the Enrollment page.  The Welcome screen contained detailed information about how Mr. Melo could claim his $10 cash back off his next 123inkjets.com purchase, and also repeated the information as to how he could cancel his membership at any time:

> If at anytime you are not completely satisfied during your trial or thereafter, simply call Reservation Rewards toll free at 1-800-732-7031 to let us know you wish to cancel your monthly membership benefits and owe nothing further.

Lichtman Decl. ¶ 74 and Exhibit 39 thereto.

95.    The Welcome screen also provided an email address should Mr. Melo prefer to contact Reservation Rewards by that method instead of calling the toll free number.  The Welcome screen also informed Mr. Melo that his Membership Kit would be arriving shortly. Lichtman Decl. ¶ 74 and Exhibit 39 thereto.

**Post-Enrollment Communications concerning Reservation Rewards**

96.    On August 3, 2005, Reservation Rewards sent Mr. Melo an email welcoming him to the program and describing its benefits and the charges he would incur after his free thirty-day period expired.  The email informed him of the Reservation Rewards password that had been generated for him and explained how he could claim his $10 cash back award.  The

subject line of this email was "As requested, your Membership Kit for Reservations Rewards please login today."  Lichtman Decl. ¶ 75, 76 and Exhibit 40 thereto.

97.   One week later, on August 10, 2005, Reservation Rewards sent Plaintiff Melo an email encouraging him to use his two-for-one dining benefits.  The subject line of this email was "New member benefit update from Reservation Rewards."  Lichtman Decl. ¶ 77 and Exhibit 41 thereto.

98.   On August 16, 2005, Reservation Rewards sent Plaintiff Melo another email, this time encouraging him to claim his cash back award and to use his membership benefits.  The subject line of this email was "Your $10.00 Cash Back on next 123inkjets.com purchase." Lichtman Decl. ¶ 78 and Exhibit 42 thereto.

99.   Later that same day, at 3:42 PM, Reservation Rewards received an email from the email address Plaintiff Melo had provided when he enrolled.  Both the subject line and body of this email were blank.  The fact that Mr. Melo sent an email to Reservation Rewards that shows that he knew how to communicate with Reservation Reward and that he received Reservation Rewards' communications providing its email address.  As of this date, Mr. Melo was still in the complimentary trial membership period and had not been charged any monthly membership fee.  Mr. Melo did not seek to cancel his membership at this time.  Lichtman Decl. ¶ 79 and Exhibit 43 thereto.

100. Later that same day, Reservation Rewards customer service responded to Mr. Melo's email by sending to Plaintiff Melo's email address an email explaining what he needed to do in order to claim his $10 Cash Back Award.  The subject line of this email was "Reservation Rewards - Rebate Information."  Lichtman Declaration ¶ 79 and Exhibit 44

thereto.

101. On August 19, 2005, two weeks before his free trial period was to expire, Reservation Rewards sent Plaintiff Melo an email reminding him that, unless he elected to cancel his membership, his debit card would be charged a $9 membership fee. The subject line of this email was "Benefit and billing reminder notice for Reservation Rewards members." This email also identified the debit card to be billed by its brand and last four digits. The email explained how Plaintiff Melo could cancel his membership if he wished to do so before being charged, and provided a toll-free number to facilitate a cancellation should he wish. Lichtman Decl. ¶ 80 and Exhibit 45 thereto.

102. On September 2, 2005, Plaintiff Melo's trial membership expired and his debit card was billed $9. On the same day, another email was sent. The subject line of this email was "Member benefit update from Reservation Rewards." Lichtman Declaration ¶ 81 and Exhibit 46 thereto.

103. Reservation Rewards sent Mr. Melo two additional emails describing membership benefits and encouraging him to use those benefits. Lichtman Decl. ¶¶ 82-83 and Exhibits 47-48 thereto.

**Mr. Melo's Cancellation of Membership**

104. On March 9, 2006, Plaintiff Melo contacted the Reservation Rewards toll free number and canceled his membership. This request was granted and processed that same day. A confirmation email was sent that same day to the email address previously on file for Plaintiff Melo confirming the cancellation. Lichtman Decl. ¶ 84 and Exhibit 49 thereto.

Respectfully submitted,

WEBLOYALTY.COM, INC, FANDANGO, INC.,
VALUECLICK, INC., E-BABYLON, INC.,
PRICELINE.COM, INC., NELSON SHANE
GARRETT, AND MAXIM O. KHOKHLOV

By Their Attorneys


/s/ Gabrielle R. Wolohojian
Gabrielle R. Wolohojian, BBO # 555704
John J. Regan, BBO # 415120
Joan S. Mitrou, BBO # 664499
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA  02109
Tel:  617-526-6000
Fax:  617-526-5000


Steven Lieberman, *pro hac vice*
Anne M. Sterba, *pro hac vice*
C. Nichole Gifford, *pro hac vice*
Rothwell, Figg, Ernst & Manbeck P.C.
1425 K Street NW
Washington, DC 20005
Tel:  202-783-6040

July 20, 2007          Fax: 202-783-6031


## Certificate of Service

I, Joan Mitrou, hereby certify that a true and accurate copy of the above document has been filed and served through the Court's electronic filing system, this 20th day of July 2007.  I also certify that I caused the above document to be served by mail upon the counsel listed on the attached Service List who do not receive electronically Notices of Electronic filing and that a copy of the foregoing document was served by hand on Mr. Gael Mahony.

_/s/ Joan Mitrou

# SERVICE LIST
# 1:07-md-01820-JLT

## Manual Notice List

**Michael L. Greenwald**
Lerach Coughlin Stoia Geller Rudman & Robbins LLP
Suite 500
120 E. Palmetto Park Road
Boca Raton, FL 33432

**Mark R. Miller**
Wexler, Toriseva, Wallace
One North LaSalle Street
Suite 2000
Chicago, IL 60602

**Mark J. Tamblyn**
Wexler, Toriseva, Wallace
1610 Arden Way
Suite 290
Sacramento, CA 95815

US1DOCS 6262629v2