UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE:  WEBLOYALTY.COM, INC. MARKETING AND SALES PRACTICES LITIGATION | MDL 07-01820 |
| | Lead Case: 06-11620-JLT |

**SECOND CONSOLIDATED AMENDED COMPLAINT**

Plaintiffs, individually and on behalf of all others similarly situated, allege for their consolidated amended complaint, by and through their attorneys, upon information and belief, as follows:

## I.  NATURE OF CASE

1.     Plaintiffs bring this consumer class action on behalf of themselves and a class of consumers and entities who were charged any fees, or paid interest, as a result of becoming subscribed to defendant Webloyalty.com, Inc.'s ("Webloyalty") "Reservation Rewards" membership program, and any other membership programs maintained by Webloyalty (including, but not limited to "Shopper Discount," "Shopper Discount and Rewards," "Travel Values Plus," and "Wallet Shield"), along with all those whose personal credit or bank debit card information was improperly used to create such subscriptions.

2.     Through partnerships it creates with online retailers (commonly referred to by Webloyalty as "e-tailers" or "retail partners"), Webloyalty uniformly sells memberships – by unilaterally "subscribing" consumers without their knowledge or consent – in sham programs such as "Reservation Rewards" for which it charges members a monthly fee, typically between $7.00 and $10.00 per month.  Reservation Rewards is the subscription-based program Webloyalty induced plaintiffs to join, but, upon information and belief, Webloyalty also uses the same uniform tactics described in this complaint to induce unwitting consumers to join other membership programs such as Travel Values Plus, Shopper Discounts & Rewards, Buyer Assurance and Wallet Shield.  These programs, including Reservation Rewards and others unknown to plaintiffs, will be collectively referenced as the "Membership Programs."

3.     The Membership Programs each purportedly provide benefits such as discounts on dining and tourist attractions, along with "travel protection" such as roadside assistance, hotel

overbooking and baggage insurance, but, upon information and belief, such Membership Programs provide virtually no benefit at all, either because the purported "benefits" do not exist or because the unwitting "subscribers" never attempt to access them.  The uniform business practice by which Webloyalty and its partners sell the Membership Programs constitutes theft, pure and simple.  Worse, this process compromises the confidential billing information (including credit and debit card information) of unsuspecting consumers who are tricked into clicking on a Membership Program advertisement.

4.      The uniform business practice at issue in this case is as simple as it is deceptive and devious.  During the course of an online retail transaction with a Webloyalty retail partner, an advertisement appears on the consumer's computer screen, offering a monetary next purchase discount or coupon reward.  All the consumer needs to do is click on a button and enter his or her e-mail address twice to redeem it.  When he or she does, however, their confidential credit card or bank debit card information – submitted to carry out the original, legitimate retail transaction – is secretly obtained and/or intercepted by Webloyalty.  Webloyalty then uses this confidential information to enroll these individuals in one of Webloyalty's Membership Programs for which Webloyalty collects monthly charges, usually after the expiration of an alleged 30-day "free trial" basis, but sometimes immediately.  The enrollment is on a "negative option" basis, meaning that the consumer is continuously billed the monthly charge until he or she discovers it and manages to convince Webloyalty to cancel.  The only reference to the charges on a consumer's bank or credit card statement is "WLI*RESERVATIONREWARDS.COM" for the Reservation Rewards, or a similar entry for the other Membership Programs.

5.      Because the amount charged (*i.e.*, between $7.00 and $10.00) is so small, many months often go by with these Webloyalty charges going unnoticed.

6.      Webloyalty then pays its e-tailer for each "subscriber" that is ensnared by this deceptive business practice.  On information and belief, Webloyalty's retail partners are paid $2.00 for each consumer who is duped.

7.      Webloyalty and its e-tailers are eminently aware of the illegal nature of this business practice, but do not care and have no intention of changing it to require consumers to re-enter their credit or debit card numbers before signing up for one of the Membership Programs – a simple process, but one which Webloyalty knows would substantially decrease its revenues, which are mostly derived from illegal charges, not usage of discounts offered through the Membership Programs.

8.      *One question must be asked by this Court and the Jury . . . .  Why don't Webloyalty and its Retailer Partners eliminate any claims of illegal business practices and any chance of liability by simply requiring all consumers to __RE-ENTER__ their credit or debit card information in order to be enrolled in Webloyalty's Membership Programs?  One answer is inevitable . . . . Because their "business" is based on deception, if they eliminate the deception, their "business" will evaporate.*

9.      Indeed, upon information and belief, ***and based on accounts of various*** confidential witnesses, approximately 99% of people who call Webloyalty call to cancel their membership claiming that they did not know they were enrolled, and were not aware that they were going to be charged for any Membership Program when they clicked on an advertisement offering money off their next purchase.

10.     Because consumer complaints to Webloyalty and its e-tailers (and to various governmental and consumer protection agencies about Webloyalty and the Retailer Partners) are so high, Webloyalty uses prepared scripts to respond to such complaints, and Webloyalty management

- 3 -

monitors customer service telephone calls in order to ensure that the scripts are followed verbatim. Webloyalty management even attends weekly meetings at the company's headquarters to listen to recordings of calls with consumers canceling their service and demanding refunds.

11.    With ready access to consumers' confidential billing information, Webloyalty's online retail partners, like the other defendants herein, exploit this confidential information to generate additional revenue for themselves by obtaining a kickback fee from Webloyalty for Membership Program accounts generated through advertising that the retail partners facilitate through their retail websites.

## II.  JURISDICTION AND VENUE

12.    The Court has original jurisdiction over this class action pursuant to 28 U.S.C. §1332(d)(2).  This action asserts claims for violations of the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. §1693e; violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §2510; for unjust enrichment; for money had and received; for civil theft; for violations of California's Consumers Legal Remedies Act, Cal. Civil Code § 1750; and for violations of California's Unfair Competition Law, Business and Professions Code § 17200.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 (federal question), 15 U.S.C. §1693m(g) (EFTA) and 18 U.S.C. §§2510, *et seq.* (ECPA).  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

13.    Venue is proper in the District of Massachusetts under 28 U.S.C. §1391(b) pursuant to the February 15, 2007 Order of the Judicial Panel on Multidistrict Litigation transferring the following actions to the District of Massachusetts for coordinated and consolidated pretrial proceedings:  *Kuefler, et al. v. Webloyalty.com, Inc. & Fandango, Inc. d/b/a Fandango.com*, Case No. 06 CA 11620 JLT; *Crouse, et al. v. Webloyalty.com, Inc. & Priceline.com, Inc. d/b/a*

*Priceline.com*, Case No. 06 CA 11834 JLT; *Staaf, et al. v. Webloyalty.com, Inc., Nelson Shane Garrett, Individually and d/b/a Justflowers.com and Giftbasketsasap.com; & Maxim O. Khokhlov, Individually and d/b/a Justflowers.com and Giftbasketsasap.com*, Case No. 06 CA 11835 JLT; and *Melo, et al. v. Webloyalty.com, Inc., E-Babylon Inc. d/b/a 123Inkjets.com & ValueClick, Inc.*, Case No. CV 06 6329 DSF (JCx).

14.    The members of the putative Class have suffered aggregate damages exceeding $5,000,000, exclusive of interest and costs.

### III. PARTIES

15.    Plaintiff Joe Kuefler ("Kuefler") is an individual who resides in Stow, Massachusetts and is a citizen of Massachusetts.

16.    Plaintiff Monica Staaf ("Staaf") is an individual who resides in Foxboro, Massachusetts and is a citizen of Massachusetts.

17.    Plaintiff Kim Crouse ("Crouse") is an individual who resides in Dallas, Texas and is a citizen of Texas.

18.    Plaintiff Alcides Melo ("Melo") is an individual who resides in Selden, New York and is a citizen of New York.

19.    Plaintiff Paula DeDomenico ("DeDomenico") is an individual who resides in Tonawanda, New York and is a citizen of New York.

20.    Defendant Webloyalty.com, Inc. ("Webloyalty") is a corporation organized and existing under the laws of Connecticut with its principal executive offices located at 101 Merritt 7, 7th Floor, Norwalk, Connecticut 06851.  According to the Connecticut Better Business Bureau, Webloyalty.com also does business as "travelvalueplus.com", "reservationrewards.com" "buyerassurance.com", "walletshield.com" and "memberspecials.com."  Webloyalty purports to be

in the business of providing marketing programs to e-commerce web sites, online communities and Internet service providers. In reality, however, Webloyalty is in the business of collecting fees from consumers and not providing promised discount coupons. As a result of Webloyalty's "business" practice of charging consumers $7 to $10 for nothing, Webloyalty was able to generate revenues of $108.6 million for Fiscal Year 2005, and achieved a compound annual growth rate of over 90% for the past three years.

21. Defendant Fandango, Inc. d/b/a Fandango.com ("Fandango") is a California corporation with a principal place of business at 12200 West Olympic Blvd, Suite 150, Los Angeles, California. Fandango is a citizen of California. Fandango has significant minimum contacts with the Judicial District of Massachusetts and all fifty states in the United States. Fandango is an internet movie ticketing service that sells movie tickets to theaters and cinemas across the nation.

22. Defendant Priceline.com, Inc. d/b/a Priceline.com ("Priceline") is a Delaware corporation with a principal place of business at 800 Norwalk Avenue, Norwalk, Connecticut. Priceline has significant systematic and continuous contacts with the District of Massachusetts and all 50 states in the United States. Priceline is an Internet-based travel service that offers leisure airline tickets, hotel rooms, rental cars, vacation packages, and cruises. Priceline also offers a personal finance service that markets home mortgages, refinancing, and home equity loans.

23. Defendant Nelson Shane Garrett ("Garrett") is an individual who, upon information and belief, resides in Los Angeles, California and is a resident of California. Garrett does business as, among other entities, JustFlowers.com and Giftbasketsasap.com. These interrelated web sites, which are based in Los Angeles, California, sell flowers, bouquets, stuffed animals, chocolates, cookies, wine and gift baskets for shipping to customers around the United States.

24.    Defendant Maxim O. Khokhlov ("Khokhlov") is an individual who, upon information and belief, resides in Los Angeles, California and is a resident of California. Khokhlov is "Domain Administrator" for JustFlowers.com and does business as, among other entities, JustFlowers.com and Giftbasketsasap.com. These interrelated web sites, which are based in Los Angeles, California, sell flowers, bouquets, stuffed animals, chocolates, cookies, wine and gift baskets for shipping to customers around the United States.

25.    Defendant ValueClick, Inc. ("ValueClick") is a corporation organized and existing under the laws of Delaware with its principal executive offices located at 30699 Russell Ranch Road, Suite 250, Westlake Village, California 91362. ValueClick states that it is "one of the world's largest integrated online marketing companies," offering services to "advertisers to cost-effectively acquire customers . . . ." According to its SEC Form 10-Q for the period ending September 30, 2006, the Media segment of ValueClick, which includes defendant E-Babylon, Inc. "provides a comprehensive suite of online marketing services and tailored programs that help marketers increase awareness of their products and brands, attract visitors and generate leads and sales through the Internet."

26.    Defendant E-Babylon, Inc. d/b/a 123Inkjets.com ("E-Babylon") is a corporation organized and existing under the laws of California, with its principal executive offices located at 30699 Russell Ranch Road, Suite 250, Westlake Village, California 91362. E-Babylon is owned by defendant ValueClick. In its SEC Form 10-Q, ValueClick states that "E-Babylon expanded [ValueClick's] e-commerce channel and provided an infrastructure with the capability to support all of [ValueClick's] current e-commerce initiatives." It further states that the results of E-Babylon's operations are included in [ValueClick's] consolidated financial statements . . . ." 123inkjets.com,

an internet retailer, is owned by defendant E-Babylon, with its principal executive offices located at 25 East Easy Street, Simi Valley, California, 93065.

27.     Defendant Kraft Foods Inc. ("Kraft") is a Virginia corporation with a principal place of business at Three Lakes Drive, Northfield, IL 60093.  Kraft, through its subsidiaries, is engaged in the manufacture and sale of packaged foods and beverages in the United States, Canada, Europe, Latin America, Asia Pacific, the Middle East and Africa.

28.     Defendant Victor Th. Engwall & Co., Inc. ("Victor") is a Delaware corporation with a principal place of business in Northfield, IL.  Victor has significant minimum contacts with the Judicial District of Massachusetts and all fifty states in the United States.  Victor, a subsidiary of Kraft, and upon information and belief, owns the domain Gevalia.com.  Through that domain, Victor is engaged in the manufacture and sale of coffees, teas, and gifts offered via direct automatic delivery or catalog order in the United States, Canada, Europe, Latin America, Asia Pacific, the Middle East and Africa.

29.     Unless otherwise stated, defendants Webloyalty, Fandango, Priceline, Garrett, Khokhlov, E-Babylon, ValueClick, Kraft and Victor are collectively referenced as "Defendants."

30.     Unless otherwise stated, defendants Fandango, Priceline, Garrett, Khokhlov, E-Babylon, ValueClick, Kraft and Victor are collectively referenced as the "Retailer Defendants."

31.     At all times herein mentioned, each Retailer Defendant on the one hand, and Webloyalty on the other hand, were the agents, principals, employees, servants, partners, joint venturers, and representatives of each other.  In doing the acts hereinafter alleged, they each were acting within the scope and course of their authority as such agents, principals, employees, servants, partners, joint venturers, and representatives, and were acting with the permission and consent of the other Defendant.

32.     Plaintiff alleges on information and belief each Retailer Defendant on the one hand, and Webloyalty on the other hand, had knowledge of and agreed to the unlawful conduct alleged herein.  Each Retailer Defendant on the one hand, and Webloyalty on the other hand, conspired with each other to engage in the common course of unlawful conduct alleged herein, for the purpose of enriching themselves at the expense of plaintiffs and the Class, resulting in damages to plaintiffs and all others similarly situated.

## IV.  FACTUAL ALLEGATIONS

### A.  Defendants' Practice of Creating and Charging for "Reservation Rewards" and Other Unauthorized Membership Programs

33.     Webloyalty and its online retail partners, like the Retailer Defendants, create unauthorized membership accounts through a uniform scheme pursuant to which the Retailer Defendants permit Webloyalty to place advertisements on their internet websites which purport to offer next purchase coupons or discounts (usually in $10 denominations).  These unsolicited advertisements appear on-screen immediately after a consumer attempts to complete a legitimate online transaction such as purchasing movie tickets (fandango.com), making hotel or plane reservations (priceline.com), purchasing flowers or gift baskets (justflowers.com), or ordering printer cartridges (123inkjets.com), and either before or immediately after a consumer reaches a final confirmation screen for their order.  Webloyalty and its online retail partners constructed and employed advertisements in a manner which automatically obtains or intercepts credit or debit card information and enrolls the consumer in the Membership Programs without the consumer's permission, knowledge, or legal consent.

34.     Defendants' marketing activities are designed to, and do, exploit consumers' well ingrained online shopping habits and widely shared assumptions about the usual steps involved in

online shopping transactions.  In short, Defendants exploit consumer behaviors for their own nefarious ends.

35.    Defendants' marketing activities are designed to, and do, take advantage of the innate limitations of consumers' cognitive ability that narrow their attention to goal-relevant information.

36.    Specifically, in light of well-established psychological research on consumer judgment and decision-making, the combined use of specific visual and verbal elements in Defendants' marketing communications to Plaintiffs and the Class, and the insertion of these marketing communications into the flow of Internet web pages for a primary intended transaction (*i.e.*, the legitimate online transaction with one of the Retailer Defendants) add to the Plaintiffs' and the Class' unawareness and subsequent misdirection.  This is a uniform practice and procedure that is applied by Webloyalty and the Retailer Defendants universally to all consumers.

37.    Webloyalty's online retail partners, like the Retailer Defendants, use the confidential billing information they collect when customers attempt to complete an online retail transaction (*e.g.*, for movie tickets).  Webloyalty, in turn, obtains and/or intercepts and then uses this confidential billing information, without the consumer's authorization, knowledge or legal consent to enroll the consumer in one of its Membership Programs.  Webloyalty engages in this practice, with the knowing assistance of its online retail partners, like the Retailer Defendants, although customers do not agree, nor have they ever agreed, to pay separate charges of approximately $7 to $10 per month for the Membership Programs by credit card, by electronic fund transfers from debit cards or bank accounts.

38.    Webloyalty and the Retailer Defendants intentionally and knowingly refuse to require consumers to re-enter their credit or debit card information as a condition of enrollment, because requiring the re-entry of credit or debit card information would put consumers on notice of the fact

- 10 -

that they would be subject to monthly charges, thus preventing Defendants from exploiting consumers through their deceptive acts.

39.    Because of the automatic billing structure employed by Webloyalty (pursuant to which Webloyalty customers do not receive any bill or invoice notifying them of charges prior to Webloyalty assessing the charges), customers often do not realize for months or years that they are being charged for unauthorized Memberships Programs.

40.    Defendants profit from this scheme by collecting fees for unauthorized Membership Programs.  Webloyalty reportedly earns approximately $100 million in annual revenue and, on information and belief, pays each Retailer Defendant $2.00 per duped consumer.

41.    Indeed, Webloyalty announced on October 20, 2006 that it earned the Number 12 slot on Deloitte's 2006 Technology Fast 500, a ranking of the 500 fastest growing technology, media, telecommunications and life sciences companies in North America.[1]  From 2001-2005, Webloyalty grew a staggering 15,151 percent.[2]

42.    Webloyalty's online retail partners, including the Retailer Defendants, also profit from this scheme because they receive kickbacks from Webloyalty for "sales" of Membership Programs to their customers.

43.    In addition to the Retailer Defendants, Webloyalty has partnered with up to 100 other Internet retailers, such as Hotels.com, FTD.com, Classmates.com, Allposters.com, and Half.com.

44.    Defendants, and Webloyalty in particular, have directly received scores of complaints from consumers who have been charged for unauthorized Membership Programs.  More complaints

---

[1]    http://www.webloyalty.com/about-customer-loyalty/news-events/press-release/fast500-2006/

[2]    http://www.webloyalty.com/about-customer-loyalty/news-events/press-release/fast500-2006/

can be found at hundreds of Internet postings at consumer protection websites and blogs such as www.ripoffreport.com (which contains over 4,000 complaints), www.investorial.com, www.complaints.com, www.consumerwebwatch.org, http://adam.rosi-kessel.org/weblog/the_man /webloyalty_aka_wli_reservations_is_a_scam.html (consumer blog containing over 1,000 consumer complaints regarding Webloyalty). Webbetrayal.com is a website dedicated solely to confronting the Webloyalty business model and publicly questioning its deceptive marketing practices. This website alone references thousands of other complaints by consumers who have been deceived by Webloyalty and its partnering retailers.

45.    The complaints found throughout the Internet evidence the uniform nature and application of Defendants' deceptive business practices, as they each contain the same common theme of consumers who were unwittingly enrolled in the Membership Programs, and then at some later time discovered charges of between $7 to $10 per month on their credit or debit statement with no disclosure as to the origin of those charges.

46.    The scores of consumer complaints regarding Defendants' business practices are further reflected in Webloyalty's "unsatisfactory" rating by the Connecticut Better Business Bureau (the "CT BBB"):

> Based on Better Business Bureau files, [Webloyalty] has an ***unsatisfactory record*** with the Bureau due to a ***pattern of complaints*** concerning deceptive ***marketing/selling practices and unauthorized charges on consumers' credit cards***. Although the company has resolved all complaints brought to its attention by the BBB by canceling consumers' program memberships and by providing refunds, the ***firm has failed to correct the underlying reasons for the complaints***.

> To date, the CT BBB continues to receive the same patterns of complaint activity.

47.    According to the CT BBB's website:

> The [CT BBB] processed a total of ***884 complaints*** about this company in the ***last 36 months***, our standard reporting period. Of the total of 884 complaints closed in 36 months, 441 were closed in the last year.

- 12 -

48.    Even Webloyalty's own customer service representatives have joined the fray and have posted the messages on Internet bulletin boards or blogs about their own company, including the following:

> WOW!! The level of stupidity on this board is incredible. You people don't get it, do you?? Webloyalty didn't sign you up for anything. You signed yourselves up. The details are right there, in plain sight, in normal sized text, right in front of your faces. It details EVERYTHING, including the cost of the service and the billing cycle. The problem is that all of you idiots chose not to read it. You saw "free", and figured "gee, something free for me? golly, I must be special". WRONG!! YOU'RE NOT SPECIAL, YOU'RE JUST FUCKING LAZY AND STUPID!! YOU SIGNED YOURSELF UP! NOTHING HAPPENED AUTOMATICALLY!! THERE WAS NO SLIGHT OF HAND OR MISLEADING WORDING!! The bottom line is you're all a bunch of stupid, lazy, crybabies who don't want to take any responsibility [sic] for your actions. NONE! Well, that's [sic] what you get for being stupid and lazy.
>
> LEARN TO TAKE RESPONSABILITY [sic] FOR YOUR OWN ACTIONS. DON'T POINT THE FINGER AT OTHERS AND CALL THEM "THEIVES" [sic] AND "SCAM ARTISTS" AND BLAME THEM FOR YOUR OWN STUPIDITY. YOU ALL MAKE ME SICK!! FUCKING CRYBABIES!!!!

49.    Another current Webloyalty customer service representative posted this on the Internet:

> I'm a rep in the call center at Webloyalty. I have no pity for any of you people. You're all suckers, plain and simple. Didn't anybody ever teach you that nothing is free? When all of you idiots made your purchases on whatever website you did business on at the end of your transaction there was an offer asking if you wanted to save $10, or get award miles, or whatever. When you clicked on that link you were not automatically signed up. What happens is that you're brought to the Reservations Rewards website. On that website it tells you that you are on the website for Reservations Rewards. You see, you can tell that because the banner at the top of the site says "Reservations Rewards". Unfortunately you were too stupid to notice or remember. It then gives you instructions on how to redeem your "reward". At that point you are instructed to enter you email address in twice and click accept. Now you have to manually type in the email twice in those boxes. No cut and paste is allowed. Then it tells you to click accept. Now, if you had any fucking brains in your head you would have noticed that right above the box where you enter your email mail address its [sic] says, in regular sized type, in plain sight, right out in the open, that entering your email twice will act as an electronic signature and that by clicking accept you are accepting that the website you just made a purchase on can share the billing information with Reservation Rewards. Also in the big box next [sic] all of this it gives the exact details of what you are signing up for, again in regular sized print, in plain sight, right out in the open. If you are too stupid

to take the time to notice all of that then you deserve what you got. [sic] which was a membership in a overpriced bullshit ptogram [sic].

Webloyalty depends on idiots like you to not notice this stuff. To be blinded by the idea that you are getting something for "free". To not look at you [sic] credit card statement so charges go through every month. Its [sic] unbelievable the amount of dummies out there that fall for this stuff. Even if you do catch the charges eventually, and get a refund they still made money off of you by collecting interest on your money when they had possesion [sic] of it. Stay a member or cancel its win-win for webloyalty.

So, anyway I hope all you dummies learned a valuable lesson and wont [sic] fall for this again. I'm sure many of you will, though. You'd be shocked at how many people are repeat members where they canceled the service a while back but fell for the scam again a few months later.

### B. The Plaintiffs

50.    On December 25, 2006, plaintiff Kuefler went to defendant Fandango's Internet website to purchase movie tickets. Using his Visa credit card, Kuefler made two purchases of movie tickets from Fandango. To proceed through the purchasing process, Kuefler provided Fandango with personal information including his name, his credit card number and its expiration date.

51.    During the online transaction with Fandango, Kuefler was presented with an advertisement offering $10 off his next Fandango purchase.

52.    Kuefler responded to the above advertisement.

53.    Unbeknownst to Kuefler, as a result of responding to the advertisement, Webloyalty unlawfully obtained and/or intercepted his private credit card information to Webloyalty and immediately enrolled Kuefler into Webloyalty's "Reservation Rewards" Membership Program.

54.    Subsequently, Webloyalty began charging Kuefler's credit card $10 per month for "WLI Reservation Rewards." On information and belief, Fandango received a kickback of $2 for its role in exploiting Kuefler.

55.    Prior to these charges appearing on his credit card statement, Kuefler had never heard of "WLI Reservation Rewards," had not agreed to purchase any product called "Reservation

Rewards" and had not consented to having his personal information including his credit card account number obtained and/or intercepted by Webloyalty for the purchase of a membership in "Reservation Rewards."

56.     Neither Fandango nor Webloyalty provided Kuefler with sufficient and adequate disclosures concerning the fact that, by clicking on an advertisement on Fandango's website offering money off his next purchase at Fandango's website, he would be enrolled in Webloyalty's negative option "Reservation Rewards" Membership Program and be charged $10 per month as a "member" of this program.  Thus, Kuefler never gave his legal consent to enrollment and was victimized by Defendants' deceptive scheme.

57.     December 19, 2005, plaintiff Staaf went to defendants Garrett and Khokhlov's JustFlowers.com Internet website to purchase a Christmas gift basket.  Using her LL Bean Visa credit card, Staaf purchased the gift basket from Garrett and Khokhlov.  To proceed through the purchasing process, Staaf provided Garrett and Khokhlov with personal information, including her name, her credit card number and its expiration date.

58.     During the online transaction with Garrett and Khokhlov's Justflowers.com website, Staaf was presented with an advertisement offering $10 off her next Justflower.com purchase.

59.     Staaf responded to the above advertisement.

60.     Unbeknownst to Staaf, as a result of responding to the advertisement, Webloyalty unlawfully obtained and/or intercepted her private credit card information and immediately enrolled her into Webloyalty's "Reservation Rewards" Membership Program.

61.     Subsequently, Webloyalty began charging Staaf's credit card $10 per month for "WLI Reservation Rewards."  On information and belief, Garrett and Khokhlov received a kickback of $2 for its role in exploiting Staaf.

62.     Prior to these charges appearing on his credit card statement, Staaf had never heard of "WLI Reservation Rewards," had not agreed to purchase any product called "Reservation Rewards" and had not consented to having her personal information including her credit card account number obtained and/or intercepted by Webloyalty for the purchase of a membership in "Reservation Rewards."

63.     Neither Garrett, Khokhlov or Webloyalty provided Staaf with sufficient and adequate disclosures concerning the fact that, by clicking on an advertisement on the Justflower.com website offering money off her next purchase at the Justflower.com website, she would be enrolled in Webloyalty's negative option "Reservation Rewards" Membership Program and be charged $10 per month as a "member" of this program. Thus, Staaf never gave her legal consent to enrollment and was victimized by Defendants' deceptive scheme.

64.     In December 2004, plaintiff Crouse went to defendant Priceline's Internet website to purchase a hotel stay. Using his Bank of Montreal MasterCard credit card, Crouse purchased a hotel stay through Priceline. To proceed through the purchasing process, Crouse provided Priceline with personal information including his name, his credit card number and its expiration date.

65.     During the online transaction with Priceline, Crouse was presented with an advertisement offering $10 off his next Priceline purchase.

66.     Crouse responded to the above advertisement.

67.     Unbeknownst to Crouse, as a result of responding to the advertisement, Webloyalty unlawfully obtained and/or intercepted his private credit card information to Webloyalty and immediately enrolled him into Webloyalty's "Reservation Rewards" Membership Program.

- 16 -

68.    Subsequently, Webloyalty began charging Crouse's credit card $9 per month for "WLI Reservation Rewards." On information and belief, Priceline received a kickback of $2 for its role in exploiting Crouse.

69.    Prior to these charges appearing on his credit card statement, Crouse had never heard of "WLI Reservation Rewards," had not agreed to purchase any product called "Reservation Rewards" and had not consented to having his personal information, including his credit card account number, obtained and/or intercepted by Webloyalty for the purchase of a membership in "Reservation Rewards."

70.    Neither Priceline nor Webloyalty provided Crouse with sufficient and adequate disclosures concerning the fact that, by clicking on an advertisement on Priceline's website offering money off his next purchase at Priceline's website, he would be enrolled in Webloyalty's negative option "Reservation rewards" Membership Program and be charged $9 per month as a "member" of this program. Thus, Crouse never gave his legal consent to enrollment and was victimized by Defendants' deceptive scheme.

71.    In or about October or November 2005, plaintiff Melo went to defendants E-Babylon's and ValueClick's 123Inkjets.com Internet website to make a purchase. Using his bank debit cards, Melo made a purchase on 123Inkjets.com. To proceed through the purchasing process, Melo provided E-Babylon and ValueClick with personal information, including his name, his bank debit card number and its expiration date.

72.    During the online transaction with 123Inkjets.com, Melo was presented with an advertisement offering money off his next 123Inkets.com purchase.

73.    Melo responded to the above advertisement.

74.    Unbeknownst to Melo, as a result of responding to the advertisement, Webloyalty unlawfully obtained and/or intercepted Melo's private bank debit card information and immediately enrolled him into Webloyalty's "Reservation Rewards" Membership Program.

75.    Subsequently, Webloyalty began charging Melo's bank account $9 per month for "WLI Reservation Rewards."  On information and belief, E-Babylon and/or ValueClick received a kickback of $2 for their role in exploiting Melo.

76.    Prior to these charges appearing on his credit card statement, Melo had never heard of "WLI Reservation Rewards," had not agreed to purchase any product called "Reservation Rewards" and had not consented to having his personal information, including his bank debit card and account number, obtained and/or intercepted by Webloyalty for the purchase of a membership in "Reservation Rewards."

77.    Neither E-Babylon, ValueClick or Webloyalty provided Melo with sufficient and adequate disclosures concerning the fact that, by clicking on an advertisement on the 123Inkets.com website offering money off his next purchase, he would be enrolled in Webloyalty's negative option "Reservation Rewards" Membership Program and be charged $9 per month as a "member" of this program.  Thus, Melo never gave his legal consent to enrollment and was victimized by Defendants' deceptive scheme.

78.    On or about November of 2006, DeDomenico went to Victor's Internet website at www.gevalia.com to purchase coffee.  Using her Visa credit card, DeDomenico made a purchase from the website.  To proceed through the purchasing process, DeDomenico provided Victor with personal information including her name, her credit card number and its expiration date.

79.    During the online transaction with Victor, Plaintiff was presented with a pop-up advertisement offering $10 off her next purchase at www.gevalia.com.

- 18 -

80.    DeDomenico responded to the above advertisement.

81.    Unbeknownst to DeDomenico, without her knowledge and consent, as a result of responding to the advertisement, Webloyalty unlawfully obtained and/or intercepted her private credit card information and immediately enrolled DeDomenico into Webloyalty's Reservation Rewards Membership Program.

82.    Subsequently, Webloyalty began charging DeDomenico's credit card $10 per month for "WLI Reservation Rewards."  On information and belief, Victor and Kraft received a kickback of $2 for their role in exploiting DeDomenico.

83.    Prior to these charges appearing on her credit card statement, DeDomenico had never heard of "WLI Reservation Rewards," had not agreed to purchase any product called "Reservation Rewards" and had not consented to having her personal information including her credit card account number obtained and/or intercepted by Webloyalty for the purchase of a membership in "Reservation Rewards."

84.    Neither Victor, Kraft nor Webloyalty provided DeDomenico with sufficient and adequate disclosures concerning the fact that, by clicking on a pop-up advertisement on the www.gevalia.com website offering money off her next purchase at Victor's website, she would be enrolled in Webloyalty's negative option Reservation Rewards Membership Program and be charged $10 per month as a "member" of this program.  Thus, DeDomenico never gave her legal consent to enrollment and was victimized by Defendants' deceptive scheme.

## C. Plaintiffs' Confidential Witnesses

85.    Plaintiffs' allegations herein are based upon, in part, interviews with former Webloyalty employees.  Throughout the course of the investigation into Defendants' unlawful business practices, former employees provided information to Plaintiffs' counsel regarding both the

- 19 -

illegal Membership Programs and the policies of Webloyalty concerning responding to complaints. Indeed, Webloyalty armed its Customer Service Representatives with prepared scripts to deal with inevitable complaints.

86.    Among those interviewed in the course of the investigation of the wrongful business practices complained of herein were numerous former Customer Service Representatives, a Customer Service Representative "Lead," a Supervisor of Webloyalty's Customer Service Department and a Quality Assurance Analyst at Webloyalty, each of whom were employed by Webloyalty during the class period.

87.    A former Webloyalty Customer Service Representative "Group Lead," employed by Webloyalty from July 2000 until December 2003 at its Norwalk, Connecticut headquarters and then its Shelton, Connecticut headquarters, described his/her position as Group Lead as being a "primary point of contact to resolve escalated issues" and also to maintain the "e-mail queue." During his/her employment with Webloyalty, "every issue was escalated" insofar as "[t]here were few and far between customers that were not upset."   This individual further explained that retail websites that offered Webloyalty memberships, "got a percentage of each member."   As a result, refunds and cancellations "has to be tracked [by Webloyalty] for purposes" of compensating marketing partners, such as JustFlowers.  In addition, this former employee explained that complaints received about Webloyalty from the BBB were so rampant that the company had to designate people to handle the BBB complaints.  Moreover, according to this former employee, Customer Service Representatives often got in trouble for not using company-designated scripts for handling customer complaints. This former employee was unwilling to use the scripts because he/she believed that Webloyalty "was trying to pull the wool over the customers' eyes."

88.    Another former employee worked for Webloyalty as a Customer Service Representative from February 2004 through May 2005.  According to this individual, Webloyalty generated customers who did not know they were signing up to be customers or be billed by Webloyalty.  If people entered their e-mail address into a "pop-up" relating to a rebate or discount offer after purchasing something from an online retailer, such as plaintiff, that was all that was needed to sign them up as Webloyalty customers.  Consumers would never know that they were actually transferring their private information to Webloyalty.  This former employee further explained that the benefits of the Webloyalty programs that people were paying for "were not really benefits."

89.    Among other things, the Webloyalty programs offered people coupons worth less than what the people were paying in membership costs each month.  In addition, this former employee explained that "[s]ome people were [Webloyalty] members for years and didn't know about it."

90.    This former employee noted that because the job of a Customer Service Representative was principally to take abuse from customers who had unwittingly signed up for Webloyalty and had been billed monthly without their knowledge (each Customer Service Representative answered approximately 50-70 calls daily, only 2 of which could be categorized as positive or neutral), there was tremendously high turnover among the Customer Service Representatives.  This Customer Service Representative confirmed that Webloyalty required Customer Service Representatives to follow a script verbatim when responding to consumer complaints.  Interestingly, this Customer Service Representative had inadvertently fallen victim to Webloyalty himself/herself a few years before working there after buying music from ColumbiaHouse.com.  He/she had eventually obtained a refund (after losing more than $200 in

overdraft/insufficient fund charges), but did not know the company that scammed him/her was Webloyalty. This former employee also described how, in 2005, Webloyalty shifted to a new, less customer-friendly script. Previously, the first step in the script for dealing with an unhappy customer was to offer at least a partial refund. The new script in early 2005 instructed Customer Service Representatives to initially offer only to cancel the customer's service and stop billing, rather than granting any refund. At this stage the script indicated that the customer will still enjoy access to the site for the remainder of the billing period, even though billing is halted. Only if the customer complains at this stage and insists on a refund can the Customer Service Representative offer a refund of one month's worth of payments. Then the customer has to demand a refund of all the payments before the Customer Service Representative can grant a full refund. The script for a full refund says that it is not Webloyalty's normal procedure to provide a full refund, but in this customer's case, Webloyalty will make an exception and grant a full refund. The former employee confirmed, however, that this script was a lie; the granting of full refunds when demanded was "very much a normal procedure." This 2005 script was effectively a "retention script" even though Webloyalty claimed it was not. The idea was to give the Customer Service Representative two or three rebuttal opportunities before processing a full refund.

91.     Another former employee is also a former Webloyalty Customer Service Representative who worked in Shelton, Connecticut. As this former employee described it, "99% of the people calling were calling to cancel their membership" because "[a] lot of the people didn't know they were going to be charged." This former employee stated that the volume of calls into the customer service department seeking cancellations was "so high" and that he/she probably received "well over 100 calls a day" from customers seeking to cancel their Webloyalty membership. He/she used prepared scripts to respond to consumer complaints. In addition, this former employee

explained that Webloyalty "could not keep track of how many people canceled memberships because there were just too many." He/she opined that "if you're doing thousands of cancellations a day, people should be getting suspicious." He/she concluded by stating that he/she "knew a lawsuit would happen one day" over people unknowingly being charged for Webloyalty memberships.

92.    Yet another former Webloyalty Customer Service Representative in Shelton, Connecticut provided details concerning the company's business practices. This former employee specifically resigned from Webloyalty employment because he/she "didn't like the way the Company worked – charging people without them knowing." As a Customer Service Representative, this former employee received calls from Webloyalty customers, and was given two different scripts to employ for customer calls – one script for cancellations and one script for refunds or credits. He/she described the scripts as requiring Webloyalty Customer Service Representatives to "use some words over and over again." In fact, according to this former employee (and confirming what others have described), "if you didn't read the script right, you got in trouble." That is, "[i]f you didn't get the script right at least 98% of the time, you were in trouble." As other former employees have described, this individual believes that 99% of the calls he/she received were from customers seeking a refund for charges to their credit card.

93.    In addition, a former Webloyalty Customer Service Supervisor, who worked for Webloyalty from August 2000 through February 2005, described the hierarchy in the call center at Webloyalty as follows:



Directors

↓

Assistant Director

↓

- 23 -



Supervisor

Lead Customer Service Representative

Customer Service Representative

94.     This former employee stated that the call center was typically so busy that Lead Customer Service Representatives had to take calls from customers and did not have much time to do anything else except take escalated calls from the representatives they supervised.  He/she confirmed that 99% of calls received were from customers canceling their memberships and complaining that they had not intentionally signed up for any services from Webloyalty.  Some consumers complained that Webloyalty "was taking food out of their kids' mouths," or had "stolen their money," and others called up just crying.  Customer Service Representatives were trained to respond to the consumer that "they had approved [the monthly charge] by putting their e-mail address twice" into a "pop-up" window.  Importantly, this former employee described how Webloyalty's upper management was well aware of the shenanigans at the company insofar as they held weekly meetings at headquarters where, among other things, they listened to recordings of calls from consumers, virtually every one of which was from an angry customer wanting to cancel his or her service and get a refund.

95.     Finally, a former Quality Assurance Analyst for Webloyalty from 2001 to 2004 who explained that his/her job function was to record and listen to Customer Service Representative conversations with customers to see how consistent those contacts were with company standards. This former employee further explained that the Webloyalty call center was a "scripted environment" and that Quality Analysts such as him/her were in charge of monitoring "script

consistency." The Quality Analyst graded the Customer Service Representative based on, among other things, how well they followed the script. When listening to calls, this witness typically heard customers ask how they had gotten signed up for a Webloyalty service and then the customers immediately demanded a refund. This former employee knew that consumers were signed up for a membership by Webloyalty without knowing it. That is, if a consumer went to the website of a Webloyalty partner such as Classmates.com, a rebate offer would come up, and that, if the consumer accepted the rebate offer, they were automatically signed up for Webloyalty membership, and if the consumer did not cancel their membership within 30 days, they would get monthly charges on their credit card statements. Interestingly, this former employee described how Customer Service Representatives at Webloyalty were required to keep their calls within three to four minutes in length, and that if the call went on for longer than that, a flag would comes up on the Supervisor's monitor. The reason given for this practice, according to this former employee, was that the script only took that long and if the call went longer other calls may not be answered and the Customer Service Representative would be "off script." In addition, this former employee confirmed that Webloyalty management attending weekly meetings in Shelton, Connecticut where Quality Analysts, including this former employee, played recordings of calls with customers canceling their service and demanding refunds.

## V.  CLASS ACTION ALLEGATIONS

96.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b) on behalf of themselves and all others similarly situated as members of the following classes (collectively, the "Class"):

(a)    All persons and entities who were charged fees or interest by Webloyalty for a "Reservation Rewards" membership, or one of the other Membership Programs maintained by Webloyalty, in an online transaction with any of the Retailer Defendants;

(b)    All persons and entities whose personal credit or bank debit card information was obtained and/or intercepted by Webloyalty through an online transaction with any of the Retailer Defendants; and

(c)    All persons and entities who were charged fees or interest by Webloyalty for a "Reservation Rewards" membership, or one of the other Membership Programs maintained by Webloyalty, in an online transaction with one of the Retailer Defendants and whose bank debit cards or bank accounts were charged (the "EFTA Subclass").

97.    Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment or amended complaint.  Specifically excluded from the proposed Class are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, or any of them; the Judge assigned to this action, and any member of the Judge's immediate family.

98.    *Numerosity*.  The members of the Class are so numerous that their individual joinder is impracticable.  Plaintiffs are informed and believe, and on that basis allege, that the proposed Class contains tens of thousands of members.  The precise number of Class members is unknown to Plaintiffs.  The true number of Class members are known by Defendants, however, and thus, may be notified of the pendency of this action by first class mail, electronic mail, and by published notice.

99.    ***Existence and Predominance of Common Questions of Law and Fact***.  Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting only individual Class members.  These common legal and factual questions include, but are not limited to, the following:

(a)     Whether Defendants developed and implemented a scheme to intentionally create unauthorized Membership Program accounts and to charge consumers and entities for such accounts;

(b)     Whether Defendants conspired with each other to intentionally create unauthorized Membership Program accounts and to charge consumers and entities for such accounts;

(c)     Whether pursuant to the policies and practices described above, Defendants made "preauthorized electronic fund transfers" from the debit card accounts of EFTA Subclass members without first obtaining the EFTA Subclass members' written authorization;

(d)     Whether Defendants violated 15 U.S.C. §1693e with respect to the EFTA Subclass members;

(e)     Whether Defendants violated the ECPA, 18 U.S.C. §2510;

(f)     Whether Webloyalty committed civil theft, and whether the Retailer Defendants aided and abetted such theft;

(g)     Whether the conduct of defendants Webloyalty, E-Babylon and ValueClick constituted unlawful, unfair, or fraudulent business practices in violation of Cal. Bus. & Prof. Code §§17200, *et seq.*, as alleged herein;

(h)     Whether Defendants have been unjustly enriched at the expense of Plaintiffs and the Class;

(i)     Whether Defendants are liable to Plaintiffs and the Class for money had and received;

(j)     Whether Plaintiffs and members of the Class have sustained damages as a result of Defendants' conduct, and, if so, what is the appropriate measure of damages;

(k)    Whether Plaintiffs and members of the Class are entitled to declaratory and/or injunctive relief to enjoin the unlawful conduct alleged herein; and

(l)    Whether Plaintiffs and members of the Class are entitled to punitive damages, and, if so, in what amount.

100.    *Typicality*.  Plaintiffs' claims are typical of the claims of the members of the Class in that Plaintiffs and each member of the Class were charged without his or her prior expressed request or consent for a Membership Program account.

101.    *Adequacy of Representation*.  Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs have retained counsel highly experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Class.

102.    *Superiority*.  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against the Defendants.  It would thus be virtually impossible for the Class, on an individual basis, to obtain effective redress for the wrongs done to them.  Furthermore, even if Class members could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

103.    In the alternative, the Class may be also certified because:

(a)    the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudication with respect to individual Class members that would establish incompatible standards of conduct for the Defendants;

(b)    the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

(c)    Defendants have acted or refused to act on grounds generally applicable to the Class thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

104.    The claims asserted herein are applicable to all individuals and entities throughout the United States who became enrolled in one of Webloyalty's Membership Programs through an online transaction with the Retailer Defendants.  The claims asserted herein are based on Federal law and Connecticut's civil theft statute, which is applicable to Class members throughout the United States insofar as Webloyalty, aided and abetted by the Retailer Defendants, commits the subject theft through its offices in Connecticut.

105.    Adequate notice can be given to Class members directly using information maintained in Defendants' records, or through notice by publication.

106.    Damages may be calculated from the sales information maintained in Defendants' records, so that the cost of administering a recovery for the Class can be minimized.  The amount of damages is known with precision from Defendants' records.

- 29 -

107.    Defendants stole money from Plaintiffs and the Class through the sale of the Membership Programs at issue to Plaintiffs and the Class.  The stolen funds in the possession of Defendants can be identified from the sale of such memberships to Plaintiffs and the Class and that restitution of such monies can be made to Plaintiffs and the Class.  Such stolen monies are the property of the Plaintiffs and the Class.  All or a portion of these monies in the possession of Defendants is money in which Plaintiffs and the Class have an ownership interest.  Plaintiffs and the Class were injured and had their money stolen from them as a result of Defendants' unlawful business practices described herein.

## VI.  SUBSTANTIVE ALLEGATIONS

## COUNT I

### (Violations of the Electronic Funds Transfer Act, 15 U.S.C. §1693e)
### (Against Webloyalty Only)

108.    Plaintiff Melo hereby realleges and incorporates by reference all paragraphs previously alleged herein.  Plaintiff Melo asserts this claim against Webloyalty on behalf of himself and the EFTA Subclass.

109.    Webloyalty has initiated electronic transfers of funds for unauthorized Webloyalty Membership Program accounts from the debit card and bank accounts of Plaintiff Melo and the EFTA Subclass members on a recurring basis, at substantially regular intervals, without first obtaining written authorization from them or providing them with a copy of any such purported authorization.

110.    Therefore, Webloyalty has violated 15 U.S.C. §1693e.

111.    Plaintiff Melo and members of the EFTA Subclass have suffered damages by reason of Webloyalty's violations of 15 U.S.C. §1693e.  Accordingly, under 15 U.S.C. §1693m, Plaintiff

Melo, on behalf of the EFTA Subclass, seeks actual damages, statutory damages, costs of suit, attorneys' fees and an injunction against further violations.

## COUNT II

### (Violations of the Electronic Communications Privacy Act)
### (Against All Defendants)

112.    Plaintiffs hereby incorporate by reference each of the preceding allegations as though fully set forth herein.

113.    Plaintiffs assert this claim against each and every Defendant on behalf of themselves and the Class.

114.    The transmission of data by Plaintiffs and the Class between their computers and Defendants, including but not limited to electronic funds transfer information stored by a financial institution, constitute "electronic communications" within the meaning of 18 U.S.C. §2510.

115.    Defendants have intentionally obtained and/or intercepted, by device or otherwise, these electronic communications without Plaintiffs' or Class members' knowledge, consent or authorization and while the communications were still en route.

116.    Defendants have intentionally disclosed to another person, and have otherwise used, such electronic communications, with knowledge, or having reason to know, that the electronic communications were obtained through interception, for an unlawful purpose.

117.    Plaintiffs and the Class, pursuant to 18 U.S.C. §2520, are entitled to preliminary, equitable and declaratory relief, in addition to statutory damages of the greater of $10,000 or $100 a day for each day of violation, actual and punitive damages, reasonable attorneys' fees, and Defendants' profits obtained from the above-described violations.

## COUNT III

### (Civil Theft – Treble Damages)
### (Against All Defendants)

118.    Plaintiffs hereby incorporate by reference each of the preceding allegations as though fully set forth herein.

119.    Plaintiffs assert this claim against each and every Defendant on behalf of themselves and the Class.

120.    This claim is brought pursuant to Connecticut General Statutes §52-564, which provides that: "Any person who steals any property of another, or knowingly receives and conceals stolen property, shall pay the owner treble his damages."

121.    Pursuant to Connecticut General Statutes §53a-119(2): "A person obtains property by false pretenses when, by any false token, pretense, or device, he obtains from another any property, with intent to defraud him or any other person."

122.    Defendants explicitly or implicitly made false representations and statements of existing facts by being silent and omitting to disclose to Plaintiffs and the Class the following material facts, which Defendants made with the intent to deceive Plaintiffs and the Class: (a) that, by clicking on an advertisement designed by Webloyalty while completing a transaction with one of the Retailer Defendants, Plaintiffs' and the Class' private credit or debit card information would be disclosed by the Retailer Defendants to Webloyalty; (b) that Webloyalty would automatically charge Plaintiffs and the Class a monthly fee for Webloyalty's Membership Programs; (c) that Webloyalty's Membership Programs provide no benefit to Plaintiff and the Class; and (d) that the Retailer Defendants obtain a percentage of the monthly fees charged by Webloyalty to Plaintiffs and the Class.

123.    In other words, Defendants stole money from Plaintiffs and the Class by false pretenses when they deceived Plaintiffs and each member of the Class into believing that, by clicking on an advertisement, they would be receiving a gift voucher or coupon.  Instead, when Plaintiffs and the members of the Class clicked on the advertisement, they were, unwittingly, enrolled into a Membership Program that charged them up to $10 per month.  This slight-of-hand scheme by Webloyalty and the Retailer Defendants is fraudulent, is the basis for the civil theft claim, and is the equivalent of each Class member having his/her pocket picked of up to $10 per month.

124.    The false statements/omissions of material fact by Defendants were not made innocently or inadvertently, but were instead made with the intent to obtain money from Plaintiffs and the Class by false pretenses.

125.    Defendants' silence and omissions as to the material facts outlined above were material insofar as such silence and omissions caused the Class to, without their knowledge, enable Defendants to defraud them out of up to $10 per month.

126.    Defendants knew that their actions would result in the theft of money from Plaintiffs and the Class.  Indeed, Webloyalty has been aware for years that consumers by the hundreds have complained to local, state and federal authorities about Webloyalty's unlawful scheme.  The Retailer Defendants' knowledge is likewise evident from the fact that the Retailer Defendants receive kickbacks from Webloyalty in the form of a percentage of the money taken from the Class by Webloyalty in monthly membership fees.

127.    All of the Defendants intended to and did defraud Plaintiffs and the Class, as evidenced by Defendants' conduct alleged in this complaint.

128.    Plaintiffs and the Class were induced to click on Webloyalty's advertisement by Defendants' fraudulent acts, and were injured thereby.

129.    Defendants obtained money from Plaintiffs and the Class as a direct and proximate cause of Defendants' fraud by false pretenses, and Plaintiffs and the Class have not been compensated for the payment of such money.

## COUNT IV

### (Unjust Enrichment)
### (Against All Defendants)

130.    Plaintiffs hereby incorporate by reference each of the preceding allegations as though fully set forth herein.

131.    Defendant Webloyalty has accessed and received payments from Plaintiffs' and the Class members' credit and debit card accounts without their legal consent and thus knowingly received a benefit from Plaintiffs and the Class.

132.    The Retailer Defendants have received fees or "kickbacks" from Webloyalty for permitting Webloyalty to obtain and/or intercept Plaintiffs' and the Class' personal and private credit and debit card information, which Webloyalty uses to charge its illegal Membership Program fees and, thus, have knowingly received benefits from Plaintiffs and the Class.  These fees or "kickbacks," upon information and belief, are usually $2 from the total fees charged by Webloyalty to Plaintiffs and Class members.

133.    Defendant Webloyalty has no valid or legal basis to access and charge Plaintiffs' and each Class member's credit and debit cards for fees associated with its Membership Programs.

134.    The Retailer Defendants have no valid or legal basis to accept payments from Webloyalty, which are actually payments from Plaintiffs and the Class for accessing and charging Plaintiffs' and the Class members' credit and debit cards for fees associated with Webloyalty's Membership Programs.

135.    Webloyalty has received, and continues to receive, substantial fees by charging Plaintiffs and Class member credit and debit card accounts and/or using Plaintiffs' and Class member personal and credit and debit information to earn money for itself.

136.    The Retailer Defendants have received, and continue to receive, substantial fees from Webloyalty as a result of Webloyalty's scheme of unilaterally charging Plaintiffs' and Class members' credit and debit card accounts and/or using Plaintiffs' and Class member personal and credit and debit information to earn money for itself.

137.    Such fees, compensation and/or profits constitute unjust enrichment for Webloyalty and the Retailer Defendants and must be disgorged.

138.    Plaintiffs and members of the Class are entitled to recover from Defendants all amounts wrongfully collected and improperly retained by Defendants, plus interest thereon.

139.    As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs and members of the Class have suffered injury and are entitled to reimbursement, restitution and disgorgement from Defendants of the benefits conferred by Plaintiffs and the Class.

140.    Plaintiffs and the Class have no adequate remedy at law.

## COUNT V

### (Money Had & Received)
### (Against All Defendants)

141.    Plaintiffs hereby incorporate by reference each of the preceding allegations as though fully set forth herein.

142.    As a result of the conduct alleged herein, Defendants improperly received monies from Plaintiffs and the Class they were not legally entitled to receive.

143.    Plaintiffs and members of the Class have a claim for improperly paid fees for the Membership Programs.

144.    Equity and good conscience require that Defendants ought to pay over such additional monies, described above, to Plaintiffs and the Class.

145.    As a direct and proximate result of Defendants' inappropriate practices, Plaintiffs and members of the Class have suffered injury and are entitled to reimbursement, restitution and disgorgement in the amount necessary to restore them to the position they would have been in if Defendants had not improperly collected and retained the aforementioned fees.

## COUNT VI

**(Violation of Consumers Legal Remedies Act, Cal. Civ. Code §1750, *et seq.*)**
**(Against Defendants Webloyalty, E-Babylon, ValueClick Only)**

146.    Plaintiff Melo hereby incorporates by reference each of the preceding allegations as though fully set forth herein.

147.    This claim is brought against defendants Webloyalty, E-Babylon, ValueClick solely by Plaintiff Melo individually and on behalf of all others similarly.

148.    This cause of action is brought pursuant to the Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §1750, *et seq.*

149.    Defendants Webloyalty, E-Babylon, ValueClick are each a "person" as defined by Cal. Civ. Code §1761(c).

150.    Plaintiff Melo and the proposed Class members are "consumers" within the meaning of Cal. Civ. Code §1761(d).

151.    Plaintiff Melo's on-line purchase as well as the enrollment by defendants Webloyalty, E-Babylon, ValueClick of Plaintiff Melo and the Class members in the Membership Programs constitute "transactions" within the meaning of Civil Code §§1761(e) and 1770.

152.    The conduct of defendants Webloyalty, E-Babylon, ValueClick violated and continues to violate the CLRA in at least the following respects:

(a)    In violation of Section 1770(a)(1) of the CLRA, defendants Webloyalty, E-Babylon, ValueClick misrepresented the source, sponsorship, approval or certification of goods or services;

(b)    In violation of Section 1770(a)(2) of the CLRA, defendants Webloyalty, E-Babylon, ValueClick misrepresented the affiliation, connection, or association with, or certification by another;

(c)    In violation of Section 1770(a)(5) of the CLRA, defendants Webloyalty, E-Babylon, ValueClick represented that its goods or services sponsorship, approval, characteristics, uses or benefits which they do not have;

(d)    In violation of Section 1770(a)(9) of the CLRA, defendants Webloyalty, E-Babylon, ValueClick advertised goods or services with the intent not to sell then as advertised;

(e)    In violation of Section 1770(a)(13) of the CLRA, defendants Webloyalty, E-Babylon, ValueClick made false or misleading statements of fact concerning reasons for, existence of, or amounts or price reductions;

(f)    In violation of Section 1770(a)(14) of the CLRA, defendants Webloyalty, E-Babylon, ValueClick advertised that a transaction confers or involves, rights, remedies, or obligations which it does not have or involve;

(g)    In violation of Section 1770(a)(16) of the CLRA, defendants Webloyalty, E-Babylon, ValueClick represented that the subject of the transaction has been supplied in accordance with a previous representation when it has not; and/or

(h)    In violation of Section 1770(a)(16) of the CLRA, defendants Webloyalty, E-Babylon, ValueClick represented that the consumer will receive a rebate, discount, or other

economic benefit, if the earning of the benefit is contingent on an event to occur subsequent to the consummation of the transaction.

153.    Defendant Webloyalty, E-Babylon, ValueClick each engaged in these unfair or deceptive acts and practices with the intent that they result, and which did result, in the sale of Memberships Programs to Plaintiff Melo and the Class.

154.    In engaging in unfair or deceptive conduct in violation of the CLRA, defendants Webloyalty, E-Babylon, ValueClick each actively concealed and intentionally failed to disclose material facts about the Reservation Rewards program and other Membership Programs.

155.    As a result of the acts and practices of defendants Webloyalty, E-Babylon, ValueClick as alleged in this Complaint, Plaintiff Melo seeks an Order enjoining defendants Webloyalty, E-Babylon, ValueClick from continuing to engage in unlawful, unfair or fraudulent business practices, and any other act prohibited by law.

156.    Plaintiff Melo has timely provided notice to defendants Webloyalty, E-Babylon, ValueClick.

157.    Defendants Webloyalty, E-Babylon, ValueClick have failed to take corrective action and, accordingly, are liable for damages to Plaintiff Melo and the Class.

### COUNT VII

**(Violation of the California Unfair Competition Law,
Business & Professions Code §§17200, *et seq.*)
(Against Defendants Webloyalty, E-Babylon, ValueClick Only)**

158.    Plaintiff Melo hereby incorporates by reference each of the preceding allegations as though fully set forth herein.

159.    This claim is brought against defendants Webloyalty, E-Babylon, ValueClick solely by Plaintiff Melo individually and on behalf of the Class.

160.    The acts and practices of defendants Webloyalty, E-Babylon, ValueClick, described herein, constitute unlawful, unfair or fraudulent business practices in violation of the Unfair Competition Law, Business & Professions Code §§17200, *et seq*. ("UCL").

161.    The utility of the sales, marketing and unauthorized billing practices of defendants Webloyalty, E-Babylon, ValueClick is significantly outweighed by the gravity of the harm they impose on Plaintiff Melo and the Class.  The acts and practices of defendants Webloyalty, E-Babylon, ValueClick are oppressive, unscrupulous or substantially injurious to consumers.

162.    The above-described unfair, unlawful and fraudulent business practices conducted by defendants Webloyalty, E-Babylon, ValueClick present a threat and likelihood of harm and deception to members of the Class in that defendants Webloyalty, E-Babylon, ValueClick have systematically perpetrated and continue to perpetrate the unlawful scheme upon members of the public by engaging in the conduct described herein.

163.    The conduct of defendants Webloyalty, E-Babylon, ValueClick violates the public policy principles espoused in both federal and state statutes and federal regulations.  For example:

(a)    The EFTA was designed to ensure basic protections for consumers against unauthorized electronic funds transfers, 15 U.S.C. §1693e;

(b)    The ECPA was enacted to ensure the privacy of electronic communications, and prohibit access to those communications by third parties without authorization, 15 U.S.C. §§2510, *et seq.*;

(c)    The Federal Trade Commission Act, Section 5, recognizes the public policy that companies must not misrepresent the nature of their goods and services, and must take precautions to protect consumers' personal information; and

(d)    The underlying purpose of the CLRA is to "protect consumers against unfair and deceptive business practices[.]" Cal. Civ. Code §1760.

164.    These stated policies seeking to protect consumers against unfair practices, including those pleaded in this Complaint, provide a sufficient predicate for Plaintiff Melo's claims.

165.    Plaintiff Melo and the Class have suffered harm as a proximate result of the wrongful conduct of defendants Webloyalty, E-Babylon, ValueClick alleged herein, and therefore bring this claim for relief for restitution and disgorgement.  Plaintiff Melo is a person who has suffered injury in fact and has lost money or property as a result of such unfair competition.

166.    Pursuant to California Business and Professions Code sections 17200 and 17203, Plaintiff Melo, on behalf of himself and the Class, seeks an order of this Court: enjoining defendants Webloyalty, E-Babylon, ValueClick from the continued Membership Program sales and billing practices in an unfair, unlawful and illegal manner, and an order enjoining defendants Webloyalty, E-Babylon, ValueClick from collecting money from the Class from the sale of such memberships, and enjoining the further disclosure and use of confidential billing information.  Plaintiff Melo further requests an order awarding Plaintiff Melo and the Class restitution and disgorgement of profits acquired by defendants Webloyalty, E-Babylon, ValueClick by means of such unlawful acts and practices, so as to deter defendants Webloyalty, E-Babylon, ValueClick and to rectify their unfair and unlawful practices and to restore any and all monies to Plaintiff Melo and the Class, which are still retained by defendants Webloyalty, E-Babylon, ValueClick, plus interest and attorneys' fees and costs.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, prays for judgment against Defendants as follows:

A.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiffs and their counsel of record to represent the Class;

B.    For restitution, disgorgement and/or other equitable relief as the Court deems proper;

C.    For compensatory damages sustained by Plaintiffs and all others similarly situated as a result of Defendants' unlawful acts and conduct;

D.    One behalf of the EFTA Subclass, for statutory damages under 15 U.S.C. §1693m;

E.    For statutory damages under 18 U.S.C. §2520(b)(2) and (c), including punitive damages;

F.    For a permanent injunction prohibiting Defendants from engaging in the conduct and practices complained of herein;

G.    Pursuant to sections 17203 and 17204 of the California Business and Professions Code, for a permanent injunction against defendants Webloyalty, E-Babylon and ValueClick enjoining each of them from performing or proposing to perform any of the aforementioned acts of unfair and unlawful business practices.

H.    For pre-judgment and post-judgment interest;

I.    For reasonable attorneys' fees and costs of suit, including expert witness fees; and

J.    For such other and further relief as this Court may deem just and proper.

### VIII.  JURY DEMAND

To the full extent available, Plaintiffs demand a trial by jury.

- 41 -

Dated:  November 9, 2007                    Respectfully submitted,

                                            **COUGHLIN STOIA GELLER**
                                            **    RUDMAN & ROBBINS LLP**
                                            DAVID J. GEORGE (*Admitted Pro Hac Vice*)
                                            STUART A. DAVIDSON (*Admitted Pro Hac Vice*)
                                            MARISA N. DEMATO
                                            JAMES L. DAVIDSON


                                            */s/ David J. George*
                                            David J. George
                                            120 East Palmetto Park Road, Suite 500
                                            Boca Raton, Florida  33432
                                            Telephone:  561/750-3000
                                            (561) 750-3364 (fax)

                                            ***Proposed Co-Lead Counsel for Plaintiffs and the***
                                            ***Class***

                                            **PHILLIPS & GARCIA, LLP**
                                            CARLIN J. PHILLIPS
                                            ANDREW J. GARCIA
                                            13 Ventura Drive
                                            North Dartmouth, Massachusettes  02747
                                            Telephone:  508/998-0800
                                            508/998-0919 (fax)

                                            ***Proposed Liaison Counsel for Plaintiffs and the***
                                            ***Class***

                                            **WEXLER TORISEVA WALLACE LLP**
                                            MARK J. TAMBLYN
                                            1610 Arden Way, Suite 290
                                            Sacramento, California  95815
                                            Telephone:  916/568-1100
                                            916/568-7890 (fax)

                                            **WEXLER TORISEVA WALLACE LLP**
                                            KENNETH A. WEXLER
                                            MARK R. MILLER
                                            55 West Monroe Street, Suite 3300
                                            Chicago, Illinois  60603
                                            Telephone: 312/346-2222
                                            312/346-0022 (fax)

- 42 -

*Proposed Co-Lead Counsel for Plaintiffs
and the Class*

**LEE & AMTZIS, P.L.**
ERIC A. LEE
GINA GREENWALD
5550 Glades Road, Suite 401
Boca Raton, Florida  33431
Telephone:  561/ 981-9988
561/981-9980 (fax)

**McCALLUM HOAGLUND COOK
    & IRBY LLP**
CHARLES M. MCCALLUM
R. BRENT IRBY
905 Montgomery Highway, Suite 201
Vestavia Hills, Alabama  35216
Telephone: 205/824-7768
205/824-7767 (fax)

**GREEN WELLING LLP**
ROBERT S. GREEN
CHARLES D. MARSHALL
595 Market Street, Suite 2750
San Francisco, California  94105
Telephone: 415/477-6700
415/477-6710 (fax)

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 9, 2007, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or *pro se* parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ David J. George*
David J. George

# Mailing Information for Case 1:06-cv-01820-JLT

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ethan J. Brown**
  ethan.brown@lw.com
- **Stuart A. Davidson**
  sdavidson@csgrr.com,e_file_fl@csgrr.com
- **Andrew J. Garcia**
  agarcia@phillipsgarcia.com,info@phillipsgarcia.com,dmedeiros@phillipsgarcia.com
- **David J. George**
  dgeorge@csgrr.com,e_file_fl@csgrr.com
- **Eric A. Lee**
  lee@leeamlaw.com,leeamlawecf@gmail.com,zallen@leeamlaw.com
- **Joan S. Mitrou**
  Joan.Mitrou@wilmerhale.com
- **Carlin J Phillips**
  cphillips@phillipsgarcia.com,info@phillipsgarcia.com,dmedeiros@phillipsgarcia.com
- **John J. Regan**
  john.regan@wilmerhale.com
- **Mark J. Tamblyn**
  mjt@wtwlaw.com
- **Kenneth A. Wexler**
  kaw@wtwlaw.com,ecf@wtwlaw.com,ehs@wtwlaw.com,amn@wtwlaw.com
- **Gabrielle R. Wolohojian**
  gabrielle.wolohojian@wilmerhale.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**C. Nichole Gifford**
Rothwell, Figg, Ernst & Manbeck, P.C.
1425 K Street, N.W.. Suite 800
Washington, DC 20005
ngifford@rfem.com

**Steven Lieberman**
Rothwell, Figg, Ernst & Manbeck
1425 K Street, N.W., Suite 800
Washington, DC 20005
slieberman@rfem.com

**Mark R. Miller**
Wexler, Toriseva, Wallace
55 West Monroe Street, Suite 3300
Chicago, IL 60602
mrm@wtwlaw.com

**Anne M. Sterba**
Rothwell, Figg, Ernst & Manbeck
1425 K Street, N.W., Suite 800
Washington, DC 20005
asterba@rfem.com

**Nathan L. Walker**
Wilmer, Cutler, Pickering, Hale & Dorr
1117 California Ave.
Palo Alto, CA 94304
nathan.walker@wilmerhale.com

**Gael Mahony, Esq.**
Holland & Knight
10 St. James Avenue, 11th Floor
Boston, MA 02116
gael.mahony@hklaw.com

**Dan Hampton, Esq.**
Holland & Knight
10 St. James Avenue, 11th Floor
Boston, MA 02116
dan.hampton@hklaw.com