## UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE:  WEBLOYALTY.COM, INC. MARKETING AND SALES PRACTICES LITIGATION | MDL No. 07-1820<br><br>Lead Case:  06-11620-JLT<br><br>Hon. Joseph L. Tauro |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR
## FINAL APPROVAL OF CLASS ACTION SETTLEMENT

## TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................1

II.   SUMMARY OF THE LITIGATION .................................................................3

III.  THE SETTLEMENT AND ITS AMENDMENTS ............................................6

    A.    The Settlement Class..................................................................................6

    B.    Remedial Relief ..........................................................................................6

    C.    Monetary Relief ..........................................................................................8

IV.   ARGUMENT ........................................................................................................9

    A.    The Proposed Class Should Be Certified for Settlement Purposes under Rule 23 ........................................................................................................9

        1.    The Requirements of Rule 23(a) are Satisfied..........................................10

            a.    The Class is So Numerous That Joinder of All members Is Impracticable...........................................................................10

            b.    Questions of Law and Fact Are Common to Members of the Class....................................................................................11

            c.    Plaintiffs' Claims are Typical of the Class' Claims.....................12

            d.    Settlement Class Representatives and Their Counsel Will Fairly and Adequately Protect the Interests of the Class ..............14

        2.    The Requirements of Rule 23(b)(3) Are Satisfied....................................15

            a.    Common Issues Predominate........................................................16

            b.    A Class Action is the Superior Method for Adjudicating These Claims............................................................................16

    B.    The Settlement Is Fair, Adequate and Reasonable and Should be Approved .......18

        1.    There Is a Presumption in Favor of Settlement .........................................19

        2.    Factors to Consider When Determining the Fairness, Adequacy and Reasonableness of a Settlement ................................................................20

            a.    Comparison of Proposed Settlement with the Likely Result of Litigation.................................................................................21

                 i.    Risks of Class Certification ...............................................21

                 ii.    Risks of Establishing Liability...........................................22

                 iii.    This Settlement Represents an Excellent Recovery Given the Attendant Risks .................................................23

            b.    Reaction of the Class to the Settlement ........................................31

|  |  | c. | Stage of the Litigation and the Amount of Discovery Completed | 33 |

c.    Stage of the Litigation and the Amount of Discovery Completed.............................................................................33

d.    Quality of Counsel ......................................................34

e.    The Settlement Is the Product of Serious, Informed and Non-Collusive Negotiations.............................................35

f.    Prospects of the Case, Including Risk, Complexity, Expense and Duration.................................................................35

C.    The Notice of Settlement and the Claims-Made Settlement Structure Are Appropriate ...............................................................................37

1.    The Manner of Distribution of Notice Was Appropriate, Particularly Given the Nature of the Class .................................................39

2.    The Claims-Made Settlement Structure Is Permissible and Routine.........40

V.    CONCLUSION............................................................................................40

# TABLE OF AUTHORITIES

**Cases**

*Aguayo v. Oldenkamp Trucking*,
 No. Civ F-04-6279 AWI LJO, 2006 U.S. Dist. LEXIS 79425 (E.D. Cal. Oct. 17, 2006) ........31

*Amchem Prods., Inc. v. Windsor*,
 521 U.S. 591 (1997) ...............................................................................................9, 10, 17, 22

*Andrews v. Bechtel Power Corp.*,
 780 F.2d 124 (1st Cir. 1985) ...............................................................................................14

*Barnes v. FleetBoston Fin. Corp.*,
 No. 01-10395-NG, 2006 U.S. Dist. LEXIS 71072 (D. Mass. Aug. 22, 2006)..........................32

*Browning v. Yahoo! Inc.*,
 No. C04-01463 HRL, 2006 WL 3826714 (N.D. Cal. Dec. 27, 2006) ....................................39

*Burstein v. Applied Extrusion Techs.*,
 153 F.R.D. 488 (D. Mass. 1994) ...........................................................................................13

*Bussie v. Allmerica Fin. Corp.*,
 50 F. Supp. 2d 59 (D. Mass. 1999)................................................................................... *passim*

*Chavez v. Netflix, Inc.*,
 162 Cal. App. 4th 43 (2008)................................................................................................39

*City of Detroit v. Grinnell*,
 495 F.2d 448 (2d Cir. 1974) .................................................................................................21

*City P'ship Co. v. Atlantic Acquisition Ltd. P'ship*,
 100 F.3d 1041 (1st Cir. 1996) ........................................................................................18, 35

*D. H. Overmyer Co. v. Loflin*,
 440 F.2d 1213 (5th Cir. 1971)...............................................................................................18

*Dehoyos v. Allstate Corp.*,
 240 F.R.D. 269 (W.D. Tex. 2007)..........................................................................................40

*Di Martino v. Hartford*,
 636 F. Supp. 1241 (D. Conn. 1986) .....................................................................................27

*Duhaime v. John Hancock Mut. Life Ins. Co.*,
 177 F.R.D. 54 (D. Mass. 1997), *overruled in part on other grounds*, 370 F.3d 124
 (1st Cir. 2004) .................................................................................................................24, 37

*Duhaime v. John Hancock Mut. Life Ins. Co.*,
    183 F.3d 1 (1st Cir. 1999) ...............................................................................18

*Durrett v. Housing Auth. of Providence*,
    896 F.2d 600 (1st Cir. 1990) ...........................................................................18

*Eisenberg v. Gagnon*,
    766 F.2d 770 (3d Cir. 1985) ............................................................................10

*Fine v. Am. Online, Inc*.,
    743 N.E. 2d 416 (Ohio Ct. App. 2000) ...........................................................39

*Giusti-Bravo v. United States Veterans Admin.*,
    853 F. Supp. 34 (D.P.R. 1993) ........................................................................18

*Green v. Am. Express Co.*,
    200 F.R.D. 211 (S.D.N.Y. 2001)......................................................................26

*Greenspun v. Bogan*,
    492 F.2 375 (1st Cir. 1974) .......................................................................24, 37

*Grimes v. Vitalink Commc'ns Corp.*,
    17 F.3d 1553 (3d Cir. 1994) ............................................................................29

*Gunnells v. Healthplan Servs.*,
    348 F.3d 417 (4th Cir. 2003)......................................................................15, 22

*Hanrahan v. Britt*,
    174 F.R.D. 356 (E.D. Pa. 1997) .....................................................................15

*Hills v. Equifax Consumer Servs.*,
    Nos. 1:04-CV-3400-TCB and 1:07-CV-314-TCB, 2007 U.S. Dist. LEXIS 48278
    (N.D. Ga. June 12, 2007).................................................................................27

*Holton v. Rothschild, Unterberg, Towbin*,
    118 F.R.D. 280 (D. Mass. 1987) .....................................................................11

*In re Airline Ticket Comm'n Antitrust Litig*.,
    953 F. Supp. 280 (D. Minn. 1997) ..................................................................39

*In re Am. Family Enters.*,
    256 B.R. 377 (D.N.J. 2000)..............................................................................27

*In re Boston Sci. Corp. Secs. Litig.*,
    No. 05-cv-11934-DPW, 2009 U.S. Dist. LEXIS 21640 (D. Mass. Mar. 10, 2009).................17

*In re Broadwing, Inc. ERISA Litig.*,
    252 F.R.D. 369 (S.D. Ohio 2006) ...................................................................36

*In re Cendant Corp. Litig.*,
  264 F.3d 201 (3d Cir. 2001) ...................................................................................22, 33

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
  216 F.R.D. 197 (D. Me. 2003) .......................................................................18, 21, 34, 35

*In re Credit Suisse-AOL Secs. Litig.*,
  253 F.R.D. 17 (D. Mass. 2008) .................................................................................11

*In re Gen. Am. Life Ins. Co. Sales Practices Litig.*,
  357 F.3d 800 (8th Cir. 2004)....................................................................................29

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
  55 F.3d 768 (3d Cir. 1995) ......................................................................................21

*In re Lupron(R) Mktg. & Sales Practices Litig.*,
  228 F.R.D. 75 (D. Mass. 2005) ...........................................................................9, 11, 12

In re *Metro. Life Ins. Co. Sales Practices Litig.*,
  No. 96-179, 1999 U.S. Dist. LEXIS 22688 (W.D. Pa. Dec. 28, 1999)....................................36

*In re Painwebber P'ship Litig.*,
  171 F.R.D. 104 (S.D.N.Y. 1997)................................................................................31

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
  962 F. Supp. 450 (D.N.J. 1997)...................................................................................9

*In re Relafen Antitrust Litig.*,
  231 F.R.D. 52 (D. Mass. 2005) ....................................................................... *passim*

*In re Relafen Antitrust Litig.*,
  Master File No. 01-12239-WGY, 2004 U.S. Dist. LEXIS 28801 (D. Mass. Apr. 9, 2004) .....31

*In re Tyco Int'l, Ltd.*,
  535 F. Supp. 2d 249 (D.N.H. 2007) .........................................................................21, 34

*In re Warfarin Sodium Antitrust Litig.*,
  391 F.3d 516 (3d Cir. 2004)....................................................................................21, 33

*In re Webloyalty.com, Inc. Marketing and Sales Practices Litig.*,
  474 F. Supp. 2d 1353 (J.P.M.L. Feb. 15, 2007) .........................................................4

*Isby v. Bayh*,
  75 F.3d 1191 (7th Cir. 1996)....................................................................................18

*Joel A. v. Giuliani*,
  218 F.3d 132 (2d Cir. 2000) ....................................................................................29

*John Hancock Life Ins. Co. v. Goldman, Sachs & Co.*,
    No. 01-10729-RWZ, 2004 U.S. Dist. LEXIS 3701 (D. Mass. Mar. 9, 2004)..........................10

*Killian v. McCulloch*,
    873 F. Supp. 938 (E.D. Pa. 1995).........................................................................................27

*Kronfield v. Transworld Airlines, Inc.*,
    No. 83 CIV. 8641 (KMV), 1989 WL 140341 (S.D.N.Y. Nov. 13, 1989) ...............................40

*Langbecker v. Elec. Data Sys. Corp.*,
    476 F.3d 299 (5th Cir. 2007)...............................................................................................14

*Lenahan v. Sears, Roebuck Co.*,
    No. 02-0045, 2006 U.S. Dist. LEXIS 60307 (D.N.J. July 24, 2006).......................................24

*Marder v. Lopez*,
    450 F.3d 445 (9th Cir. 2006)...............................................................................................31

*Mathewson Corp. v. Allied Marine Indus., Inc.*,
    827 F.2d 850 (1st Cir. 1987) ...............................................................................................36

*McCuin v. Sec'y of Health and Human Servs.*,
    817 F.2d 161 (1st Cir. 1987) ...............................................................................................11

*McIntosh v. Irwin Union Bank & Trust, Co.*,
    215 F.R.D. 26 (D. Mass. 2003) ...........................................................................................11

*Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*,
    247 F.R.D. 253 (D. Mass. 2008) ...........................................................................11, 12, 13, 17

*New Eng. Carpenters Health Benefits Fund v. First DataBank, Inc.*,
    602 F. Supp. 2d 277 (D. Mass. 2009).................................................................................21

*Payne v. Goodyear Tire & Rubber Co.*,
    216 F.R.D. 21 (D. Mass. 2003) ...........................................................................................17

*Pearson v. Skydell*,
    522 F.2d 171 (5th Cir. 1975)...............................................................................................18

*Pettway v. Harmon Law Offices*,
    No. 03-CV-10932-RGS, 2005 U.S. Dist. LEXIS 21341 (D. Mass. Sept. 27, 2005) ...............16

*Randle v. SpecTran*,
    129 F.R.D. 386 (D. Mass. 1988) .........................................................................................13

*Reppert v. Marvin Lumber & Cedar Co.*,
    359 F.3d 53 (1st Cir. 2004).................................................................................................30

*Reyes v. Buddha-Bar NYC*,
No. 08 Civ. 02494 (DF), 2009 U.S. Dist. LEXIS 45277 (S.D.N.Y. May 28, 2009)................26

*Rodrigues v. Members Mortg. Co.*,
226 F.R.D. 147 (D. Mass. 2005) .......................................................................................17

*Rolland v. Cellucci*,
191 F.R.D. 3 (D. Mass. 2000) ....................................................................................20, 34

*Rolland v. Patrick*,
562 F. Supp. 2d 176 (D. Mass. 2008)................................................................................18

*Smilow v. Southwestern Bell Mobile Sys.*,
323 F.3d 32 (1st Cir. 2003) ........................................................................................16, 17

*Sullivan v. DB Invs., Inc.*,
No. 04-2819 (SRC), 2008 U.S. Dist. LEXIS 81146 (D.N.J. May 22, 2008) ..........................26

*Swack v. Credit Suisse First Boston*,
230 F.R.D. 250 (D. Mass. 2005) .......................................................................................11

*Thomas v. Blue Cross & Blue Shield Ass'n*,
No. 08-15395, 2009 U.S. App. LEXIS 11520 (11th Cir. May 28, 2009) ...............................30

*Torrisi v. Tucson Elec. Power Co.*,
8 F.3d 1370 (9th Cir. 1993)...............................................................................................38

*United States v. Cannons Engineering Corp.*,
720 F. Supp. 1027 (D. Mass. 1989)...................................................................................19

*United States v. Comunidades Unidas Contra la Contaminacion*,
204 F.3d 275, 280 (1st Cir. 2000) ....................................................................................18

*United States v. DiBiase*,
45 F.3d 541 (1st Cir. 1995) ..............................................................................................36

*Varacallo v. Mass. Mut. Life Ins. Co.*,
226 F.R.D. 207 (D.N.J. 2005) ...........................................................................................32

*Varljen v. H.J. Meyers & Co.*,
No. 97 CIV. 6742 (DLC), 2000 U.S. Dist. LEXIS 16205 (S.D.N.Y. Nov. 8, 2000)...............21

*Vroegh v. Eastman Kodak Co.*,
Case No. A116242 (Cal. Ct. App. 2007).......................................................................32, 33

*Williams v. GE Capital Auto Lease*,
159 F.3d 266 (7th Cir. 1998).............................................................................................29

## STATUTES, RULES AND REGULATIONS

15 U.S.C. § 1693(e) ...................................................................................................3

18 U.S.C. § 2510, *et seq.*............................................................................................3

28 U.S.C. § 1407 ..................................................................................................3, 33

28 U.S.C. § 1715(b) ........................................................................................2, 5, 31

California Civil Code § 1542 ....................................................................................30

Federal Rule of Civil Procedure
    Rule 16 ................................................................................................................33
    Rule 23 .............................................................................................................9, 10
    Rule 23(a) .....................................................................................................3, 9, 10
    Rule 23(a)(1) ................................................................................................10, 11
    Rule 23(a)(2) ................................................................................................11, 12
    Rule 23(a)(3) ..........................................................................................10, 12, 13
    Rule 23(a)(4) ................................................................................................14, 15
    Rule 23(b) ..............................................................................................................9
    Rule 23(b)(3) ....................................................................................3, 10, 16, 17
    Rule 23(e) .......................................................................................................1, 18
    Rule 26(f) .............................................................................................................33
    Rule 56(f) .........................................................................................................4, 33

## SECONDARY AUTHORITIES

1 Herbert B. Newberg & Alba Conte, Newberg on Class Actions (4th ed. 2002)
    § 10:15 .................................................................................................................40
    § 11:41 .................................................................................................................35
    § 11:46 .................................................................................................................27

I.    **INTRODUCTION**

The proposed Stipulation of Settlement and amendment thereto[1] resolves hard-fought litigation regarding consumers' alleged enrollment in membership programs without their consent and authorization, and unlawful transfer of consumers' credit and debit account information to charge fees for such programs on a recurring monthly basis.  The proposed Stipulation of Settlement was preliminarily approved on February 24, 2009.  [Dkt. No. 124].  This Settlement, as well as its amendments, properly satisfy the applicable requirements for final approval under Federal Rule of Civil Procedure 23(e) ("Rule 23(e)").

The many months of hard-fought, arm's-length negotiations between experienced counsel and counsel's complete understanding of the strengths and weaknesses of their case warrants an initial presumption of fairness.  Plaintiffs are the only individuals who undertook litigation against Webloyalty, initiating these now consolidated actions in 2006.  Their vigorous pursuit of this action and their significant work to resolve the Class' claims, including the difficult, early-filed and contentious summary judgment proceedings, has resulted in a remarkable settlement, providing nationwide relief to the millions of consumers who became enrolled in various membership programs provided by Webloyalty.com, Inc. ("Webloyalty") through its online retail partners ("e-tailers").[2]

Although Plaintiffs believe they would prevail were this case to be fully litigated, the facts and claims underlying this litigation involve undeniable risks and substantial costs.  Class certification would be extremely difficult and Plaintiffs would face significant obstacles to establishing Defendants' liability.  For instance, the lack of uniformity among Webloyalty's Program Enrollment Pages and the variation in Class Members' understanding of Program

---

[1] This document incorporates by reference the definitions in the Stipulation of Settlement and the proposed amendment thereto, and all terms used herein shall have the same meaning as set forth in the Stipulation of Settlement and proposed amendment.

[2] The online retail partners that are party to this proposed Settlement include Fandango, Inc. d/b/a Fandango.com, Priceline.com, Inc. d/b/a Priceline.com, Nelson Shane Garrett, individually and d/b/a Justflowers.com and Giftbasketsasap.com, Maxim O. Khokhlov, individually and d/b/a/ Justflowers.com and Giftbasketsasap.com, ValueClick, Inc., E-Babylon, Inc. d/b/a/ 123inkjets.com, Kraft Foods Global Inc. and Vict. Th. Engwall & Co., Inc. d/b/a Gevalia.com (collectively with Webloyalty, "Defendants").

membership offer and billing terms could have persuaded the Court that individual issues predominate in this case, making this case unsuitable for class treatment. Furthermore, as demonstrated in their motions for summary judgment, Webloyalty will contest liability by pointing to the numerous disclosures that are provided throughout the enrollment process, that Class Members were required to actively provide two email addresses and click on a button marked "YES" to become enrolled in the Programs, that Class Members had several opportunities to inquire about and cancel membership during a 30-day free trial period, and that Class Members received several post-enrollment emails informing them that membership charges would be incurred and providing additional opportunities to cancel their membership.

In light of these risks, parties to the Settlement negotiated a resolution to this action on January 29, 2009 that proposed substantial therapeutic relief designed to increase consumers' awareness of Program membership and billing terms, as well as monetary relief up to $10 million. This Court preliminarily approved the Settlement on February 24, 2009. Notice of the proposed Settlement was extensive, reaching millions of Class Members. The reaction of the class has been extremely positive. Despite this comprehensive Notice Program, this Court has received a mere *five*[3] objections and only 145 requests for exclusion. Two of the five objections are advanced by professional objectors who regularly appear in class action settlements.

In March 2009, after required notice was provided pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1715(b), and the Preliminary Approval Order, only one of fifty state attorneys general expressed concerns with the proposed Settlement. The New York Attorney General's Office ("NYAG"), with its significant public enforcement and review powers, requested certain information regarding Webloyalty's business, its customers and ultimately filed an objection on the May 29, 2009 deadline.

In response, and after discussions with the NYAG, Webloyalty enhanced an already remarkable Settlement. The proposed June 23, 2009 amendment to the January 29 Settlement

---

[3] Emphasis is added and citations and quotations are omitted unless otherwise noted.

("the Amendment") removes the cap on the settlement fund, makes full refunds available to Class Members and reduces eligibility requirements for receiving a refund, and augments the remedial relief. Together, the proposed Settlement and amendments thereto materially change Webloyalty's business practices and more than address the very few objections to this Settlement.

Plaintiffs move that this Court certify the proposed Settlement Class for settlement purposes pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3). The Settlement Class meets all the criteria for certification and should be certified for purposes of effectuating this Settlement. Furthermore, this Settlement is exceedingly fair, reasonable and adequate and merits approval by this Court.

## II.    SUMMARY OF THE LITIGATION

Beginning in early 2006, consumers filed several class actions in this District and in the Central District of California, alleging that Webloyalty, through its online retail partners, enrolled consumers throughout the country in its membership programs[4] without meaningful authorization and consent. *See* Joint Declaration of Co-Lead Counsel In Support of Final Approval of Class Action Settlement and Motion for Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Joint Decl."), ¶ 3. In addition, Plaintiffs argued that Webloyalty unlawfully obtained consumers' billing information to charge recurring monthly fees for such Programs until consumers managed to cancel their memberships. Plaintiffs alleged violations of state consumer protection statutes, the Electronic Funds Transfer Act ("EFTA"), 15 U.S.C. § 1693(e), the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2510, *et seq.*, and common law, including invasion of privacy, money had and received, and unjust enrichment.

On February 15, 2007, pursuant to Plaintiffs' motions under 28 U.S.C. § 1407, the Judicial Panel on Multidistrict Litigation ("JPML") transferred four related actions to this Court

---

[4] These programs include: Reservations Rewards, Shoppers Discounts & Rewards, Member Specials, Buyer Assurance, Distinctive Privileges, PC Protection Plus, Travel Values, Travel Values Plus, Classmates Rewards, and/or Wallet Shield ("Programs"). Stipulation of Settlement, § IV(1)(L).

for consolidated and/or coordinated pretrial proceedings.  Joint Decl., ¶ 8.  A fifth related case was filed in this Court in early 2007 and became part of this consolidated action.[5]

Prior to entry of the JPML's Transfer Order, and within only two months after this action was initiated, Defendants demonstrated the aggressive manner in which they would approach every aspect of this action and moved for summary judgment in *Kuefler*, the designated lead case. Joint Decl., ¶ 10.  Defendants contended that Plaintiff Kuefler must have seen, read and understood the material terms of Program enrollment disclosed in numerous places throughout Webloyalty's existing enrollment process and in post-enrollment emails.  Defendants argued that such disclosures entitled them to judgment as a matter of law.  [Dkt. Nos. 16-20].  In response, Plaintiff Kuefler filed a motion for discovery pursuant to Rule 56(f), which Defendants opposed. [Dkt. Nos. 24, 26].  Soon after the close of briefing on Defendants' summary judgment motion and Plaintiff's Rule 56(f) motion, Defendants moved for sanctions against Plaintiff Kuefler and his counsel for the premature issuance of a third-party subpoena due to a clerical error.  [Dkt. Nos. 30-32]; Joint Decl., ¶ 13.

This Court held a Status Conference on April 24, 2007, at which time, after argument, the Court removed from its calendar Defendants' summary judgment motion as being premature, ordered that Plaintiffs file a motion for leave to file a consolidated complaint (having all related actions then before the Court) and denied Defendants' motion for sanctions.  Joint Decl., ¶¶ 13-14.  The Court also indicated it would refer the case to a Special Master to manage discovery, issue recommendations on dispositive motions and decide all non-dispositive motions.  *Id*. at ¶ 15; [Dkt. No. 44].  Accordingly, the Court entered an Order on June 18, 2007 appointing Mr. Gael Mahony as Special Master and directed the Special Master, in part, to:  (1) supervise all aspects of discovery; (2) decide all non-dispositive pretrial motions; (3) make recommendations to the Court regarding dispositive motions; and (4) assist the parties with settlement.  *Id*.; [Dkt. No. 52].  In addition, the Court's June 18 Order authorized the filing of Plaintiffs' proposed

---

[5] *See In re Webloyalty.com, Inc. Marketing and Sales Practices Litig.*, 474 F. Supp. 2d 1353 (J.P.M.L. Feb. 15, 2007).

Consolidated Amended Class Action Complaint, which Plaintiffs duly filed on June 22, 2007. *Id*.

On July 20, 2007, Defendants answered the Amended Complaint, and re-filed their summary judgment motion. Joint Decl., ¶ 16; [Dkt. Nos. 55-63].

Special Master Mr. Gael Mahony conducted a scheduling and discovery conference on September 27, 2007 during which the Special Master heard extensive arguments concerning the contours of discovery, class certification issues, the pendency of Defendants' summary judgment motion and other pretrial matters. Joint Decl., ¶ 17. The Special Master entered a Scheduling Order on October 30, 2007, which described in detail the subjects of discovery, appointed the firms Wexler Wallace LLP ("Wexler Wallace") and Coughlin Stoia Geller Rudman & Robbins LLP ("Coughlin Stoia") as Plaintiffs' Co-Lead Counsel and setting summary judgment proceedings for a time after completion of appropriate discovery. [Dkt. No. 76]. Plaintiffs filed a Second Consolidated Amended Complaint on November 9, 2007, [Dkt. No. 80], and Defendants filed their Answer on November 27, 2007. [Dkt. No. 85].

Soon after the September 27 conference, the parties met in Boston, New York, and Chicago to discuss the possibility of settlement. Joint Decl., ¶ 22. These in-person settlement discussions were followed by numerous and lengthy negotiations and exchanges of information. Parties continued to negotiate settlement terms over the course of several months. *Id*. Negotiations were difficult, time-consuming, and there were several occasions on which it appeared settlement would not occur. *Id*. Throughout this time, the parties regularly updated the Special Master on the progress of the confidential settlement discussions through Joint Status Reports under Seal. *Id*. at ¶ 25. Ultimately, the parties reached an agreement and Plaintiffs moved for preliminary approval on January 29, 2009 ("January 29 Settlement"). [Dkt. Nos. 119-122]. On February 24, 2009, the Court granted preliminary approval. [Dkt. No. 124].

On February 5, 2009, notice of the Settlement was provided pursuant to CAFA and the Preliminary Approval Order. Among the fifty states, only the NYAG voiced concerns. [Dkt. No. 138]. After discussions with the NYAG and in consideration of its significant strength and independent enforcement powers, Webloyalty proposed amendments to the Settlement

Agreement.  The parties to this action have contemporaneously filed their Joint Motion to

Amend Stipulation of Settlement and the Amendment to January 29th Stipulation of Settlement,

in which the amendments are set forth in detail.  Noteworthy is the fact that in a class of millions,

there were only five objections to the Settlement, demonstrating an extremely positive reaction to

the Settlement.  Joint Decl., ¶ 30.

### III.   THE SETTLEMENT AND ITS AMENDMENTS

#### A.  The Settlement Class

On February 24, 2009, the Court conditionally certified the following Settlement Class:

"all consumers who enrolled in or were members of a program during the Class Period of

September 11, 2000 through September 30, 2008, excluding (1) those consumers who both were

residents in the United Kingdom and enrolled in a Webloyalty International, Ltd. Program, (2)

those consumers who received a complimentary Program membership, and (3) those Webloyalty

employees who were members of a Program for purposes of fulfilling their job functions.  *See*

Preliminary Approval Order, ¶ 2.

#### B.  Remedial Relief

Pursuant to the January 29th Settlement Agreement, together with its Amendment,

Webloyalty is obligated to the following therapeutic relief:

- Webloyalty will not use the words "award" or "reward" when referring to an offer
  or solicitation to join a Program (other than in reference to the brands Reservation
  Rewards and Shoppers Discounts and Rewards, other Program brands, or benefits
  offered through a Program).  January 29 Settlement, § IV(3)(B)(i)(a);

- Webloyalty will include on all Enrollment Pages the following disclosures:  (a) the
  price of the Program in at least two (2) locations in addition to the Offer and
  Billing Details; (b) in any graphic depicting a coupon that includes a money-
  saving incentive on a consumer's next transaction with the Webloyalty partner,
  such as "Save $10 Cash Back on your next purchase" ("Coupon Graphic"), "See
  Billing Details" or substantially similar words; (c) proximate to any coupon
  graphic, information regarding (1) the cost of the Program, (2) the term of the free
  trial program, if any, and (3) method of billing; (d) proximate to any direction to
  proceed directly to the enrollment button where consumers enroll for a Program
  membership and take action (*e.g*., "Click YES Below"), other than in a Coupon
  Graphic, information regarding the cost of the Program; and (e) a statement that

the Program is being offered by Webloyalty. *Id.* at § IV(3)(B)(i)(c)(i)-(v);

- Webloyalty will display the entire Offer and Billing Details for the Programs on the Enrollment Page in a location proximate to where consumers enroll for a Program membership; and without use of a separate box that requires members to scroll through the Offer and Billing Details. *Id.* at § IV(3)(B)(i)(d)(i)-(ii);

- Webloyalty will display all terms contained in the Offer and Billing Details in a font that is at least the same size as a majority of the copy size of all other text on the Enrollment Page, with the exclusion of header and footer text. *Id.* at § IV(3)(B)(i)(e);

- Webloyalty will ensure that information regarding (a) cost of the Program, (b) billing method, and (c) cancellation of membership in a Program contained in the Offer and Billing Details on the Enrollment Page are in bolded font. *Id.* at § IV(3)(B)(i)(f);

- For a consumer who accepts a 30-day free trial offered by Webloyalty, Webloyalty will send a notification at least 15 days but no more than 30 days before the consumer is required to cancel the free trial, including the following: (a) information regarding the amount of the Program membership fee that will be incurred at the end of the free trial period; (b) information sufficient to identify the credit or debit card to be charged the Program membership fee; (c) information regarding the date upon which the first Program membership fee will be billed; and (d) if the notification is emailed, a Subject line that contains the term "billing" or substantially similar words. Amendment, § IV(3)(B)(i)(f)(i)-(iv);

- Webloyalty will include on all regularly scheduled emails sent to Program members thirty (30) days or more after enrollment a toll-free telephone number that may be used to contact customer service and cancel a Program membership. *Id.* at § IV(3)(B)(i)(g);

- Webloyalty will include on all regularly scheduled emails sent to Program members thirty (30) days or more after enrollment a link and reference to a member's billing detail so that a member can click the link to view (a) the method of payment that the member will be or is being billed for the Program and (b) the fee for the Program membership. January 29 Settlement, § IV(3)(B)(i)(h);

- Webloyalty will include on all regularly scheduled post-enrollment emails sent to Program members a link that may be used to contact customer service and cancel a Program membership. *Id.* at § IV(3)(B)(i)(i);

- Webloyalty will include on all banner advertisements displayed on client purchase confirmation pages that refer to an offer or solicitation to join a Program and that contain hyperlinks to Enrollment Page(s) "Terms and conditions apply" and "When you join their service" or substantially similar words. Amendment, § IV(3)(B)(ii)(a)(i)-(ii);

- Webloyalty will include on all Enrollment Pages, in the enrollment button, where consumers enroll for a Program membership, "Click here now to sign-up" or substantially similar words. *Id.* at § IV(3)(B)(ii)(b);

- Webloyalty will include on all Enrollment Pages an affirmative step that consumers must take to consent to the transfer, for billing purposes, of credit or debit card information to Webloyalty from Webloyalty's partner with such affirmative step being in close proximity to a clear and conspicuous disclosure regarding consent to the transfer of credit or debit card information for billing. *Id.* at § IV(3)(B)(ii)(c);

- Webloyalty will include in the Offer and Billing Details, information regarding any expiration period for the money-saving incentive described in the Coupon Graphic. *Id.* at § IV(3)(B)(ii)(d);

- Webloyalty will include in all audio messages that accompany an Enrollment Page the statement "terms and conditions apply" or substantially similar words. *Id.* at § IV(3)(B)(ii)(e);

- Webloyalty will send a first class mailing to every member of a Program for whom Webloyalty has determined after the first thirty (30) days of the member's join date that Webloyalty does not have a valid email address (a "Reminder Mailing"). A Reminder Mailing will include the following: (a) information regarding the specific Program in which the member enrolled, including the website of the Program, (b) a toll-free telephone number and email address which the member may use to contact Webloyalty's customer service to cancel his or her membership in the Program,(c) a method that the member may use to obtain his or her billing information, and (d) the use of the word "member," "membership," or substantially similar terms to indicate that the member is enrolled in the Program. Webloyalty will send the Reminder mailing at least every four (4) months from the discovery of the invalidity of the email address. January 29 Settlement, § IV(3)(B)(i).

### C. Monetary Relief

Webloyalty will make available 100% full cash refunds to all eligible class members who choose to seek them. These payments are available to any member who was charged for a membership, did not use the Program or any of the benefits of the Program, and, simply attests under oath that he or she did not authorize charges to his or her credit or debit card or did not understand that his or her credit or debit card would be charged upon enrollment in the Program ("Tier 3 Relief"). Other eligible Class Members, who do not meet the criteria for Tier 3 Relief, may receive for each Program: (a) a payment equivalent to the cost of one month's membership

if he or she had been charged for one month of membership ("Tier 1 Relief"); or (b) a payment equivalent to the cost of two months' membership if he or she was charged for two or more months of membership ("Tier 2 Relief").[6]

## IV.    ARGUMENT

### A.    The Proposed Class Should Be Certified for Settlement Purposes under Rule 23

Before the Court can determine whether the settlement is fair, it must finally certify the class. *See In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 67 (D. Mass. 2005) ("*Relafen*"); *accord Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997) ("*Amchem*").  To wit, a court may certify a class for settlement purposes where, as here, the proposed class satisfies the four prerequisites of Federal Rule of Civil Procedure 23(a) ("Rule 23(a)") and one of the three subsections of Federal Rule of Civil Procedure 23(b) ("Rule 23(b)").  *See, e.g., Amchem*, 521 U.S. at 613; *Relafen*, 231 F.R.D. at 67; *Bussie v. Allmerica Fin. Corp.*, 50 F. Supp. 2d 59, 69-72 (D. Mass. 1999).

Class actions certified for purposes of settlement are well recognized under Rule 23.  *See, e.g., In re Lupron(R) Mktg. & Sales Practices Litig.*, 228 F.R.D. 75, 87 (D. Mass. 2005) ("*Lupron*"); *see also In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 562 (D.N.J. 1997).  Class actions are an essential tool in adjudicating complex claims for recoveries that may be too small to merit individual litigation.  Accordingly, district courts have "broad discretion" to certify a class and Rule 23 should be "liberally construed" to effectuate

---

[6] For all tiers of monetary relief, to prevent fraud and to verify that the person submitting the claim is, in fact, a class member to whom notice was directed, the person submitting a Claim Form or Additional Benefits Claim Form is asked to supply certain information that should be in the class member's possession and readily available: (1) the claimant's membership number for the Program (available from any number of post-enrollment emails sent by Webloyalty) OR (2) the Program name (available on the credit or debit card bill on which the charges appear), the email address used to join the program, and either (a) the month and date the member enrolled in the Program or (b) the credit or debit card the member used to enroll, together with the last four digits of that card.  These requirements allow the Settlement Administrator to identify the member from among members with possibly similar names, particularly where verification is hampered by changes in email or home addresses since the member enrolled.  Also, the requirements prevent possible fraudulent claim submissions of member names and email addresses that may be found on the internet by giving the claimant the option of submitting from a choice of options some additional piece of information that should readily be known by and available only to a genuine claimant. January 29 Settlement, § IV(10)(A).

class certification. *John Hancock Life Ins. Co. v. Goldman, Sachs & Co.*, No. 01-10729-RWZ, 2004 U.S. Dist. LEXIS 3701, at *5 (D. Mass. Mar. 9, 2004). Moreover, courts resolve doubts about whether to grant class certification in favor of certifying the class. *Id.*; *see also Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985) ("The interests of justice require that in a doubtful case, any error, if there is to be one, should be committed in favor of allowing a class action.").

On February 24, 2009, this Court conditionally certified the following settlement class for settlement purposes pursuant to Rules 23(a) and 23(b)(3), which Plaintiffs respectfully submit should be finally approved:

> All consumers who enrolled in or were members of [a Program] from September 11, 2000 through September 30, 2008.

> Excluded from the Settlement Class are (1) those consumers who both were residents in the United Kingdom and enrolled in a Webloyalty International, Ltd. Program; (2) those consumers who received complementary Program membership; and (3) those [Webloyalty] employees who were members of a Program for purposes of fulfilling their job functions.

Preliminary Approval Order at 2. [Dkt. No. 124]. The Settlement Class will also exclude those Settlement Class Members who have properly opted out. As each of the requirements of Rule 23(a) and 23(b)(3) are met, this Class should be certified for settlement purposes.

### 1.   The Requirements of Rule 23(a) are Satisfied

Under Rule 23(a), four threshold elements must be satisfied for a class to be certified:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a); *see also Amchem*, 521 U.S. at 613. As demonstrated below, Plaintiffs have satisfied each of the four elements under Rule 23(a).

### a.   The Class is So Numerous That Joinder of All Members Is Impracticable

The numerosity requirement under Rule 23(a)(1) is met when the class is "so numerous that joinder of all members would be impracticable." FED. R. CIV. P. 23(a)(1). Several courts in

this District have held that it is not necessary to know the exact number of the potential class to satisfy Rule 23(a)(1). *See*, *e.g.*, *In re Credit Suisse-AOL Secs. Litig.*, 253 F.R.D. 17, 22 (D. Mass. 2008) (indicating that numerosity may be satisfied without plaintiffs having to "generate an exact number."); *see also Swack v. Credit Suisse First Boston,* 230 F.R.D. 250 at 258 (D. Mass. 2005) (holding that plaintiffs Rule 23(a)(1) was satisfied even though "the precise number of potential class members [was] not yet known, . . . ."); *McIntosh v. Irwin Union Bank & Trust, Co.*, 215 F.R.D. 26, 35 (D. Mass. 2003) (same). Moreover, courts have held that potential classes consisting of more than fifty (50) members satisfy the numerosity requirement. *See*, *e.g.*, *Holton v. Rothschild, Unterberg, Towbin,* 118 F.R.D. 280, 282 (D. Mass. 1987) (finding that 50 or 60 members "is sufficiently large" to warrant class certification). In addition, "district courts may draw reasonable inferences from the facts presented to find the requisite numerosity." *McCuin v. Sec'y of Health and Human Servs.*, 817 F.2d 161, 167 (1st Cir. 1987).

Webloyalty has enrolled millions of consumers in its various Programs through approximately 400 different e-tailer websites during the Class Period. Furthermore, Webloyalty's Programs are offered throughout the United States and Settlement Class Members reflect this geographic dispersion. As a result, joinder of these parties is not only impracticable; it is virtually impossible.

### b. Questions of Law and Fact Are Common to Members of the Class

Under Rule 23(a)(2), there must be "questions of law or fact common to the members of the class." FED. R. CIV. P. 23(a)(2). "'[T]he rule requires only that resolution of the common questions affect all or a substantial number of class members.'" *Lupron*, 228 F.R.D. at 88. Furthermore, "'there need be only a single issue *common* to all members of the class." *Natchitoches Parish Hosp. Serv. Dist. v. Tyco Int'l, Ltd.*, 247 F.R.D. 253, 263 (D. Mass. 2008) ("*Natchitoches*"). As a result, "[t]he threshold of commonality is easily penetrated." *Id.*; *see also Lupron*, 228 F.R.D. at 88 ("The threshold of 'commonality,' is not high.").

The commonality requirement is easily satisfied in this matter as there are numerous

common factual and legal questions applicable to all Settlement Class Members, including:

- Whether Defendants developed and implemented a scheme to intentionally create unauthorized Membership Program accounts and to charge consumers and entities for such accounts;

- Whether Defendants conspired with each other to intentionally create unauthorized Membership Program accounts and to charge consumers and entities for such accounts;

- Whether Defendants transmitted consumers' billing information without meaningful authorization in violation of federal and state privacy laws;

- Whether the conduct of Defendants constituted unlawful, unfair or fraudulent business practices in violation of state statutes;

- Whether Defendants were unjustly enriched at consumers' expense;

- Whether Defendants are liable to Plaintiffs and the Class for money had and received;

- Whether Settlement Class Members sustained damages and, if so, the proper measure of those damages; and

- Whether Plaintiffs and members of the Class are entitled to declaratory and/or injunctive relief to enjoin Defendants alleged unlawful conduct.

Plaintiffs' claims arise out of the same nucleus of operative facts and are pursuant to the same legal theories as those of the absent Settlement Class Members. Plaintiffs and Settlement Class Members were also all allegedly damaged by the same or similar conduct. Thus, Rule 23(a)(2) is satisfied.

### c. Plaintiffs' Claims are Typical of the Class' Claims

Rule 23(a)(3) requires that "the claims of the representative parties are typical of the claims of the class." *Natchitoches*, 247 F.R.D. at 264. "A sufficient nexus is established [to show typicality] if the claims or defenses of the class and class representative arise from the same event or pattern or practice and are based on the same legal theory." *Lupron*, 228 F.R.D. at 89. Moreover, as with commonalty, typicality "does not require that all putative class members share identical claims." *Natchitoches*, 247 F.R.D. at 264. Typicality may also be met despite

"minor variations in the fact patterns underlying individual claims." *Randle v. SpecTran*, 129

F.R.D. 386, 391 (D. Mass. 1988); *Burstein v. Applied Extrusion Techs*., 153 F.R.D. 488, 491 (D.

Mass. 1994) ("Typicality refers to the nature of the claim of the class representatives, and not to

the specific facts from which the claim arose or relief in sought.").

    Here, the Settlement Class Representatives' claims are aligned with those of Class

Members and arise out of the same conduct. Each of the Settlement Class Representatives, like

members of the Class, were enrolled in and charged for Webloyalty Programs and through the

same or similar means. Therefore, the Settlement Class Representatives' claims are typical of

the Class' claims and Rule 23(a)(3) is satisfied.

    The objection filed by Charles D. Chalmers on behalf of Nina Ortega and David Klausner

("Chalmers Objectors") asserts that the proposed Settlement Class Representatives cannot meet

the typicality requirement because the Settlement Agreement provides for a release of "unknown

claims" without any limitation. Objections to Settlement ("Chalmers Objection") at 2; January

29 Settlement, § IV(1)(X) (definition of "Unknown Claims"). The Chalmers Objectors state that

"[t]here is no way for [the typicality] requirement to be met for unknown claims." Chalmers

Obj. at 2.

    However, while it is unclear whether the Chalmers Objectors are challenging class

certification, the release of Unknown Claims does not prevent Plaintiffs from satisfying the

typicality requirement under Rule 23(a)(3). The Settlement Agreement clearly states that

"Unknown Claims" are "all claims . . . which any Settlement Class Representatives or any

Settlement Class Member does not know . . . at the time of the release of the Released Parties

which, if known by him or her, might have affected his or her decision not to object to this

settlement." January 29 Settlement, § IV(1)(X) (emphasis added). Moreover, "Unknown

Claims" are included under the definition of "Released Claims," which are defined as

> [A]ll claims . . . known or unknown, . . . asserted or that might have been asserted,
> by the Settlement Class Representatives or any Settlement Class Member, . . .
> against any of the Released Parties *arising out of or related to the enrollment
> and/or membership in any of the Programs or any of the allegations set forth in*

*the Complaint.*

*Id.* at § IV(1)(N) (emphasis added). This definition is further refined by Section IV(2)(C), which limits Released Claims to "any claim between a Settlement Class Member and any Released Party that is unrelated to the Released Claims, including any product liability, personal physical injury or intellectual property claim." *Id.* at § IV(2)(C).

Released Claims, including Unknown Claims, are limited to the claims underlying this action. As a result, because Settlement Class Representatives' claims are aligned with those of Settlement Class Members, as described above, the release of Unknown Claims does not undermine typicality. Indeed, that Settlement Class Representatives are bound by the same release terms as Settlement Class Members supports typicality. *Compare*, *e.g.*, *Langbecker v. Elec. Data Sys. Corp.*, 476 F.3d 299, 313 n.26 (5th Cir. 2007) (no typicality where "the defense of the release of claims was not shared by the named plaintiffs and the purported class.").

### d. Settlement Class Representatives and Their Counsel Will Fairly and Adequately Protect the Interests of the Class

Rule 23(a)(4) requires that the representative parties will fairly and adequately protect the interests of the class. FED. R. CIV. P. 23(a)(4). The adequacy requirement entails a two-part showing: First, the moving party must show "that the interests of the representative party will not conflict with the interests of any of the class members, and second, that counsel chosen by the representative party is qualified, experienced and able to vigorously conduct the proposed litigation." *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985).

This case meets both prongs of the adequacy requirement under Rule 23(a)(4). Settlement Class Representatives' interests are directly aligned with those of Class Members. The Plaintiffs do not have any interests antagonistic with the Class. Each Settlement Class Representative, like each absent Class Member, was damaged as a result of Defendants' alleged scheme to deceptively enroll consumers in Programs for which it charges a monthly fee. Moreover, Plaintiffs will have to prove the same wrongdoing as absent Class Members to establish Defendants' liability. All Class Members share an interest in obtaining maximum

monetary and other relief and Settlement Class Representatives have acted, and continue to act, as fiduciaries of the Settlement Class.

Furthermore, Plaintiffs have retained counsel who are well-qualified and experienced in prosecuting complex consumer class action litigation. Class Counsel have successfully litigated, managed and settled numerous class actions and are among the most well-respected law firms in the plaintiffs' complex litigation bar. Both firms have vigorously pursued this action since its inception and dedicated significant resources toward achieving substantial benefits on behalf of the putative Class. *See* Motion for Preliminary Approval, Exs. 2 and 3 (individual Class Counsel firm biographies). [Dkt. No. 120]. As a result, the two prongs under Rule 23(a)(4) are satisfied.

The Chalmers Objectors suggest that Settlement Class Representatives cannot adequately represent Class Members who are not eligible for monetary compensation under the Settlement. Chalmers Obj. at 8. However, that Class Representatives are eligible for a different form of relief than certain other Class Members does not defeat adequacy under Rule 23(a)(4). The monetary relief available to Authorized Claimants and the remedial relief available to the Class as a whole are not in conflict. Numerous courts have held that variations in the form of relief that pose even a potential conflict do not undermine the adequacy requirement where class representatives' interests are nevertheless aligned with members of the Class. *See, e.g.*, *Hanrahan v. Britt*, 174 F.R.D. 356, 364 (E.D. Pa. 1997) ("Potential conflicts relating to relief issues which would arise only if the plaintiffs succeed on common claims of liability on behalf of the class will not bar a finding of adequacy . . . ."); *see also Gunnells v. Healthplan Servs.*, 348 F.3d 417, 431 n.7 (4th Cir. 2003) (differences in relief did not render representatives inadequate where class representatives and absent class members shared "common objectives and the same factual and legal positions."). Here, the relief available to Settlement Class Representatives and the absent Class is based on their common claims of liability after allegedly becoming enrolled in Webloyalty's Programs. Consequently, the Chalmers Objectors' assertion that the Class is not adequately represented is entirely without merit.

### 2.   The Requirements of Rule 23(b)(3) Are Satisfied

Rule 23(b)(3) requires that

> the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

*Smilow v. Southwestern Bell Mobile Sys.*, 323 F.3d 32, 38 (1st Cir. 2003). The proposed Settlement Class satisfies the requirements of Rule 23(b)(3).

### a.    Common Issues Predominate

As Judge Stearns recognized, "Rule 23(b)(3) requires merely that common issues predominate, not that all issues be common to the class." *Pettway v. Harmon Law Offices*, No. 03-CV-10932-RGS, 2005 U.S. Dist. LEXIS 21341, at *33 (D. Mass. Sept. 27, 2005). Therefore, predominance under Rule 23(b)(3) "'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Relafen*, 231 F.R.D. at 70. Furthermore, courts have held that consumer cases are particularly well-positioned for satisfying the predominance test under Rule 23(b)(3). *See*, *e.g.*, *Smilow*, 323 F.3d at 41 n.9 (classes "made up of consumers are especially likely to satisfy the predominance requirement.").

Individual issues in this case do not overwhelm common questions of law or fact. At the heart of Settlement Class Members' claims is whether the Defendants enrolled consumers in Programs and charged them for such Programs without their meaningful consent. If class members were required to bring individual actions, there is no doubt that they would be required to present identical or substantially similar evidence and prove the same wrongdoing to establish Defendants' liability. As a result, common issues of fact and law predominate.

### b.    A Class Action is the Superior Method for Adjudicating These Claims

Courts examine the following factors in determining whether the superiority requirement is met under Rule 23(b)(3):

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the

> class; (C) the desirability or undesirability of concentrating the litigation of the
> claims in the particular forum; (D) the difficulties likely to be encountered in the
> management of a class action.

*Rodrigues v. Members Mortg. Co.*, 226 F.R.D. 147, 151-52 (D. Mass. 2005). These factors are

"nonexhaustive." *Amchem*, 521 U.S. at 615-16. The Supreme Court instructs that where a court

is "[c]onfronted with a request for settlement-only class certification, a court need not inquire

whether the case, if tried, would present intractable management problems, for the proposal is

that there be no trial." *Id.* at 620. Furthermore, where the court has found that the predominance

requirement was met, "the Court likely will also find that Plaintiffs satisfy the superiority

requirement of Rule 23(b)(3)." *Natchitoches*, 247 F.R.D. at 273 n.6.

Given the substantial size of the proposed class, as described above, it would be

inefficient for each class member to assert individual claims to recover their membership fees,

which amount to approximately $7-$12 per month. Second Consol. Am. Compl., ¶ 2. [Dkt. No.

80]. Such piecemeal adjudication of substantially similar claims would likely be costly for

individual plaintiffs and "would be an inefficient allocation of court resources." *In re Boston

Sci. Corp. Secs. Litig.*, No. 05-cv-11934-DPW, 2009 U.S. Dist. LEXIS 21640, at *38 (D. Mass.

Mar. 10, 2009). Moreover, an individualized approach would necessarily risk inconsistent

adjudications establishing varying standards for identical conduct.

In contrast, the class action mechanism enables individual consumers to adjudicate

potentially valid claims against defendants "even where those [consumers] suffered relatively

small damages and have insufficient resources to pursue litigation on their own." *Id.* Indeed,

numerous decisions in this District have described such advantages of class actions as the "core

purpose" of Rule 23(b)(3). *See*, *e.g.*, *Smilow*, 323 F.R.D. at 41 ("The core purpose of Rule

23(b)(3) is to vindicate the claims of consumers and other groups of people whose individual

claims would be too small to warrant litigation."); *Payne v. Goodyear Tire & Rubber Co.*, 216

F.R.D. 21, 29 (D. Mass. 2003) (same). Furthermore, should Class Members desire to pursue

individual claims, they may do so through the opt-out procedure. A class action is plainly the

superior method of adjudication for the fair and efficient resolution of these claims.

### B.  The Settlement Is Fair, Adequate and Reasonable and Should Be Approved

In accordance with Rule 23(e), "[a] district court can approve a class action settlement only if it is fair, adequate and reasonable."  *See*, *e.g.*, *City P'ship Co. v. Atlantic Acquisition Ltd. P'ship*, 100 F.3d 1041, 1043 (1st Cir. 1996); *see also Rolland v. Patrick*, 562 F. Supp. 2d 176, 178 (D. Mass. 2008).  Such an analysis requires the Court to assess the settlement terms, the interests of the Class Members as well as any third parties who might be affected, and the circumstances of the litigation and the proposed settlement.  *See*, *e.g.*, *Duhaime v. John Hancock Mut. Life Ins. Co.*, 183 F.3d 1, 7 (1st Cir. 1999); *see also Durrett v. Housing Auth. of Providence*, 896 F.2d 600, 604 (1st Cir. 1990).  The First Circuit gives significant deference to trial courts and has "refrain[ed] from intervening unless there is found to be an abuse of discretion."  *City P'ship Co.*, 100 F.3d at 1043-44; *Durrett*, 896 F.2d at 603.

Numerous courts, including the First Circuit, have adhered to the "principle that 'settlement agreements are highly favored in the law and will be upheld whenever possible because they are a means of amicably resolving doubts and preventing lawsuits."  *Pearson v. Skydell*, 522 F.2d 171, 176 (5th Cir. 1975) (quoting *D. H. Overmyer Co. v. Loflin*, 440 F.2d 1213, 1215 (5th Cir. 1971)); *see also United States v. Comunidades Unidas Contra la Contaminacion*, 204 F.3d 275, 280 (1st Cir. 2000) (describing a "strong public policy in favor of settlements").

Instead of trying the underlying merits of the case or determining whether the proposed settlement is the best possible deal, a court should determine whether the "proposal, *taken as a whole*, is fair, adequate, reasonable and in the best interests of all those who will be affected by it."  *Giusti-Bravo v. United States Veterans Admin.*, 853 F. Supp. 34, 36 (D.P.R. 1993); *see also In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 211 (D. Me. 2003) ("*Compact Disc*") ("As supervising judge I am not to prejudge the merits of the case . . . and I am not to second-guess the settlement; I am only to determine if the parties' conclusion is reasonable.").  Courts recognize that the "essence of settlement is compromise" and will not represent a total win for either side.  *Isby v. Bayh*, 75 F.3d 1191, 1200 (7th Cir. 1996).

18

### 1.    There Is a Presumption in Favor of Settlement

A proposed settlement is entitled to a presumption of fairness "'[w]hen sufficient discovery has been provided and the parties have bargained at arms-length, . . . .'" *Relafen*, 231 F.R.D. at 76; *see also Bussie*, 50 F. Supp. 2d at 77 (holding there was a "strong initial presumption" of fairness where settlement negotiations were conducted at arm's-length over several months) (quotation omitted).  The "sufficient discovery" requirement allows the court to determine whether counsel appreciated the strengths and weaknesses of plaintiff's case prior to entering into a settlement.  *See, e.g., United States v. Cannons Engineering Corp.*, 720 F. Supp. 1027, 1036 (D. Mass. 1989) (presumption of fairness where "sufficient discovery has taken place to enable . . . counsel to evaluate accurately the strengths and weaknesses of the plaintiff's case").

Early on, Plaintiffs engaged preeminent marketing experts, including in the specific field of consumer judgment and decision-making.  Joint Decl., ¶¶ 9, 19.  Because Webloyalty's enrollment pages are publicly shown, the consumer "experience" in dispute was readily capable of close study by Plaintiffs' experts.  Expert Aimee Drolet, Ph.D., Professor UCLA Anderson School, was able to critically inform Plaintiffs on the strength and weaknesses of this case.  Plaintiffs also retained Thomas J. Maronick, the former Director of the Office of Impact Evaluation in the Bureau of Consumer Protection at the Federal Trade Commission ("FTC").  Dr. Maronick, as the former FTC staff expert on consumer behavior and survey matters, similarly provided valuable information on the nature of Webloyalty's enrollment process and on appropriate remedial relief.  *Id.* at ¶ 19.  These experts allowed Plaintiffs to develop a deep understanding of consumers' reactions to messages, images, and screen flows displayed on e-tailer and Program websites.  *Id.* at ¶¶ 9, 19-20.

The proposed Settlement Agreement was the result of many months of intense negotiations between experienced and capable counsel.  Settlement negotiations were conducted in-person in Chicago, New York and Boston, required numerous subsequent discussions by phone, and involved many exchanges of proposals.  Joint Decl., ¶ 22-24.  The negotiations were at all times conducted at more than arm's-length with each side vigorously advocating for their

parties' interests.  *Id.*  The parties continuously updated the Special Master on the progress of settlement negotiations through the filing of numerous Joint Status Reports.  *Id.* at ¶ 25.

Plaintiffs' understanding of the nature of the litigation was also informed through the aggressive motion practice that included two motions for summary judgment.  [Dkt. Nos. 16 and 56].  Joint Decl., ¶¶ 12, 20.  Defendants took the position, and still maintain, that none of the Plaintiffs could prevail on their core allegation that they did not understand they would be billed for a Program, when certain disclosures existed in various places on their Enrollment Page.  *Id.* at ¶¶ 23, 35.  Defendants' aggressive summary judgment tactic required Plaintiffs to address this fundamental issue, with early and extensive expert consultation, which of course provided essential guidance in settlement negotiations.  *Id.* at ¶ 20.  Finally, Plaintiffs were further informed by the Defendants' initial disclosures and a continuous exchange of information during settlement negotiations, which culminated in confirmatory discovery.  *Id.* at ¶ 27.  There can be no question that Plaintiffs were well-informed of the relative strength of their class certification and liability cases, enabling these negotiations.  The Settlement merits an initial presumption of fairness.

### 2. Factors to Consider When Determining the Fairness, Adequacy and Reasonableness of a Settlement

The First Circuit has not followed a particular test for evaluating the fairness, reasonableness and adequacy of a proposed settlement.  *See*, *e.g.*, *Relafen*, 231 F.R.D. at 72 ("'[T]here is no single test in the First Circuit for determining the fairness, reasonableness and adequacy of a proposed class action settlement.'"); *see also Rolland v. Cellucci*, 191 F.R.D. 3, 8 (D. Mass. 2000) (indicating that the fairness of a settlement depends upon a "'wide variety of factors bearing on the central question of whether the settlement is reasonable in light of the uncertainty of litigation.'").  Courts may determine the fairness, reasonableness and adequacy of class action settlements based on some or all of the following factors:

(1)  Comparison of the proposed settlement with the likely result of litigation;
(2)  Reaction of the class to the settlement;
(3)  Stage of the litigation and the amount of discovery completed;

    (4)     Quality of counsel;
    (5)     Conduct of the negotiations; and
    (6)     Prospects of the case, including risk, complexity, expense and duration.

*Relafen*, 231 F.R.D. at 72 (citing *Compact Disc*, 216 F.R.D. at 206); *see also In re Tyco Int'l, Ltd.*, 535 F. Supp. 2d 249, 259 (D.N.H. 2007) ("*Tyco*") (applying a similar and condensed version of the *Compact Disc* factors).[7]  The proposed settlement is fair and reasonable under these factors.

### a.  Comparison of Proposed Settlement with the Likely Result of Litigation

The first factor compares the value of the settlement to "the relief the plaintiffs might recover after a successful trial and appeal, discounted for risk, delay and expense."  *Compact Disc*, 216 F.R.D. at 207; *see also Varljen v. H.J. Meyers & Co.*, No. 97 CIV. 6742 (DLC), 2000 U.S. Dist. LEXIS 16205, at *10 (S.D.N.Y. Nov. 8, 2000) (comparing the recovery provided through the settlement with the "genuine hurdles [that] exist[ed] for plaintiffs" in proving liability).  Here, the monetary and remedial relief achieved through this Settlement is extraordinary compared to the significant risks, delays and expenses that would have befallen this case were it fully litigated and taken to trial.

### i.  Risks of Class Certification

The risk of obtaining and maintaining class certification through to trial is an important consideration for the Court in evaluating the fairness, reasonableness and adequacy of a proposed settlement because "'the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the [class] action.'"  *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 537 (3d Cir. 2004) ("*Warfarin*") (quoting *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 817 (3d Cir. 1995) ("*GM Trucks*")).  "[N]ot only does the aggregation of the claims enlarge the value of the suit, but often the combination of the individual cases also pools litigation resources and may facilitate proof on the merits."  *GM*

---

[7] The six (6) factor test under *Compact Disc* is "pared down version" of the factors outlined in *City of Detroit v. Grinnell*, 495 F.2d 448 (2d Cir. 1974).  *New Eng. Carpenters Health Benefits Fund v. First DataBank, Inc.*, 602 F. Supp. 2d 277, 281 (D. Mass. 2009).

*Trucks*, 55 F.3d at 817.

While a court need not consider the issue of manageability when certifying a class for settlement purposes, *Amchem*, 521 U.S. at 620, a district court has discretion to decertify or modify a class at any time during the litigation if manageability becomes a problem. *See*, *e.g.*, *Gunnells*, 348 F.3d at 433. Courts often find that risks related to class certification favor approval of the settlement because "[t]here would always entail the risk, even if slight, of decertification." *In re Cendant Corp. Litig.*, 264 F.3d 201, 239 (3d Cir. 2001) ("*Cendant*").

As described in detail in Defendants' Joinder in Plaintiffs' Memorandum In Support of Final Approval of Proposed Settlement ("Defendants' Joinder"), there are significant risks associated with class certification for litigation purposes. Defendants will emphasize individual issues related to consumer enrollment in Webloyalty Membership Programs and consumer understanding of Program membership and billing terms.

For instance, Class Members initiated Program memberships through a variety of Enrollment Pages. These various Enrollment Pages presented distinct layouts and images, positioned advertising language in different areas within the Enrollment Page and contained varying displays of membership and billing terms. As a result, Defendants will undoubtedly argue that Class Members' understanding of the Program membership offer was also varied, and whether any given Class Member voluntarily enrolled, or whether any other factors interfered with Class Members' ability to contemplate or understand the purported disclosures, are fundamentally individual questions. *See* Joint Decl., ¶ 35.

While Plaintiffs continue to believe they would ultimately succeed in obtaining class certification, it is common sense that these are issues of considerable risk. It is therefore not surprising that no other members of the competitive plaintiffs' bar opted to pursue this litigation in the midst of widespread complaints. Such vulnerability favors approving the proposed Settlement.

### ii.    Risks of Establishing Liability

Liability is no slam-dunk. Defendants will argue that consumers authorized enrollment

in and payment for Program memberships.  Defendants will point to the numerous disclosures featured on the Enrollment Page, consumers' involvement in the transaction, the numerous post-enrollment reminders regarding consumers' membership(s) and the ability to cancel during the free trial period, prior to incurring any charges.  Indeed, such issues were at the heart of the Defendants' summary judgment motions.  (*See* Defendants' Joinder).

For example, Webloyalty's Enrollment Page contains an "Offer and Billing Details" box within which are disclosures stating that membership is free for thirty (30) days and that consumers incur monthly charges thereafter.  The Enrollment Page contains a statement informing consumers that they consent to the transfer of their debit and credit card information by entering their email in two separate text windows.  Moreover, consumers must not only enter their e-mail address twice but they are required to click a colorized button marked "YES" to initiate their membership.  In addition, after consumers enroll as members in one of the Programs and prior to incurring any charges for membership, Webloyalty sends multiple e-mails reminding the member of their membership, of impending membership fees and providing information for canceling membership and avoiding any membership fees.

Defendants will argue that the location, colorization and positioning of these disclosures are of no moment and that Class Members had ample opportunity to consider and assent to the terms of membership that were clearly presented to them.  Defendants will also argue that even if Class Members did not perceive the membership terms upon their enrollment, they had numerous opportunities to reject these membership terms during the free trial period.

Plaintiffs have contended throughout the litigation that Defendants' disclosures are not conspicuous or presented in a manner that elicits meaningful consent.  This is why the Settlement directly confronts the enrollment presentation, vastly improving the substance and form of information provided to consumers.  The Settlement will avoid substantial risk to Class Members on liability.

      **iii.    This Settlement Represents an Excellent Recovery Given the Attendant Risks**

The proposed Settlement represents a significant achievement in light of the substantial risks, delays and expenses that would be required were this action to be fully litigated. In evaluating the relief available, the court may approve the settlement even where it is possible that additional relief could have been awarded at trial. *See, e.g., Duhaime v. John Hancock Mut. Life Ins. Co.*, 177 F.R.D. 54, 68 (D. Mass. 1997), *overruled in part on other grounds*, 370 F.3d 124 (1st Cir. 2004) (holding that the court "cannot, and should not, use as a benchmark the highest award that could be made to the plaintiff after full and successful litigation of the claim."); *see also Lenahan v. Sears, Roebuck Co.*, No. 02-0045, 2006 U.S. Dist. LEXIS 60307, at *48 (D.N.J. July 24, 2006) ("[T]here is no reason, at least in theory why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery."). Indeed, settlement is a product of compromise – "'each party surrendering something in order to prevent unprofitable litigation, and the risks and costs inherent in taking litigation to completion. A district court need not engage in a trial of the merits, for the purpose of settlement is precisely to avoid such a trial.'" *Id.* (quoting *Greenspun v. Bogan*, 492 F.2 375 (1st Cir. 1974)).

## <u>Remedial Relief</u>

The proposed Settlement provides extensive remedial relief in the form of improved visual and audio references to the Offer and Billing Details displayed on Webloyalty enrollment pages and additional electronic and mailed post-enrollment notifications regarding Program enrollment and membership fees. For instance, the Settlement improves disclosures relating to the terms and conditions of membership on Webloyalty's banner advertisements. The Settlement requires additional disclosures within the "enrollment button" that consumers must depress to enroll in one of Webloyalty's Programs. Furthermore, this Settlement requires consumers to more affirmatively consent to the transfer of their billing information.

The Settlement also requires Webloyalty to send post-enrollment emails during a member's free trial period to remind the member about impending charges to his or her debit and/or credit card account. Moreover, the terms of the Settlement require that Webloyalty mail Program members for whom Webloyalty does not have a valid e-mail address information

concerning their membership and on how to obtain his or her billing information.

The Chalmers Objectors argue that the remedial relief provided in the Settlement is inadequate. Chalmers Obj. at 7-8. Furthermore, the objection filed by Jeffrey Weinstein on behalf of Maw-Suen Ma ("Weinstein Objector") asserts that Class Members who are not entitled to monetary relief release their claims without consideration. Maw-Seun [*sic*] Ma's Objection to Proposed Settlement; Notice of Intention to Appear; and Request to Speak at the Hearing ("Weinstein Objection") at 3-4. In addition, the NYAG argues that the "minor changes required under the proposed settlement are entirely inadequate to address the misleading nature of the solicitations, advertisements and enrollment process." NYAG Obj. at 3. However, the extensive remedial relief described above demonstrates that these objections are without merit and have been addressed through many of the proposed amendments to the Settlement.

The Chalmers Objectors' criticism of the injunctive relief provided in this Settlement is particularly puzzling given that they find no fault with Webloyalty's business practices. At the same time the Chalmers Objectors question the duration of the remedial relief in the Settlement, whether the remedial relief provisions "really change anything" and suggest that the remedial relief is simply "window-dressing," (Chalmers Obj. at 7-8), the Chalmers Objectors indicate that Webloyalty's business practices "seem on their face to be *legitimate*." Chalmers Obj. at 10 (emphasis added). Indeed, it would be difficult to imagine what form of injunctive relief the Chalmers Objectors would deem necessary or effective given their satisfaction with Webloyalty's business practices. Moreover, that the Chalmers Objectors found Webloyalty's business practices to be legitimate on their face only emphasizes the significant risks and obstacles to liability that Plaintiffs could encounter and how extraordinary the monetary and remedial relief in the proposed Settlement is in light of such risks and obstacles.

The Chalmers Objectors overlook that, as part of the remedial relief in the proposed Settlement, Webloyalty is required to make substantial changes to its Enrollment Page, the enrollment process and to post-enrollment notifications. For example, although it was difficult for the Chalmers Objectors "to identify any difference between the [proposed remedial relief]

and the description in the Answer," (Chalmers Obj. at 8), the Defendants' Answer to Second

Consolidated Amended Complaint ("Answer") [Dkt. No. 85] and the exhibits thereto make no

mention of first class mailings that are sent to Program members for whom Webloyalty has

invalid email addresses containing additional enrollment, billing and customer service

information.  January 29 Settlement, § IV(3)(B).  In addition, Defendants' Answer provides

examples of enrollment pages where Program Offer and Billing Details are still contained in

separate boxes that require consumers to scroll through offer and billing provisions, (Answer,

Ex. 1), where coupon graphics do not contain reference to Offer and Billing Details, (Answer,

Exs. 1, 5, 8, 9, 12, 13, 16, and 17), and that do not present Program membership costs, billing

methods and cancellation options in bolded font on Webloyalty's enrollment pages.  (Answer,

Exs. 1, 8, 12 and 16).  However, these changes were required as part of parties' settlement

negotiations and the remedial relief terms included in the Settlement.  January 29 Settlement, §

IV(3)(B).  Furthermore, there is stark contrast between the enrollment pages, enrollment process

and post-enrollment notifications represented in the Defendants' Answer and exhibits compared

to the remedial relief terms contained in the Amendment.  Amendment, § IV(3)(B).

Also, at just two years, several courts have held that the duration of the injunctive relief

provisions in the proposed Settlement is reasonable.  *See*, *e.g.*, *Reyes v. Buddha-Bar NYC*, No. 08

Civ. 02494 (DF), 2009 U.S. Dist. LEXIS 45277, at *2-*3 (S.D.N.Y. May 28, 2009); *see also*

*Green v. Am. Express Co.*, 200 F.R.D. 211, 212 (S.D.N.Y. 2001); *Cf. Sullivan v. DB Invs., Inc.*,

No. 04-2819 (SRC), 2008 U.S. Dist. LEXIS 81146, at *70-*71 (D.N.J. May 22, 2008) ("[T]he

injunction is the result of a settlement, and therefore, by its nature, it is a negotiated compromise.

. . . Because of this, the injunctive relief being weaker or shorter in duration than absolutely

possible does not render the injunction 'inadequate.'").  Moreover, the duration of the remedial

relief under the Amendment has, in fact, doubled and now continues for at least four years.  The

Chalmers Objectors' objections to the injunctive relief terms of the Settlement are without merit.

The Chalmers Objectors and Weinstein Objectors, without citation, also argue that Class

Members who are not eligible for monetary relief are releasing their claims without

consideration. Chalmers Obj. at 8; Weinstein Obj. at 3. However, the substantial remedial relief from which the Settlement Class as a whole, including those not eligible for monetary relief, greatly benefit provides more than adequate consideration for the proposed release.

A release is supported by adequate consideration where something of value or benefit is conferred upon a party who is not otherwise entitled to receive it. *See*, *e.g.*, *Di Martino v. Hartford*, 636 F. Supp. 1241, 1249 (D. Conn. 1986); *see also Killian v. McCulloch*, 873 F. Supp. 938, 943 (E.D. Pa. 1995). Importantly, a settlement may be supported by "[c]ash as well as noncash consideration . . . as long as the total consideration is sufficient." 1 HERBERT B. NEWBERG & ALBA CONTE, NEWBERG ON CLASS ACTIONS § 11:46 at 134 (4th ed. 2002) ("NEWBERG"). The remedial relief terms of the proposed Settlement fundamentally and materially improve the manner in which consumers are informed of and enrolled in Program memberships. Moreover, as described above, these changes address the very membership authorization problems that gave rise to this consolidated action. *See*, *e.g.*, *Hills v. Equifax Consumer Servs.*, Nos. 1:04-CV-3400-TCB and 1:07-CV-314-TCB, 2007 U.S. Dist. LEXIS 48278, at *31-*32 (N.D. Ga. June 12, 2007) (injunctive relief that "directly address[es] the issues raised by the Plaintiffs in their Complaints . . . has significant value for the Settlement Class."); *In re Am. Family Enters.*, 256 B.R. 377 (D.N.J. 2000) (holding that the injunctive relief provisions were important aspects of the proposed Settlement Agreement).

Furthermore, it is proper that certain Class Members are not eligible for monetary relief because they suffered little or no monetary harm. Such Class Members include those who cancelled their membership during the free trial period, who plainly authorized membership by inputting their credit or debit card account number at the time of enrollment, or who have received a full refund. Moreover, particular remedial relief provisions are directed at those with little or no monetary damages, namely that all regularly scheduled e-mails sent to Program members thirty (30) or more days after enrollment must include (a) a toll-free number that may be used to cancel membership, and (b) a hyperlink with reference to billing details that allow a member to view the member's method of payment and fees charged for membership.

**Monetary Relief**

The Settlement originally provided that Class Members receive a cash refund of up to two months' payments, subject to a $10,000,000 cap, for all memberships.  It required no submission of documentation, and a claimant only needed to provide the minimum information needed to establish that a consumer did not authorize such payments.  It now allows claimants to potentially receive up to a full refund, with no cap. "Tier 1" and "Tier 2" relief allows Class Members to recover between one and two months' of membership fees, less any refunds.  Amendment at § IV(3)(C)(ii)(a)-(b).  "Tier 3" relief enables Class Members to receive 100% reimbursement for all membership fees and requires claimants, in part, to submit a simple attestation indicating they did not authorize the charges.  *Id.* at § IV(3)(C)(ii)(c).  Such a resolution is virtually unheard of in a consumer case that implicates issues surrounding a consumer's meaningful consent.  Indeed, this result appears unprecedented.

Among the few objections filed in response to the Settlement, those related to the amount of monetary relief provided in the Settlement are easily addressed by the supplemental terms included in the Amendment.  For instance, the NYAG argues that the refund amounts available to Class Members are insufficient.  NYAG Obj. at 4.  The Chalmers Objectors note that Settlement Class Members will have little incentive to submit a Claim Form for "between $7 and $20."  *Id*.  In addition, objectors Patricia Hogue and Michael Turro argued that the Settlement should not be approved because it only provided for two months' membership fees and failed to provide Class Members with full refunds.  Letter re:  Settlement from Patricia Hogue [Dkt. No. 127] and Letter re:  Settlement from Michael Turro.  [Dkt. No. 129].  The Amendment *more than* addresses Objectors' concerns regarding monetary relief in that eligible Settlement Class Members are now entitled to up to a *100%* cash recovery of economic damages related to Program membership fees.

**The Release**

The Settlement releases all "Released Claims, known or unknown, . . . which now exist, or heretofore have existed" and that "might have affected his or her decision not to object to this

settlement." January 29 Settlement, § (IV)(1)(X). Moreover, "Released Claims" are, in part, those claims "arising out of or related to the enrollment and/or membership in any of the Programs or any of the allegations set forth in the Complaint." *Id.* at § IV(1)(N). The release in this Settlement is intended to "prevent relitigation of settled questions at the core of a class action," *Grimes v. Vitalink Commc'ns Corp.*, 17 F.3d 1553, 1563 (3d Cir. 1994), and furthers the important policy interest of encouraging swift and efficient settlements. Indeed, were defendants in class actions unable to secure global peace through a broad release of claims, they would have little incentive to settle. *See id.*; *see also Williams v. GE Capital Auto Lease*, 159 F.3d 266, 274 (7th Cir. 1998) ("It is not at all uncommon for settlements to include a global release of all claims past, present, and future, that the parties might have brought against each other. . ."). Accordingly, the release in the proposed Settlement states that the waiver was "separately bargained for and a key element of the settlement of which this release is part." January 29 Settlement, § IV(1)(X).

The release contained in the proposed Settlement is appropriate and consistent with black letter law that class action settlement releases may include all claims, including unpleaded claims, known or unknown, that arise out of or are related to the allegations at issue in the litigation. *See*, *e.g.*, *In re Gen. Am. Life Ins. Co. Sales Practices Litig.*, 357 F.3d 800, 803 (8th Cir. 2004); *see also Joel A. v. Giuliani*, 218 F.3d 132, 141-42 (2d Cir. 2000).

The Chalmers Objectors contend that the release is without limitation and "is as all encompassing as can be imagined." Chalmers Obj. at 1. The Chalmers Objectors also argue that the scope of the release does not comply with the "identical factual predicate" doctrine. *Id.* at 1-2. Yet, by choosing to analyze the release provisions in piecemeal rather than in conjunction with one another, the Chalmers Objectors grossly mischaracterize the release and carelessly ignore the substantial limitations that Plaintiffs extensively negotiated. The release is explicitly limited to claims, demands, rights, liabilities, and causes of action arising out of or related to the underlying litigation.

While the release discharges "Unknown Claims," pursuant to section IV(1)(X) of the

January 29 Settlement, such claims are limited by the very terms of the Settlement.  For example, although the release contemplates the discovery or existence of additional or different facts "with respect to the subject-matter of the Released Claims," the release language is clear that the release is limited to "*Released Claims*" whether known or unknown, . . . ."  *Id.*.  "Released Claims," which include Unknown Claims, are defined as claims "*arising out of or related to the enrollment and/or membership in any of the Programs or any of the allegations set forth in the Complaint*."  *Id.* at § IV(1)(N) (emphasis added).  In addition, the Settlement includes a stand-alone provision, ignored by the Chalmers Objectors, entitled "Scope and Effect of Settlement," that explicitly limits the release.  The relevant provision of this section states that "[n]otwithstanding Paragraph IV(2)(B), above, 'Released Claims' shall not include any claim against any person or entity that is not a Released Party, . . . any claim between a Settlement Class Member and any Released Party that is *unrelated to the Released Claims*, . . . ."  *Id.* at § IV(2)(C) (emphasis added).  Even more, this provision is further limited by reciting the types of claims that are not released, which include "any product liability, personal physical injury or intellectual property claim."  *Id.*

Consequently, the release contained in the Settlement is plainly limited by the factual and legal parameters of this litigation.  Any released claim would necessarily entail Program enrollment and membership or any allegations set forth in the Complaint and, as a result, arise out of a common nucleus of facts.  Such a limitation comports with the requirements of the "identical factual predicate" doctrine.  *See*, *e.g.*, *Reppert v. Marvin Lumber & Cedar Co.*, 359 F.3d 53, 58-59 (1st Cir. 2004) (holding that the difference between the two cases was not meaningful where they were based on the same operative factual predicate to those released in the settled action); *see also Thomas v. Blue Cross & Blue Shield Ass'n*, No. 08-15395, 2009 U.S. App. LEXIS 11520, at *7-*8 (11th Cir. May 28, 2009) ("[A]n 'identical factual predicate' requires only a common nucleus of operative fact.").

The Chalmers Objectors also argue that the waiver of California Civil Code § 1542 and similar statutes is inappropriate.  Chalmers Obj. at 2.  However, this District is aligned with many

other courts in approving a nearly identical release containing such a waiver.  *In re Relafen Antitrust Litig.*, Master File No. 01-12239-WGY, 2004 U.S. Dist. LEXIS 28801, at *15-*17 (D. Mass. Apr. 9, 2004); *see also Marder v. Lopez*, 450 F.3d 445, 454-55 (9th Cir. 2006); *Aguayo v. Oldenkamp Trucking*, No. Civ F-04-6279 AWI LJO, 2006 U.S. Dist. LEXIS 79425, at *15-*18 (E.D. Cal. Oct. 17, 2006).

### b.   Reaction of the Class to the Settlement

The reaction of the class assists the Court in determining the fairness of the proposed settlement.  *See, e.g.*, *Bussie*, 50 F. Supp. 2d at 77.  "A favorable reception by the Class constitutes 'strong evidence' of the fairness of a proposed settlement and supports judicial approval."  *In re Painwebber P'ship Litig.*, 171 F.R.D. 104, 126 (S.D.N.Y. 1997).  Decisions in this district have recognized that low numbers of opt-outs and objections are compelling in deciding whether to approve a proposed Settlement.  *See, e.g.*, *Bussie*, 50 F. Supp. 2d at 77 (approving a settlement with 144 requests for exclusion and 13 objections); *Relafen*, 231 F.R.D. at 72-73 (holding that the "overall reaction to the settlement has been positive" where there were a total of 140 opt-outs and 10 objections).

Here, the response to the Settlement – in the form originally proposed – has been exceedingly positive.  In a Class of millions, only *five* objections have been received by the Court, on behalf of *five* Class Members.  Joint Decl., ¶ 30.  Significantly, of the five objections, two were filed by professional objectors, who frequently engage in opportunistic objection practice.  *Id.* at ¶¶ 30-31.  Another of the objections was filed by the one attorney general who responded to the CAFA notice with concerns.  *Id.* at ¶ 33.  To date 320,136 claim forms have been downloaded from the Settlement Website (65% of all those who visited the Settlement Website).  There have been only 145 requests for exclusion.  *See* Declaration of Jennifer M. Keough Regarding Notice and Claims Administration ("Keough Decl."), ¶¶ 15, 20, 22.

In addition, two Settlement Class Members submitted letters in support of the proposed Settlement.  Joint Decl., ¶ 32.  Refugio Carney wrote, "I am very pleased to see persons taking a stance against sneaky and unethical companies, such as this one . . . . Please allow this suit to

continue on so that it can serve as a lesson to other companies that operate in the same unethical manner as this." Letter re: Proposed Settlement from Refugio Carney. [Dkt. No. 128]. Also, Julie Patton stated, "**No objections** and <u>thank you</u> for considering a class action. I don't expect a refund even but just that you put an end to their questionable and possible illegal practices." Letter re: Settlement from Julie Patton (emphasis in the original). [Dkt. No. 125].[8] As for the Chalmers and Weinstein Objectors, federal courts are "increasingly weary of professional objectors." *Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 240-41 (D.N.J. 2005); *Barnes v. FleetBoston Fin. Corp.*, No. 01-10395-NG, 2006 U.S. Dist. LEXIS 71072, at *3-*4 (D. Mass. Aug. 22, 2006) (disapproving of repeat professional objectors).

The Chalmers Objection constitutes a smattering of unsubstantiated attacks with little attention to the actual provisions of the proposed Settlement Agreement or the extensive case law supporting settlements such as the one now before the Court. The Chalmers Objection challenges multiple aspects of the Settlement in relatively few pages and, despite admittedly knowing little about the proposed Settlement,[9] brashly insinuates that parties have acted collusively in reaching this Settlement Agreement.

Moreover, it is conspicuous that Mr. Chalmers' client, David Klausner, has appeared in multiple objections filed by Mr. Chalmers. For instance, David Klausner – along with a Kenneth Chalmers – was also represented by Mr. Chalmers in an objection to the proposed class action settlement in *Vroegh v. Eastman Kodak Co.*, Case No. A116242 (Cal. Ct. App. 2007), which

---

[8] Claude Reed also submitted a letter to the Court regarding the proposed Settlement. [Dkt. No. 130]. However, it does not appear that Mr. Reed is a Settlement Class Member in that the program for which he incurred charges, TLG Great Fun, is not a Webloyalty Program.

[9] The Chalmers Objectors repeatedly complain that they "lack information" about the proposed Settlement because "little information was presented to the court with the application for preliminary approval" and "[m]ost proceedings have been under seal." Chalmers Obj. at 10. However, Plaintiffs provided detailed support for the Motion for Preliminary Approval and attached all relevant documentation, including the Settlement Agreement, all forms of Notice and the Claim Form. Moreover, the close to 140 docket entries in this case, most of which reference motions, orders and proceedings that were *not* under seal were readily available to the Chalmers Objectors and provide significant background to this case and the Settlement of it. With respect to those relatively few proceedings that were ordered sealed by Special Master Mahony, it is not uncommon for a defendant company in complex class action litigation to prefer that settlement discussions not be made public due to its confidential terms. Such confidential settlement discussions do not give rise to collusion, as the Chalmers Objectors brazenly suggest. Chalmers Obj. at 11.

involved the marketing and sales of flash memory drives.  Joint Decl., ¶ 30; Ex. F.  The *Vroegh* Court upheld the district court's approval of the settlement and denied the objection, analyzing many of the arguments that have been replicated in this case.  As with this case, Mr. Chalmers argued in *Vroegh* that the refund remedy was of little value because few class members would be motivated to submit a claim form "to obtain such a small refund."  *Vroegh* Order Approving Class Action Settlement and Award of Attorneys' Fees and Costs, entered Nov. 30, 2007, at 9. Mr. Chalmers also accused the parties in *Vroegh* of negotiating a collusive class action settlement. *Id.* at 13.

For his part, Mr. Weinstein has lodged objections in at least seventeen (17) class actions. Joint Decl., ¶ 31.

The few exclusions and objections in light of the significant number of claims submitted strongly favors approval of the Settlement.  Joint Decl., ¶ 34.

### c.  Stage of the Litigation and the Amount of Discovery Completed

The third factor "captures the degree of case development that class counsel [had] accomplished prior to settlement.  Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating."  *Warfarin*, 391 F.3d at 537. In addition, courts often look to what informal and formal discovery was taken before counsel decided that they could "fairly, safely and appropriately decide to settle the action with [defendants]."  *Cendant*, 264 F.3d at 235.

Counsel's aggressive approach to this litigation has enabled them to acquire a deep appreciation of the merits of this case in the over two years since this litigation commenced. Since the initial Complaints were filed, counsel have filed and opposed a Consolidated Class Action Complaint and Consolidated Amended Class Action Complaint, two motions for summary judgment, motions to transfer and coordinate or consolidate under 28 U.S.C. § 1407, and a motion for discovery under Rule 56(f).  Moreover, parties filed a Joint Rule 16 and 26(f) Statement and presented arguments before Special Master Gael Mahony regarding the

scheduling and parameters of discovery.  Class Counsel also submitted initial disclosures, requests for production of documents, first sets of interrogatories and conducted confirmatory discovery on the proposed Settlement.  Each of the extensive and contentious proceedings in this litigation refined counsel's understanding of the strengths, weaknesses and risks associated with the underlying claims prior to entering into settlement discussions.  Joint Decl., ¶¶ 10, 14, 16, 20.

Class Counsel also developed a keen appreciation of the merits of the Settlement by taking substantial informal discovery.  Class Counsel conducted a thorough, independent investigation of Webloyalty's practices and retained and consulted with two well-respected experts in the fields of consumer behavior and electronic marketing.  Joint Decl., ¶¶ 9, 19-20; *See*, *e.g.*, *Rolland*, 191 F.R.D. at 10 (holding that where parties, in part, "had the advice and reports of their experts . . . parties' agreement was achieved precisely at the moment when they were most informed . . . .").  Both experts were extremely helpful for understanding what amount of diligence consumers exercise while conducting online transactions and consumers' reactions to various internet-based marketing presentations, including the effects of:  on-screen prompts, screen flows, fonts and text sizes, imaging, coloring, scroll bars and where on-screen information is positioned.  These discussions were crucial for determining where consumers' focus and attention was directed throughout various stages of the Program enrollment process.  Joint Decl., ¶ 9, 19-20.

As a result, Plaintiffs possessed a well-developed and extensive understanding of the merits of this case prior to and throughout settlement negotiations.

### d.  Quality of Counsel

Courts analyze the skill, experience and diligence of counsel in determining whether the proposed settlement should be approved.  *See*, *e.g.*, *Compact Disc*, 216 F.R.D. at 211-12; *In re Tyco*, 535 F. Supp. 2d at 261-62.  "When the parties' attorneys are experienced and knowledgeable about the facts and claims, their representations to the court that the settlement provides class relief which is fair, reasonable and adequate should be given significant weight." *Rolland*, 191 F.R.D. at 10 (citing *Bussie*, 50 F. Supp. 2d at 77).

Class Counsel and their firms are highly experienced class action practitioners with national reputations. Joint Decl., ¶¶ 28-29. They are acutely aware of the strengths, weaknesses and risks involved in this litigation and firmly believe that relief provided in this Settlement, in its original form and as amended, represent a remarkable achievement on behalf of the Class. *Id.* at ¶¶ 29, 35-39; *see*, *e.g.*, *Bussie*, 50 F. Supp. 2d at 77 (attributing weight to whether experienced counsel believe the settlement is fair, reasonable and adequate).

### e. The Settlement Is the Product of Serious, Informed and Non-Collusive Negotiations

As mentioned above, there is a presumption of fairness attached to a class settlement reached in arm's-length negotiations between experienced, capable counsel. *See*, *e.g.*, *City P'ship Co.*, 100 F.3d at 1043; *see also* NEWBERG § 11.41, at 90.

In this matter, the parties actively engaged in numerous rounds of hard-fought negotiations over several months. The negotiations involved several exchanges of potential settlement terms and proposals and many contentious telephonic conferences and in-person meetings, including in Chicago, New York and Boston. There were numerous occasions on which discussions broke down, and it appeared that resolution could not be obtained. Joint Decl., ¶¶ 22-24. Furthermore, negotiation of attorneys' fees were conducted separate from and only after parties agreed upon the substantive terms of the Settlement. *Id.* at ¶ 40.

As discussed above, Class Counsel were at all times well-informed of the factual and legal nuances of this litigation prior to and during these settlement discussions. This Settlement is a product of well-informed and non-collusive negotiations.

### f. Prospects of the Case, Including Risk, Complexity, Expense and Duration

In evaluating the sixth factor, the Court in *Compact Disc* held that the reasonableness, fairness and adequacy of a class action settlement depend on the "strength of the plaintiffs' case and the opposing defenses." *Compact Disc*, 216 F.R.D. at 212. This factor captures the "prudential policy favoring settlement as a preferred alternative to costly, time-consuming

litigation." *Mathewson Corp. v. Allied Marine Indus., Inc.*, 827 F.2d 850, 852 (1st Cir. 1987); *see also United States v. DiBiase*, 45 F.3d 541, 546 (1st Cir. 1995) ("[S]ettlements reduce excessive litigation expenses and transaction costs.").

As described above, the risks attendant to this litigation are substantial. Indeed, no other member of the plaintiffs' bar attempted litigation against Webloyalty despite numerous and vociferous complaints by consumers, including one particular weblog[10] that contained several thousand postings against the company for at least several months before this action was initiated. Joint Decl., ¶ 4. Class Counsel proceeded with litigation, recognizing that it would entail significant costs, could proceed for several years and presented difficult questions of fact and law. *Id.* at ¶¶ 36-38.

Furthermore, as demonstrated from the extensive proceedings that occurred within the first few months of this case, motion practice and discovery would be highly adversarial and prolong this action for several additional months, if not years, were this case to proceed. Were Plaintiffs claims to survive, significant additional resources would have to be expended by counsel and this Court to prepare for and conduct a trial, including the preparation of fact witnesses and mock trial and/or jury consultation. *Id.* at ¶¶ 35-38. The issues underlying these claims are complex and would necessarily involve a costly and time-consuming "battle of the experts." *Id.* at ¶ 36; *In re Broadwing, Inc. ERISA Litig.*, 252 F.R.D. 369, 373 (S.D. Ohio 2006) (approving the proposed settlement and holding that "[a]cceptance of expert testimony is always far from certain" and that the settlement "reached by the parties avoids the risks attendant to this 'battle of the experts,' which could result in a ruling against Plaintiffs."); *see also* In *re Metro. Life Ins. Co. Sales Practices Litig.*, No. 96-179, 1999 U.S. Dist. LEXIS 22688, at *87 (W.D. Pa. Dec. 28, 1999) (same). In addition, this case would be subject to post-trial appeals, consuming even more time and resources and further jeopardizing recovery to the Class.

---

[10] *See* http://adam.rosi-kessel.org, The Substantially Similar Weblog, WebLoyalty.com aka WLI*ReservationRewards Is A Scam, at http://adam.rosi-kessel.org/weblog/2004/12/24/webloyalty_aka_wli_reservations_is_a_scam (last viewed June 19, 2009).

In light of the significant risks, complexities, costs and delays of continuing this litigation, this Settlement is remarkable in that it provides certain and substantial relief to the Class in the form of sweeping therapeutic relief and up to 100% cash recovery. As a result, this factor favors approval of the proposed Settlement.

### C. The Notice of Settlement and the Claims-Made Settlement Structure Are Appropriate

As a general matter, notice of a class action settlement need not recite every fact but must merely "provide class members the information necessary to make an informed and intelligent decision about whether to participate in the class or whether to object to the proposed settlement." *Duhaime*, 177 F.R.D. at 61 (setting forth standard for reasonable notice). "[T]he essential purpose of the [class] notice, . . . [is] to fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them." *Greenspun*, 492 F.2d at 382. Here, the full long form notice provided a detailed description of the available relief and the criteria for making monetary claims, explained why the reader may be a member of the class[11] and what the Plaintiffs alleged[12] ("that the Defendants enrolled consumers in the Programs . . . in the course of online retail transactions without obtaining sufficient authorization or consent, and thereafter wrongly charged fees for membership

---

[11] All members of the Class were directed to the full long form notice on the Settlement Website. In addition, anyone reading the publication notice in a national newspaper could go to the Settlement Website and view the notice. Therefore, the notice logically stated that the reader "may" be entitled to the relief described if various criteria were met. Clearly elevating form over substance or the practicalities of this enormous notice program, the NYAG objected to the use of the term "may" asserting that because the notice was sent to an individual in Webloyalty's records, they must already have been a Class Member. NYAG Obj. at 5-6. However, the notice also states: "[Webloyalty's] records show that you were enrolled in one or more of the membership Programs that this lawsuit concerns . . . ." (Keough Decl., Ex. E), and the full Stipulation of Settlement, which clearly spells out the definition of the Class, was also available to Class Members on the Settlement Website. In any event, to address this objection, the notices describing additional benefits under the Amendment will each state in substantially similar terms: "You are receiving this notice because Webloyalty's records indicate that you became enrolled as member of Webloyalty's [Programs]."

[12] Contrary to one of the objections of the NYAG (*see* NYAG Obj. at 6), the notice also provided the names of the on-line retailer defendants on whose websites the Webloyalty offers appeared: "Fandango, Inc. d/b/a Fandango.com, Priceline.com, Inc. d/b/a Priceline.com, Nelson Shane Garrett, individually and d/b/a Justflowers.com and Giftbasketsasap.com, Maxim O. Khokhlov, individually and d/b/a Justflowers.com and Giftbasketsasap.com, ValueClick, Inc., E-Babylon, Inc., Kraft Foods Global, Inc. and Vict. Th. Engwall & Co., Inc. d/b/a Gevalia.com." Keough Decl., Ex. E.

benefits").[13]  The e-mail notice (which runs two full pages) described the general substance of the litigation; set forth the terms of the settlement and the date of the fairness hearing; described the potential aggregate payout to the class; and explained the process by which Class Members could submit claims, exclude themselves, or object to the Settlement.  The e-mail notice also directed Class Members to the Settlement Website for the full long form notice, for answers to frequently asked questions about the Settlement and provided a toll-free telephone number and an email contact should Class Members want or need more information.  Keough Decl., ¶ 13, Ex. C.

At the commencement of the notice program, the Settlement Administrator sent e-mail notices to millions of Class Members.  *Id.* at ¶ 8.  Then, for those e-mail notices that "bounced back" because of invalid or inactive email addresses, the Settlement Administrator sent more than four million notices by postal mail.  *Id.* at ¶ 10, Ex. D.  The parties also twice published notice in *USA Today*.  *Id.* at ¶ 12, Ex. F.  Given these efforts, it is not surprising that there have been nearly half a million visits to, and more than 320,000 claim forms downloaded to date from, the Settlement Website, and over 50,000 calls received by the call center – all with more than two months still remaining in which to make claims under the Settlement as originally proposed.  *Id.* at ¶¶ 15, 17, 22.[14]  Likewise, of a Class of several million individuals, the Settlement Administrator has received only 145 requests for exclusion, and the Court has received only five objections.  *Id.* at ¶¶ 20-21.  Finally, in distributing the supplemental notice of additional benefits contemplated by the Amendment, the parties have committed to using the same extensive notice program just described.  Taken in its entirety, the full notice program in this litigation is more than sufficient as a matter of law.

---

[13] The e-mail notice received by the Class also indicated that "the Settlement will resolve a lawsuit in which claims are made that . . . the Defendants . . . failed to disclose program enrollment details regarding monthly billing and transfer of billing information causing consumers to enroll in Programs with full consent in violation of state and federal law," and indicated that Defendants disputed the claims.  Keough Decl., Ex. C.  Although the NYAG objects to this description as using only "vague terms" (*see* NYAG Obj. at 6; *see also* Chalmers Obj. at 9-11), the description clearly provides sufficient "detail to alert those with adverse viewpoints to investigate and to come forward and be heard."  *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1374 (9th Cir. 1993).  No more is required.

[14] As mentioned above, under the Amendment, Class Members will, in fact, have an extended period of up to 150 days after the Effective Date in which to review information about the Settlement and submit a claim for monetary relief.

### 1. The Manner of Distribution of Notice Was Appropriate, Particularly Given the Nature of the Class

Where, as here, the Class is made up of individuals who made an online transaction, entered their e-mail addresses and purportedly consented to receive further communications by e-mail, notice via e-mail is particularly appropriate and more than reasonably calculated to reach potential members, notwithstanding the unsupported objection of the NYAG otherwise. *See Chavez v. Netflix, Inc*., 162 Cal. App. 4th 43, 58 (2008) (noting that the class members "conducted business with [Netflix] over the Internet, and can be assumed to know how to navigate between the summary notice and the Web site. Using the capability of the Internet in that fashion was a sensible and efficient way of providing notice . . . ."); *see also Fine v. Am. Online, Inc*., 743 N.E. 2d 416 (Ohio Ct. App. 2000) (recognizing propriety of emailed notice to customers of Internet service provider AOL); *In re Airline Ticket Comm'n Antitrust Litig*., 953 F. Supp. 280, 281-82 (D. Minn. 1997) ("The Court notes that notice was provided electronically to the class. Such notice was unusually effective with this industry, which conducts much of its business by electronic network."); *Browning v. Yahoo! Inc.*, No. C04-01463 HRL, 2006 WL 3826714 at *8-*9 (N.D. Cal. Dec. 27, 2006) (in class settlement involving internet service provider, approving two-tiered notice system using summary e-mail and long-form notice posted on Web site).

The results of the notice speak for themselves – of the e-mails sent, only 23% "bounced back" or were otherwise undeliverable. Keough Decl., ¶ 9. In those instances, direct mail followed the email notice, so that more than 96% of the class received direct notice.

Accordingly, any examination of notice must be viewed in light of the *complete notice program*.[15] In this case, the program involved reaching out to the class by e-mail, direct mail,

---

[15] Without considering all of the information available to Class Members in the notice program as a whole, the Weinstein and Chalmers Objections complain narrowly that the notice confuses who is in the class, who is an "Authorized Claimant," and who may be entitled to cancel their membership. *See* Weinstein Obj. at 1-2; Chalmers Obj. at 8. However, Sections IV(1)(D), (Q), (R) and IV(3)(C)(i) of the January 29 Settlement clearly and deliberately set forth who is a Class Member and which Class Members are "Authorized Claimants" entitled to claim monetary relief, and Section IV(3)(D) plainly states that all Settlement Class Members may exercise the cancellation option "whether or not such Settlement Class Member meets the Settlement Payment Eligibility Requirements." In any event, under the proposed Amendment, "Authorized Claimants" will no longer exclude

publication, an automated information telephone system, and live telephone operators, together with an extensive website containing the full Stipulation of Settlement and other pertinent settlement documents – all facilitated and supervised by a recognized leader in legal administration services for class action settlements, The Garden City Group, Inc. *See*, *e.g.*, *Dehoyos v. Allstate Corp.*, 240 F.R.D. 269, 297 (W.D. Tex. 2007) (the thoroughness and efficiency gains that come from using a "nationally recognized expert in class action notice programs" argue in favor of recognizing the notice as sufficient).

## 2. The Claims-Made Settlement Structure Is Permissible and Routine

The Chalmers Objectors oppose the Settlement on the grounds that it is a so-called "reversionary claims made" settlement, in which unclaimed funds below the monetary cap will revert to Webloyalty. Chalmers Obj. at 3. However, as now structured under the proposed Settlement, this is not a reversionary claims-made settlement at all. There is no monetary cap on the Settlement, and thus, by definition, there will be no reversion.

However, even if the Settlement did involve a reversionary claims-made structure, courts routinely approve such structures, because the parties to a class action have "broad flexibility to determine the final distribution of any part of a settlement fund remaining after all claims and reimbursable costs, fees, and expenses have been paid." NEWBERG, § 10:15; *Kronfield v. Transworld Airlines, Inc.*, No. 83 CIV. 8641 (KMV), 1989 WL 140341, at *1 (S.D.N.Y. Nov. 13, 1989) (approving reversionary claims structure over objection and holding "recapture clauses are common in class action settlements").

## V.   <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court grant final approval of the Settlement.

---

Class Members who previously only received partial refunds. *See* Weinstein Obj. at 3 (objecting that Class Members who received partial refunds "would lose their rights and receive no payment"). The only Class Members excluded from the definition of Authorized Claimants will be those with no cognizable monetary damage claim, *i.e.,* Class Members who have already received a full refund or cancelled their memberships during a free trial period or who knowingly became paying members of a Program as demonstrated by the affirmative physical entry of their credit card information.

DATED:  June 23, 2009                    Respectfully submitted,

                                      **COUGHLIN STOIA GELLER**
                                         **RUDMAN & ROBBINS LLP**
                                     DAVID J. GEORGE
                                     STUART A. DAVIDSON

By:   *s/David J. George*
                             David J. George

120 E. Palmetto Park Road, Suite 500
Boca Raton, Florida 33432
Telephone:  (561) 750-3000
Facsimile:  (561) 750-3364

**WEXLER WALLACE LLP**
Mark J. Tamblyn
455 Capitol Mall Suite 231
Sacramento, California 95814
Telephone: (916) 492-1100
Facsimile: (916) 492-1124

*Co-Lead Counsel for Plaintiffs*

Eric Lee
**LEE & AMTZIS, P.L.**
550 Glades Road, Suite 401
Boca Raton, Florida 33431
Telephone:  (561) 981-9988
Facsimile:  (561) 981-9980

Carlin J. Phillips
Andrew J. Garcia
**PHILLIPS & GARCIA, LLP**
13 Ventura Drive
North Dartmouth, Massachusetts 02747
Telephone:  (508) 998-0800
Facsimile:  (508) 998-0919

Charles M. McCallum
R. Brent Irby
**McCALLUM HOAGLUND COOK**
  **& IRBY LLP**
905 Montgomery Highway, Suite 201
Vestavia Hills, Alabama 35216
Telephone:  (205) 824-7768
Facsimile:  (205) 824-7767

41

Robert S. Green
Charles D. Marshall
**GREEN WELLING LLP**
595 Market Street, Suite 2750
San Francisco, California 94105
Telephone:  (415) 477-6700
Facsimile:  (415) 477-6710

*Co-Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of

record for each other party through the Court's electronic filing service on June 23, 2009.

*s/David J. George*
David J. George